NOTICE: This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.

**HealthBridge Management, LLC; 107 Osborne Street Operating Company II, LLC d/b/a Danbury HCC; 710 Long Ridge Road Operating Company II, LLC d/b/a Long Ridge of Stamford; 240 Church Street Operating Company II, LLC d/b/a Newington Health Care Center; 1 Burr Road Operating Company II, LLC d/b/a Westport Health Care Center; 245 Orange Avenue Operating Company II, LLC d/b/a West River Health Care Center; 341 Jordan Lane Operating Company II, LLC d/b/a Wethersfield Health Care Center[1] *and* New England Health Care Employees Union, District 1199, SEIU, AFL–CIO.** Cases 34–CA–012715, 34–CA–012732, 34–CA–012765, 34–CA–012766, 34–CA–012767, 34–CA–012768, 34–CA–012769, 34–CA–012770, and 34–CA–012771

February 22, 2017

DECISION AND ORDER

By Acting Chairman Miscimarra and Members Pearce and McFerran

On August 1, 2012, Administrative Law Judge Steven Fish issued the attached decision. The Respondents filed exceptions and a supporting brief, the General Counsel filed an answering brief, and the Respondents filed a reply brief. In addition, the General Counsel filed a limited cross-exception and a supporting brief, and the Respondents filed an answering brief.

The National Labor Relations Board has considered the decision and the record in light of the exceptions and briefs and has decided to affirm the judge's rulings, findings,[2] and conclusions as modified below, to amend the judge's remedy,[3] and to adopt the recommended Order as modified and set forth in full below.[4]

This case involves six Connecticut skilled-nursing centers—Danbury Health Care Center (Danbury), Newington Health Care Center (Newington), Long Ridge of Stamford (Long Ridge), West River Health Care Center (West River), Westport Health Care Center (Westport), and Wethersfield Health Care Center (Wethersfield)—and their management company, HealthBridge Management, LLC (HealthBridge), which jointly employs the centers' employees. The judge found that the Respondents violated Section 8(a)(1) and (5) of the Act on a number of occasions during 2010.

As explained further below, we affirm the judge's findings that HealthBridge and Westport violated Section 8(a)(1) by threatening to call the police at a May 17, 2010 meeting when employees protested against the Respondents' announcement that they would have to reapply for employment in order to retain their positions and that they would lose all their preexisting seniority. We also affirm the judge's finding that HealthBridge, Newington, Long Ridge, and Westport modified their collective-bargaining agreements in violation of Section

---

[1] We grant the Respondents' unopposed motion to remove "Care Realty, LLC a/k/a Care One" from the caption. The parties stipulated to the withdrawal of Care Realty as a respondent in this case, and the judge orally granted the withdrawal during the hearing.

[2] The Respondents have excepted to some of the judge's credibility findings. The Board's established policy is not to overrule an administrative law judge's credibility resolutions unless the clear preponderance of all the relevant evidence convinces us that they are incorrect. *Standard Dry Wall Products*, 91 NLRB 544 (1950), enfd. 188 F.2d 362 (3d Cir. 1951). We have carefully examined the record and find no basis for reversing the findings.

[3] In the remedy section of his decision, the judge stated that backpay for employees affected by the Respondents' unfair labor practices shall be computed in accordance with *F.W. Woolworth Co.*, 90 NLRB 289 (1950). *F.W. Woolworth* provides the correct method for computing

backpay for employees Myrna Harrison and Newton Daye, whom Respondents HealthBridge Management, LLC and Westport Health Care Center unlawfully refused to reemploy, and for the employees whom the Respondents laid off at Long Ridge without complying with the contractually required 45-day notice period. (For the Long Ridge employees laid off with insufficient notice, we will include a backpay requirement of 45 days minus the number of days' notice the employees were given of their layoff, plus reimbursement for any expenses ensuing from the unlawful layoff, as set forth in *Kraft Plumbing & Heating, Inc.*, 252 NLRB 891 fn. 2 (1980), enfd. mem. 661 F.2d 940 (9th Cir. 1981).) However, the rest of the Respondents' unfair labor practices that resulted in loss of pay did not involve cessation of employment. For example, Respondents HealthBridge and Long Ridge of Stamford unlawfully removed some employees from the work schedule for up to 3 days a week, and all of the Respondents unlawfully reduced employees' wages and benefits. In making employees whole for violations that did not involve cessation of employment or interim earnings that would, in the course of time, reduce backpay, the correct backpay-computation method is that set forth in *Ogle Protection Service, Inc.*, 183 NLRB 682 (1970), enfd. 444 F.2d 502 (6th Cir. 1971). See, e.g., *Raven Government Services, Inc.*, 336 NLRB 991, 992 (2001), enfd. 315 F.3d 499 (5th Cir. 2002). Under both backpay-computation methods, interest shall be computed at the rate prescribed in *New Horizons*, 283 NLRB 1173 (1987), compounded daily as prescribed in *Kentucky River Medical Center*, 356 NLRB 6 (2010).

[4] We shall amend the judge's conclusions of law in accordance with our findings herein. We shall modify the judge's recommended Order to conform to our findings and the Board's standard remedial language, to correct certain inadvertent omissions, and in accordance with our decisions in *Don Chavas, LLC d/b/a Tortillas Don Chavas*, 361 NLRB No. 10 (2014), *AdvoServ of New Jersey*, 363 NLRB No. 143 (2016), and *Excel Container, Inc.*, 325 NLRB 17 (1997). We shall substitute new notices to conform to the Order as modified and in accordance with our decision in *Durham School Services*, 360 NLRB 694 (2014).

For the reasons explained below, we grant the General Counsel's request to require the Respondents to read the remedial notices aloud to their employees.

8(a)(5) and (1) when, after temporarily requiring the housekeeping and laundry employees at those three centers to work under a subcontractor, they "rehired" those employees as new or probationary employees, thereby divesting them of their seniority and related benefits.[5] Finally, we adopt the judge's findings that the Respondents violated Section 8(a)(5) and (1) by unilaterally changing their practice of paying all employees time and a half for hours worked on certain holidays; and by unilaterally changing their practice of counting paid half-hour lunch periods toward hours worked in a given day when calculating daily overtime.[6]

### A. Facts

*Background.* At each of the skilled-nursing centers, the Union has represented a bargaining unit of service and maintenance employees since the early 1990s. These units include certified nursing assistants, cooks, central supply clerks, and housekeeping and laundry employees. The Union entered into separate collective-bargaining agreements with each center that were effective from December 31, 2004, to March 16, 2011 (the "2004–2011 CBAs" or "CBAs"). For purposes of this case, the CBAs were virtually identical. Each CBA barred the subcontracting of unit work or the sale of the center's operations unless the subcontractor or successor agreed to retain the unit employees and assume all the terms of the CBA.[7] In the event of layoff, each CBA required the Respondents to give 45 days' notice to the Union, established recall

rights by seniority, and protected all accrued seniority rights of employees who were laid off for 2 years (or for the length of seniority if less than 2 years).[8]

*The 2006–2009 "Supervisor-Only" Contracts.* In 2006, HealthBridge, on behalf of all six centers, contracted with Healthcare Services Group (HSG)[9] to supervise their respective housekeeping and laundry departments. Under these "supervisor-only" arrangements, the housekeeping and laundry employees remained on the Respondents' payroll and continued to perform their work at the centers. HSG supplied on-site account managers to supervise these employees and furnished certain materials and supplies.

*The 2009 "Full-Service" Contracts.* On February 15, 2009, HealthBridge, Long Ridge, Newington, and Westport subcontracted to HSG all managerial and payroll responsibility for housekeeping and laundry employees at those three centers.[10] As required by the 2004–2011 CBAs, however, the Respondents required that HSG retain the Respondents' housekeeping and laundry employees and maintain all of the terms and conditions of employment the CBAs had established.

The Respondents also advised the Union that HSG had agreed "to retain the employees and recognize all their rights, including seniority, under the [2004–2011] Collective Bargaining Agreement," and HSG similarly advised the Union that "all accrued benefits, seniority and job status will be intact and . . . HSG will agree to all terms and conditions of the contract between the Union and the facilities." The 48 affected housekeeping employees were told they were being "transferred to HSG's payroll"; none was told she was being terminated or laid off by HealthBridge or her Respondent center. The affected housekeepers were not interviewed for employment by HSG, did not fill out HSG job applications, and underwent no HSG reference checks. In conversations with the employees and on other occasions, both the Respondents' and HSG's managers repeatedly referred to the subcontracting transaction as a "payroll transfer." All the housekeeping employees continued to perform the same work at the same Respondent facilities in the same manner as before. Also, as during the "supervisor-only"

---

[5] For this finding, we rely only in part on the judge's analysis (see Part B.4).

[6] We also agree with the judge, for the reasons stated in his decision, that Respondents HealthBridge and Long Ridge violated Sec. 8(a)(5) and (1) by modifying the collective-bargaining agreement without the Union's consent when they failed to give 45 days' notice of the February-March 2010 layoff of certified nursing assistants, and by unreasonably delaying their response to the Union's information requests related to the layoff. In addition, we adopt the judge's finding that Respondents HealthBridge, Danbury, and Wethersfield violated Sec. 8(a)(5) and (1) by modifying the collective-bargaining agreements without the Union's consent by calculating benefit eligibility for part-time employees based on hours these employees were guaranteed to be scheduled each week instead of the hours that employees worked. Because we agree that this was an unlawful contract modification, we find it unnecessary to pass on the judge's additional finding that the changes to benefit eligibility also constituted unlawful unilateral changes of a past practice.

[7] Article 9(F) dealt specifically with "[s]ubcontracting," stating that "[n]o bargaining unit work shall be subcontracted unless the subcontractor agrees in advance to retain the Employees and recognize all their rights, *including seniority*, under this agreement" (emphasis added). Article 38 (or 39, depending on the particular CBA) bound "all sublessees, assignees, purchasers or other successors . . . to such terms and provisions, to which the Employees are and shall be entitled under this Agreement," and obligated the employer to require "any purchaser, transferee, lessee [or] assigns . . . of the operation covered by this Agreement to accept the terms of this Agreement by written notice."

[8] The same section covering seniority, Article 9, also defined five events that would cause an employee to lose seniority: voluntary resignation or retirement; discharge for cause; failure to return from a leave of absence; failure to return upon recall from layoff; and layoff for a period exceeding recall rights. It is undisputed that none of these events occurred here.

[9] HSG provides housekeeping and laundry services to skilled-nursing facilities. It is not a party to this proceeding.

[10] For brevity, this decision and order will henceforth refer to these employees as the "housekeeping employees," and to the three housekeeping and laundry units as the "housekeeping units."

phase, HSG's managers continued to supervise the housekeeping units.

*The Subcontract Period.* It is uncontroverted that, throughout the period of "full-service" subcontracting, the Respondents continued their nursing home operations at Long Ridge, Newington, and Westport, and the CBAs continued to be applied to all unit employees, including the housekeeping employees. As the judge found, HSG made good on its commitment to apply the terms of the Respondents' CBAs to the housekeeping employees with "virtually no changes" other than payroll (which was paid by HSG) and punching in (on separate time clocks installed by HSG).

On February 25, 2009, Franz Petion, a housekeeping employee at Westport, filed a grievance in support of his bid for an open position in the center's dietary department. He was ultimately granted the position on the basis of his unitwide seniority. However, before completing his transfer in May, Petion was told by the Respondents' Westport Administrator, Kimberly Coleman, that his pay in his new position would be reduced from $15.65 to $12.80/hour, the contractual starting rate for new employees. Petion was allowed to retain his current pay rate only after he protested to the Respondents' regional human resources manager.

In a similar instance, Claudette Parks-Hill, a per diem housekeeping employee at Long Ridge, filed and won a grievance for her bid for a position in the nursing department. On another occasion, Michael Cockburn, a housekeeping employee at Newington, pursued a grievance for a position in the maintenance department. His grievance was denied, but only on the ground that the employee who got the position, who was already in the maintenance department, had slightly more seniority. All of the foregoing grievances were filed with the Respondents.

The three Respondent centers operated under their "full-service" agreements until May 2010, when those agreements were all terminated. The record does not clearly establish whether it was the Respondents or HSG that decided on the termination. However, as early as the spring or summer of 2009, the HSG account manager at the Newington home told a laundry employee/union delegate on several occasions that the housekeeping employees would "eventually be going back to Respondent Newington's payroll." Similarly, in early 2010, the HSG district manager for the Long Ridge home told a housekeeping employee, who was also a union delegate, that the employees might return to being employees at Long Ridge. In April 2010, the HSG district manager for the Westport home told the Union's organizer assigned to

the homes that the housekeeping employees would be transferred back to the Westport payroll.[11]

*The Respondents' Resumption of Housekeeping Operations and the "Rehiring."* On May 17, 2010, the housekeeping employees at all three "full service" centers were given individual letters by HSG stating that "employees will no longer be employed by [HSG]. Payroll services will not be provided for [the respective home]." The employees were told that they needed to attend a meeting to be held that day by the Respondents at each center in order to reapply for their jobs. The 2004–2011 CBAs, by their terms, undisputedly remained in force at this time. At those meetings with employees, however, the Respondents confirmed that the employees would have to apply for "rehire" at their respective centers, and also told them they would be treated as probationary "new hires" with no seniority at a starting rate of $12.80 per hour (the starting wage for new hires under the CBAs). This would result in major reductions of pay and benefits, particularly for highly senior employees.[12]

At the meeting at the Westport center, this information was conveyed to housekeeping employees by Respondent administrator Coleman. As the judge found, the Westport employees reacted to this announcement by voicing "considerable complaints that this was unfair," and said they wanted to contact the Union before they filled out any applications.[13] Coleman responded by telling them that if they were not going to fill out job applications they should leave the premises and that she would "call the cops" or "call the police" if they did not leave. The employees then left the premises, went outside, and contacted the Union.

Forty-seven of the 48 affected housekeeping employees at the three centers applied for rehire. All but two—Myrna Harrison and Newton Daye, who both had high seniority—were reemployed on May 17 or 18, 2010.[14] As the judge found, the Respondents' "rehiring" interviews were "non-existent, perfunctory or cursory." Most employees returned to work the same day they were reemployed, continuing to do the same work they had performed before and during the full-service HSG subcontracts.

---

[11] A few days later, the Westport district manager called the organizer back and said the transfer back to the Westport payroll was not a set plan and only a possibility, adding that "I shouldn't have said that."

[12] Under Articles 9(C) and 11 of the CBAs, employees' wages and benefits correlated to bargaining-unit seniority.

[13] One of the two employees who testified about the incident said without contradiction that "some people been there for a long time so they was kind of arguing. . . . They was just saying that starting in the, from 12 dollar it would be unfair."

[14] The Respondents gave no explanation, at the time or at the Board hearing, for not rehiring Daye and Harrison.

Neither the Respondent centers' administrators nor the HSG managers who first informed the housekeeping employees of the May 17 change in employment were told the reason for it. The judge found that HSG managers "were simply informed by higher ranking HSG officials that HSG was no longer going to employ the employees." One was told by the Respondent district manager that HealthBridge was taking the "payroll back" and "they're going to be their employees." Another was similarly informed that the employees would no longer be on HSG's payroll and would be going back to the "payroll of the home." When an employee asked Coleman, the Respondent Westport's administrator, the reason for the change, she said "It's not me, it's corporate." The Respondents called no management or supervisory witnesses of their own (as opposed to from HSG) to testify at the hearing, so there is no other evidence of the Respondents' intention in requiring the housekeeping employees to work under the HSG subcontracts and then "rehiring" them. From the failure of any Respondent management to testify, the judge drew an adverse inference that the Respondents intended the "full service" subcontracts to be temporary arrangements that the housekeeping employees work under HSG's supervision, not permanent terminations of their employment by the Respondents.

*The Holiday Premium Pay and Overtime Changes.* The Respondents had an undisputed practice of paying all employees time and a half for hours worked on certain holidays listed in the CBAs, and of counting paid half-hour lunch periods toward hours worked in a given day when calculating daily overtime. There is no dispute that the Respondents unilaterally changed these practices.

### B. Analysis

#### 1. The Threat to Call the Police

As noted, the Westport housekeeping employees reacted to the announcement that they would be rehired as probationary employees—at the starting wage, with no seniority—by asserting that the change was unfair and stating that they needed to contact the Union. Administrator Coleman responded by telling them to fill out new job applications or leave the premises, and threatened to "call the cops" if they did not leave.

As the judge found, the employees were "understandably upset" and were engaged in Section 7 activity when they protested against the sudden (and, as we find, unlawful) termination of their seniority and reduction in pay and refused to complete the forms without consulting the Union. We agree with the judge that under these circumstances, Coleman's threat to call the police was a response to the employees' protected activity and violat-

ed Section 8(a)(1). The employees, though angry, did not refuse to leave, disrupt the Respondents' operations, or commit any misconduct that would have deprived them of statutory protection.[15]

#### 2. The "Rehiring" of Housekeeping/Laundry Employees as "Probationary"

Section 8(a)(5) makes it unlawful for an employer to "refuse to bargain collectively" with a certified or recognized union, and Section 8(d) defines the duty "to bargain collectively" when a collective-bargaining agreement is in effect to include a prohibition on implementing any mid-term contract modification absent the other party's consent. See *Milwaukee Spring Division (Milwaukee Spring II)*, 268 NLRB 601, 602 (1984) (quoting Section 8(d)), enfd. sub nom. *Auto Workers Local 547 v. NLRB*, 765 F.2d 175 (D.C. Cir. 1985). Because we find that, under the circumstances of this case, the housekeeping employees at issue retained their status as the Respondents' employees and consequently all of their rights under the 2004–2011 CBAs, we find that the Respondents' attempt to extinguish those rights constituted an unlawful midterm modification of the CBAs in violation of Section 8(a)(5).

Under the CBAs, the Respondents' housekeeping and laundry employees had significant accrued seniority rights that, in turn, substantially affected their wages and benefits. While the CBAs were in effect, the Respondents subcontracted to HSG the management of the three housekeeping operations at Long Ridge, Newington, and Westport for a relatively brief period (from February 15, 2009 to May 17, 2010), and required the housekeeping employees at those centers to continue performing that subcontracted work.[16] On May 17, 2010, as described, the Respondents discontinued the subcontracting arrangement and resumed their direct employment of the housekeeping and laundry employees. Although the Respondents remained bound by the 2004–2011 CBAs, and notwithstanding their prior assurances that all employee rights "including seniority" would be unaffected by the HSG subcontracting, the Respondents conditioned the "rehiring" of their housekeeping employees on the employees' forfeiture of all their accrued seniority, including all seniority-based wages and benefits, and ac-

---

[15] Our colleague concurs in finding this violation, but believes it unnecessary to decide whether the threat to call the police was in response to employees' protected activity. In his view, the threat violated Sec. 8(a)(1) "because it reasonably tended to coerce employees into accepting Respondents' unlawful requirement that they forfeit all accrued seniority." We agree that our colleague's rationale provides an additional, independent basis for finding the violation.

[16] We do not find that the HSG subcontract itself was unlawful, contrary to our colleague's apparent characterization of our position.

ceptance of probationary employee status. We agree with the judge that this action is unlawful.

The Respondents were not entitled to "rehire" the housekeeping employees as new, probationary employees (and strip them of their accrued contractual rights) because the Respondents continued to employ them at all relevant times, despite the HSG subcontracting. We reach that conclusion following two independent analytical paths, which separately and together support finding the violation from the record of this unusual case. First, analyzing the issue purely as a matter of common law and contract interpretation, we conclude that the Respondents failed to terminate their employment relationships with the housekeeping employees and to escape the Respondents' contractual obligations to them. Second, in agreement with the judge, we conclude that the Respondents remained at least *joint* employers of the housekeeping employees, under established Board doctrine, based on their continuing control over the housekeepers' terms and conditions of employment.

Our colleague, who concurs in finding a violation of Section 8(a)(5), arrives at that conclusion despite his view that there was no employment relationship between the Respondents and the housekeeping employees (whether under the common law and the collective-bargaining agreement or under the Board's joint-employer doctrine) during the period that they were employed by HSG. As we will explain, notwithstanding our disagreement with respect to the existence of a continuing employment relationship, we agree with our colleague's alternative rationale in all critical respects. In the specific circumstances here, the Respondents' actions—subcontracting housekeeping operations and then resuming them, for no apparent purpose other than to strip employees of their contractual seniority and seniority-based wage and benefit improvements—were unlawful under Board precedent refusing to permit employers to use short-term operational changes to defeat their collective-bargaining obligations. Indeed, the case for finding a violation of Section 8(a)(5) is particularly strong.

*a. The Respondents Never Effectively Terminated Their Employment Relationships with the Housekeeping Employees, and Board Law Does Not Permit Them to Escape Their Collective-Bargaining Obligations*

This case—unlike, for example, cases involving an alleged alter ego or successor—does not involve a business entity with no apparent prior relationship with bargaining-unit employees. Here, rather, the Respondents were initially the sole employers of the housekeeping employees, and they were bound by the 2004–2011 CBAs before they entered into full-service subcontract agreements with HSG. Moreover, unlike cases where an actual shutdown and hiatus in operations raises an issue about employer status, the Respondents here did not discontinue the housekeeping operations at the respective facilities even for a brief period of time. Rather, the Respondents continued their operations as before, and the housekeeping employees, while managed by HSG, continued to provide their services to the Respondents. It is undisputed that the Respondents required the housekeeping employees to continue performing, under HSG's management, exactly the same work, in exactly the same places (the Respondents' own facilities) and under the terms of the CBAs that bound the Respondents. The Respondents then purported to "rehire" the employees as their own "new" employees, with probationary status, to perform the same work during the term of the *same* CBAs that had bound the Respondents from the beginning.[17] This series of transactions changed nothing whatsoever in the work the housekeeping employees performed for the Respondents.

Nor did the legal relationship between the housekeeping employees and the Respondents change. It remained what it always was under the common law and the collective-bargaining agreements: an employment relationship, governed by the agreements. Under the common-law authority that guides the Board in determining the existence and scope of employment relationships,[18] an employment relationship is formed by agreement between employee and employer.[19] The relationship, once formed, continues until it is terminated by one or both parties. Where (as here) an employer assigns an employee to work under the supervision of another employer, the employee remains the assigning employer's employee "in the absence of evidence to the contrary."[20]

---

[17] Again, the Respondents do not dispute that the 2004–2011 CBAs remained applicable to them after they resumed management of the housekeeping operations.

[18] The Supreme Court has established that when a statute uses the term "employer" without clearly defining it (as does the Act), the term should be interpreted under the "conventional master-servant relationship as understood by common-law agency doctrine." *Nationwide Mutual Insurance Co. v. Darden,* 503 U.S. 318, 322–323 (1992). See, e.g., *NLRB v. Town & Country Elec., Inc.,* 516 U.S. 85, 94 (1995); *NLRB v. United Insurance Co.,* 390 U.S. 254, 256 (1968). See also *Browning-Ferris Industries of California,* 362 NLRB No. 186, slip op. at 12 (2015).

[19] See Restatement (Second) of Agency §§ 1(1), 15.

[20] Restatement (Second) of Agency § 227, comment b ("Inference that original service continues"). "In the absence of evidence to the contrary, there is an inference that the actor [employee] remains in his general employment so long as, by the service rendered another, he is performing the business entrusted to him by the general employer. *There is no inference that because the general employer has permitted a division of control, he has surrendered it.*" Id. (emphasis added). Contrary to our colleague, the significance of this comment is not negated by that fact that § 227 focuses primarily on the employer status of the receiving employer.

6            DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

Although the Respondents were free to require the housekeeping employees to work under HSG's supervision, and the employees did so, there is no evidence that Respondents took any steps—oral, written, or otherwise—to terminate their employment relationships with the housekeeping employees before purportedly "rehiring" the employees. The evidence, rather, demonstrates that the Respondents treated the HSG subcontract as merely a temporary "payroll transfer" and that HSG never became the *sole* employer of the housekeepers.

The Respondents did not inform the employees at any time prior to their "rehiring" that they had been terminated. When the Respondents subcontracted with HSG, they did not inform the employees that HSG had become their sole employer, let alone obtain employee (or Union) consent to such an exclusive relationship. Just the opposite is true. The Respondents indicated that they were retaining significant control over the units' terms and conditions of employment, and they assured the Union at the outset of the full service contracts with HSG that all the employees' rights under the Respondents' CBAs, "including seniority," would continue to be honored by HSG for the duration of the service contracts. Nor did the Respondents take any action that would have conveyed to the employees that their employment relationship had been transferred, in its entirety, from the Respondents to HSG. The conclusion that the Respondents never terminated the housekeeping employees' employment—and retained their employer, despite the assignment of managerial functions to HSG—is further confirmed by several other factors: the Respondent and HSG managers' repeated characterizations of the "full service" period as merely a "payroll transfer;" and the HSG managers' comments to employees that they would eventually "be going back" to the Respondents.[21]

Moreover, the Respondents continued to act as employers of the housekeepers by recognizing the housekeepers' contractual right, under the Respondents' extant collective-bargaining agreement with the Union, to transfer to non-housekeeping positions elsewhere in the Respondents' bargaining units. Notably, there is no evidence that, in making those transfers, the Respondents ever consulted with HSG, the housekeepers' asserted sole employer. This confirms that (1) the Respondents continued to treat the housekeeping employees as members of their wider bargaining units, outside HSG's authority; (2) the housekeeping employees retained their seniority under the Respondents' contracts with the Un-

ion; and (3) those employees had seniority rights applicable not only to *their respective* housekeeping department but to *the other departments in their facility*. The Respondents' conduct, in short, is inconsistent with the contention that the Respondents ceased to be the housekeepers' employers during the HSG subcontract.

The judge was also correct to draw an adverse inference from the Respondents' failure to call any of their own management officials to testify as to the Respondents' reason for subcontracting the work of the housekeeping units to HSG or the termination of that brief subcontracting arrangement.[22] The Respondents made no showing whatsoever that they intended the "full service" transaction to terminate their own employment relationship with the employees or that they treated the transaction as anything more than a temporary "payroll transfer."[23]

As our concurring colleague emphasizes, the Respondents' claim that they could legitimately treat the "rehired" housekeepers as new employees in these circumstances is also belied by the terms of the parties' CBAs. As noted, the subcontracting provision prohibited subcontracting unless the subcontractor "agree[d] in advance to retain the employees and recognize all their rights, including seniority, under this Agreement," and required the Respondents to "require any [successor] to accept the terms of this agreement." The seniority section of each CBA not only mandated recall from layoff in order of seniority, but fully protected seniority rights for a recall period of up to 2 years.[24] These CBA provisions—all made binding on HSG by the Respondents in their subcontracts—clearly contemplated that accrued employee seniority would be fully protected whenever the Respondents laid off employees, subcontracted unit work, or conveyed any operation from the unit to another "purchaser, transferee, lessee [or] assigns."[25] It defies logic

---

[21] That an employment relationship with HSG was established—as suggested by the formal indicia cited by our colleague (new-hire, enrollment, I-9, W-4, and background forms)—does not mean that the employment relationship with the Respondents was terminated.

[22] See *Vista Del Sol Healthcare*, 363 NLRB No. 135, slip op. at 14, 26 (2016).

[23] Even if, as the Respondents assert, HSG was solely responsible for the termination of the "full service" subcontracts at the time it occurred, that would not determine whether the Respondents viewed the assignment of the housekeeping employees to HSG's management as permanent.

[24] As noted above, the seniority section of the CBAs also required at least 45 days' notice to the Union of any layoff. The Respondents' failure to comply with that requirement in connection with the HSG subcontracts shows that they did not view the subcontracts as any form of layoff.

[25] The Respondents rely largely on the CBAs' Article 8, which states: "All newly hired regular full-time employees of the Center who are covered by this Agreement, whether or not previously employed by the Center . . . , shall be deemed probationary Employees." However, this article's reference to individuals who were "previously employed" clearly applies to employees whose employment was terminated. As we have found, the housekeeping employees were never terminated,

and common sense to interpret these contract terms to reflect an agreement by the Union that, in circumstances like those presented here, unit employees who never stopped performing services for the Respondents under the CBA would be treated as "newly hired," have their accrued seniority extinguished, and lose all their seniority-based wages and benefits. Because the parties had agreed to protect the seniority rights of unit employees in layoff, subcontracting, and successorship situations, it is inconceivable that they intended to provide *less* protection to employees who were not laid off, i.e. who continued (at the Respondents' direction) to perform the same work at the Respondents' facilities under HSG's supervision, and who were explicitly protected by HSG's agreement (as imposed by the Respondents) to continue in effect all the terms of the CBAs.[26] We agree with our concurring colleague that the "Respondents' unilateral elimination of seniority and seniority-based wage and benefit improvements for all housekeeping employees was not permitted by the terms of the 2004–2011 CBAs."

Last, as our concurring colleague emphasizes, rejecting the Respondents' attempt to manufacture a break in their continuous employment relationship with the housekeepers is consistent with precedent in other areas of Board law. The Board has found Section 8(a)(5) violated where employers treated employees covered by a collective-bargaining agreement as "newly hired" by eliminating their contractual benefits in reliance on short-duration operational changes, including temporary shutdowns.[27] The Act similarly does not permit an employer to unilaterally modify a collective-bargaining agreement or to unilaterally alter bargaining-unit employees' terms of employment by means of an alter ego entity.[28] Nor does the Act permit a "perfectly clear successor" employer to alter unit employees' terms of employment without bargaining with the Union.[29] Permitting the Respondents here to escape the obligations imposed by the Act and by their collective-bargaining agreements simply by imposing a temporary intermediary between themselves and their employees is contrary to the Act's goal of preserving stable collective-bargaining relationships and avoiding labor disputes.[30] As the General Counsel notes, if the Respondents were permitted to do what they did here, any employer could eliminate the seniority rights and benefits of bargaining unit employees, while retaining them as employees and controlling their employment terms and conditions, for no legitimate reason.[31]

Relying on the same critical facts as we do,[32] and much of the same Board precedent, our colleague con-

---

and Article 8 provides no basis for finding otherwise. In any case, we agree with our concurring colleague's close and careful reading of Article 8, which demonstrates that even if the housekeeping employees *could* be deemed "previously employed" (a proposition we reject), the CBAs, considered in their entirety, cannot reasonably be read to treat the employees as "newly hired" or to privilege the Respondents to strip them of their seniority and to treat them as probationary.

[26] For the same reasons, as the judge found, the contract terms cited negate a clear and unmistakable waiver by the Union of its right to bargain over terms of employment. See generally *Provena St. Joseph Medical Center*, 350 NLRB 808, 808–816 (2007). Nor, in light of the cited terms, is there any "sound arguable basis" for interpreting the CBAs to permit the Respondents' actions. See generally *Bath Iron Works Corp.*, 345 NLRB 499, 501–503 (2005), affd. sub nom. *Bath Marine Draftsmen's Assn. v. NLRB*, 475 F.3d 14 (1st Cir. 2007). Finally, we agree with our concurring colleague (who also would find no clear and unmistakable waiver here) that the result would be the same applying the "contract coverage" standard utilized by some appellate courts (but not the Board). See generally *NLRB v. Postal Service*, 8 F.3d 832 (D.C. Cir. 1993).

[27] See, e.g., *El Torito-La Fiesta Restaurants, Inc.*, 295 NLRB 493, 493–496 (1989) (employer unlawfully repudiated CBA after reopening restaurant following a 14-month hiatus for remodeling), enfd. 929 F.2d 490 (9th Cir. 1991); *Martin Bush Iron & Metal*, 329 NLRB 124, 125, 135 (1999) (employer ceased operations for 4-1/2 months, then resumed operations through an alter ego that unlawfully failed to adhere

to the CBA); *Rockwood Energy & Mineral Corp.*, 299 NLRB 1136 (1990) (employer unlawfully repudiated terms of expired CBA when it resumed mining operations following 5-year hiatus), enfd. 942 F.2d 169 (3d Cir. 1991); *Golden State Warriors*, 334 NLRB 651 (2001) (similar), enfd. mem. 50 Fed. Appx. 3 (D.C. Cir. 2002).

[28] *Martin Bush Iron & Metal*, supra; *Circle T Corp.*, 238 NLRB 245 (1978), enfd. mem. 614 F.2d 777 (9th Cir. 1980); *Big Bear Supermarkets # 3*, 239 NLRB 179 (1978), enfd. 640 F.2d 924 (9th Cir. 1980), cert. denied 449 U.S. 919 (1980); *Rushton & Mercier Woodworking Co.*, 203 NLRB 123 (1973), enfd. mem. 502 F.2d 1160 (5th Cir. 1974), cert. denied 419 U.S. 996 (1974).

[29] *NLRB v. Burns Int'l Security Services, Inc.*, 406 U.S. 272, 295 (1972); *GVS Properties, LLC*, 362 NLRB No. 194, slip op. at 5 (2015); *Spruce Up Corp.*, 209 NLRB 194 (1974), enfd. 529 F.2d 516 (4th Cir. 1975).

[30] "The object of the National Labor Relations Act is industrial peace and stability, fostered by collective-bargaining agreements providing for the orderly resolution of labor disputes between workers and employees." *Auciello Iron Works, Inc. v. NLRB*, 517 U.S. 781, 783 (1996).

[31] See *El Torito-La Fiesta Restaurants, Inc.*, 295 NLRB at 496: "[if] an employer who closes temporarily and reopens at the same location with substantially the same business" could withdraw recognition on that basis, "employers could readily escape their collective-bargaining obligations without justification by merely instituting a temporary shutdown of operations." Cf. also *PCMC/Pacific Crane Maintenance*, 362 NLRB No. 120 (2015), reaffirming 359 NLRB 1206, 1210 (2013) (single employer's layoff and unilateral changes were not exempt from mandatory bargaining because the nature of the operation and unit work remained the same, and "generally the same employees, now PCMC employees, were doing the identical work . . . at the same facility and locations within the facility using the same tools and equipment to do so"; and the employer "could not escape its bargaining obligation by the simple device of laying off the [unit] employees . . . on March 30 and then rehiring them as 'new' employees . . . on March 31").

[32] Our colleague properly points out that the "record reveals many facts that are even more indicative of unlawful conduct than what is presented in many other cases," observing that:

curs in finding a violation of Section 8(a)(5), invoking what he correctly describes as the "well established" principle that an employer may not "use[] a short-duration shutdown and resumption of operations to circumvent union obligations to extinguish collectively bargained rights or obligations." He observes, also correctly, that on the record here, there was "no apparent purpose" for the Respondents' actions "other than to extinguish . . . contractual seniority and . . . seniority-based [wage and benefit] improvements," and he properly infers that the Respondents did indeed act "for the purpose of extinguishing" those collectively-bargained entitlements.[33] We agree with our colleague—although we do not mean to imply either that the demonstration of a legitimate business purpose (purely a matter of speculation here) would have privileged the Respondents to act as they did or that proof of an illegitimate purpose is necessary to find an 8(a)(5) violation here or generally.

In reaching our conclusion that the Respondents never terminated their employment relationship with the

"(1) in contrast to situations where the Board finds that *different* entities are alter egos that have unlawfully circumvented labor obligations, here, *the same employers* (HealthBridge and the Long Ridge, Newington, and Westport Respondents) were in place before the February 2009 subcontracting and after the May 2010 resumption of housekeeping operations by Respondents;

(2) the housekeeping work was performed continuously by the same employees in the same locations before, during and after the period of subcontracting;

(3) between February 2009 and May 2010, the housekeeping employees—though employed by HSG—were providing services for the benefit of the Respondents (as HSG's clients);

(4) the February 2009-May 2010 subcontracting period, during which the Respondents were not the employer of housekeeping employees, was relatively short;

(5) the subcontracting occurred completely within the term of the 2004-2011 CBAs applicable at Long Ridge, Newington, and Westport, respectively;

(6) the Respondents were bound by the same CBAs before, during and after the subcontracting period (i.e., during the subcontracting period, the Respondents' CBAs remained applicable to their non-housekeeping employees);

(7) the record reflects no evidence of business changes except for the elimination of housekeeping employees' seniority rights; and

(8) apart from extinguishing the seniority rights of housekeeping employees, the record is devoid of any explanation by Respondents or any discernible business reason for these events."

We agree that these facts, in their totality, support the finding of a Sec. 8(a)(5) violation here.

[33] In this connection, the judge found it "likely," from administrator Coleman's attempt to reduce Petion's pay to $12.80/hour, the contractual starting rate for probationary employees, when he transferred to a non-housekeeping position, that "Respondent Westport, even [in] April of 2009, was contemplating or even had decided that it would be hiring back the laundry and housekeeping employees but as new employees, thereby, reducing their pay to $12.80 per hour." To the extent this is correct, it would further undermine the Respondents' assertion that they ceased to have any employment relationship with the housekeeping employees from the outset of the HSG "full-service" subcontract.

housekeeping employees, we do not imply (as our colleague asserts), that in subcontracting work and requiring the subcontractor to abide by particular terms and conditions of employment, an employer necessarily will retain its employer status with respect to the employees performing the subcontracted work. Every case in which we determine whether an employment relationship exists or continues is fact-specific. Thus, we find only that here, under all the circumstances, the Respondents remained the housekeepers' employers for purposes of Section 8(a)(5), despite the transactions in which they engaged.

Accordingly, we find that the Respondents' action in treating their housekeeping employees as newly hired probationers with no seniority rights constituted an unlawful midterm modification within the meaning of Section 8(d) and thereby violated Sections 8(a)(5) of the Act. For the same reasons, we find that HealthBridge's and Westport's failure to reemploy Daye and Harris also modified the Westport CBA with respect to their seniority rights in violation of Sections 8(a)(5).[34]

### b. The Respondents Were Joint Employers with HSG

We reach the same conclusion analyzing the case under the Board's joint-employer doctrine, which provides an entirely separate basis for finding that the employment relationship between the Respondents and the housekeeping employees never ceased for purposes of Section 8(a)(5). We agree with the judge that the Respondents and HSG, during the term of their "full service" subcontracts, were joint employers of the housekeeping employees, applying Board precedent as it existed at that time.[35]

In our analysis of whether the Respondents terminated their employment relationship with the housekeeping employees, we emphasized the *absence* of any Respondent actions or contract language that would establish or confirm such a termination. In the joint-employer analysis, we focus on whether the Respondents "share[d], or codetermine[d], those matters governing [the units'] essential terms and conditions of employment" during the term of the subcontracts,[36] and whether the Respondents' exercise of such control was "direct and immediate."[37]

[34] The General Counsel has not alleged that the Respondents' "rehiring" of the housekeeping employees as new employees, or their failure to reemploy Daye and Harrison, violated Sec. 8(a)(3).

[35] This case was litigated before the issuance of *Browning-Ferris Industries of California,* 362 NLRB No. 186 (2015), in which the Board refined its standard for determining joint-employer status under the Act. However, because we find that the Respondents were joint employers even under prior, more restrictive precedent, there is no need for us to determine whether *Browning*-Ferris is retroactively applicable here.

[36] *TLI, Inc.,* 271 NLRB 798 (1984), enfd. mem. 772 F.2d 894 (3d Cir. 1985); *Laerco Transportation*, 269 NLRB 324 (1984).

[37] *Airborne Express*, 338 NLRB 597, 597 fn. 1 (2002).

Here, the Respondents, in compliance with the CBAs and acting through the explicit mandate they imposed on HSG through their subcontracting agreements, required HSG to retain all of their housekeeping employees and continue all terms and conditions of employment required under the CBAs to all three housekeeping departments for the duration of the subcontracts. HSG fully complied with these requirements. The Respondents thus dictated that there would be no break in the employment of all housekeeping employees and (through the imposition of the CBAs) dictated all of their essential terms of employment, keeping them in force for the entire subcontract period. The Respondents also continued to exert important control over those employees' choice of jobs by permitting them to bid for non-housekeeping positions in other departments of the Respondents' bargaining units that were not affected by the HSG contract. In short, the Respondents did not merely "co-determine" but solely determined the relevant terms of employment.[38] This control continued until the subcontracts were terminated and the Respondents immediately "rehired" the housekeeping employees as probationers.

In addition, the HSG service contracts with the Respondents were essentially "cost plus" agreements, under which the Respondents reimbursed HSG at a preset monthly rate which included labor costs along with all other cost and profit factors. Although this arrangement, is not itself dispositive of whether a joint-employer relationship existed,[39] it is a recognized indication of such a relationship. *CNN America*, 361 NLRB No. 47, slip op. at 6 (2014).

Under these circumstances, established Board law confirms that the Respondents were the housekeeping employees' joint employers. See *G. Heileman Brewing Co.*, 290 NLRB 991, 999–1000 (1988), enfd. 879 F.2d 1526, 1531 (7th Cir. 1989) (finding joint-employer status, and

unlawful unilateral changes in terms and conditions of employment, where respondent employer subcontracted work, but imposed collective-bargaining agreement on subcontractor and required subcontractor to retain former employees and preserve seniority); *Executive Cleaning Services*, 315 NLRB 227, 235 (1994) (finding joint- employer status based on the subcontractor's purported assumption of a collective-bargaining agreement), enf. denied sub nom. *AT&T v. NLRB*, 67 F.3d 446 (2d Cir. 1995).

That the Respondents did not directly supervise the day-to-day work of the housekeeping employees—this was the responsibility of HSG—does not preclude a joint-employer finding here, given the Respondents' dominant role in controlling the terms and conditions of employment under which the housekeepers worked.[40]

---

[38] For this reason, we disagree with our colleague's assertion that the Respondents, during the term of the HSG subcontract, "no longer had any meaningful effect" on the unit's terms of employment. Moreover, like the judge, we give little weight to two minor changes emphasized by the Respondents: the direct-deposit option becoming no longer available to employees under HSG, and the Respondents' representatives' diminished participation in the otherwise identical grievance procedure.

The Respondents rely heavily on *Summit Express*, 350 NLRB 592 (2007), in which the Board found no alter-ego relationship between various companies. There, one set of entities played no role in the other entity's hiring process and exercised no "continuing supervision" over the entity's employees. Id. at 595. While the contract between the companies referred to labor rates, the evidence did not show that the putative alter egos "dictated or even sought those rates." Id. at 596. The contrast with this case is clear.

[39] See *Pulitzer Publishing Co.*, 242 NLRB 35, 36 (1979), enf. denied 618 F.2d 1275 (8th Cir. 1980), cert. denied 499 U.S. 875 (1980) (assessing parties' cost-plus contract as one factor among many).

[40] This case arises in the Second Circuit. That court, in two decisions reversing the Board, has interpreted the joint-employer standard we apply here to require that the putative joint employer respondent exercise its "immediate" control over employees by "actually supervis[ing] or exercis[ing] control" over the employees' work on a constant basis. *AT&T v. NLRB*, 67 F.3d 446 (2d Cir. 1995), denying enforcement to *Executive Cleaning Services*, supra; *International House v. NLRB*, 676 F.2d 906, 913, 915 (2d Cir. 1982). In our view, this case presents a stronger case for finding joint-employer status, taking into account the Second Circuit's interpretation of the Board's joint-employer standard.

In *AT&T*, the Board had concluded that a joint-employer relationship for a cleaning unit existed because of "AT&T's [the putative joint employer] collective-bargaining relationship with the union." 315 NLRB at 236. On review, however, the Second Circuit found that the Board had overlooked its own fact findings: although AT&T had previously negotiated area agreements for such units with the union, it had not done so in that case, and although AT&T exerted downward wage pressure and the subcontractor eventually agreed to pay a lower wage than the union's proposed contract provided, AT&T did not participate in the negotiations between the union and the subcontractor that actually determined the unit's wages and all other terms of employment. 315 NLRB at 232–236. We understand the court's refusal to enforce the Board's order as based largely on this set of facts. 67 F.3d at 448–451.

In *International House* the only control imposed by the putative joint employer over any term of employment was a limitation on the number of hours worked by a sub-group of employees in the unit: the respondent's resident graduate students, who were compensated only in the form of credit for their room and board. The respondent had no control over any other terms of employment, even the hours worked by the unit's non-student employees. 676 F.2d at 908, 911.

Neither *AT&T* nor *International House* addressed a case like this one where the putative joint employer (1) required the retention of entire bargaining units of its own employees (2) dictated virtually all of the units' terms of employment for the duration of the subcontracts by imposing its own collective-bargaining agreement for the unit, still in force, on the subcontractor; and (3) following termination of the subcontract, purported to rehire the employees under the agreement, while stripping them of contractual rights and benefits.

This case also stands in contrast to the situation in *Clinton's Ditch Cooperative Co., Inc., v. NLRB*, 778 F.2d 132 (2d Cir. 1985), denying enforcement to 274 NLRB 728 (1985), where the Second Circuit also rejected the Board's joint-employer finding. There, the subcontractor agreed to hire the respondent's drivers and assume its collective-

Moreover, as the judge noted, the day-to-day supervision factor carries less weight in this case because daily supervision of the housekeepers did not change upon the commencement of the HSG "full-service" subcontract or over the duration of the subcontract. HSG had already been supervising the housekeeping employees on behalf of the Respondents *prior* to the "full service" contracts under the 2006 "supervisor" contracts, during which the Respondents were undisputedly the units' employers. HSG's site managers were therefore the Respondents' designated supervisors for the housekeeping units even before the "full service" subcontracts began. And once the subcontracts did begin, the housekeepers' employment continued to be governed in every respect by the existing collective-bargaining agreements, negotiated by the Respondents and imposed by the Respondents on HSG.

In sum, applying joint-employer doctrine as an independent rationale, we find that Respondents Health-Bridge, Long Ridge, Newington, and Westport were joint employers of the housekeeping employees with HSG;[41] that they consequently remained bound by the CBAs with respect to these employees during the term of the "full service" subcontracts with HSG; and that they violated Section 8(a)(5) and (1) by modifying the 2004–2011 CBAs without the Union's consent, after May 17, 2010, by eliminating employees' accrued seniority, and

reducing their wages and benefits to those of newly hired employees.[42]

### 3. Holiday Premium Pay

We agree with the judge that Respondents violated Section 8(a)(5) and (1) by unilaterally changing their undisputed past practice of giving holiday premium pay to part-time employees and per-diem employees who worked on contract-specified holidays. As found by the judge, prior to late 2009 or early 2010, all full-time, part-time and per diem employees received time and a half for working such holidays. In late 2009, Respondents began to cease paying this premium to certain part-timers and per diem workers, without prior notification to the Union. Respondents claim that Article 15 of the CBAs expressly provides that part-time employees working fewer than 20 hours a week and per-diem employees (who have no guaranteed hours) are ineligible for the premium. This is unsupported, however, by the language of Article 15 (B) which provides that "[i]n the event an Employee is required to work on any of the [listed holidays], she/he shall be paid at the rate of one and one-half times her/his regular rate of pay for all hours worked on such holiday and shall in addition" receive straight-time pay as described in Article 15(A).[43] Only Article 15(B) addresses the holiday premium for employees who work on holidays, and it does not limit that premium to employees who work 20 hours or more a week.[44] As noted, this interpretation conforms to the Respondents' established past-practice of paying the premium to the employees at issue.

Accordingly, we find that Article 15 does not constitute a clear and unmistakable waiver of the Union's right to receive notice and the opportunity for bargaining over changes to the Respondents' undisputed past practice of paying the holiday premium to all employees who work on listed holidays. See *Provena St. Joseph Medical Center*, 350 NLRB 808, 808–816 (2007).

---

bargaining agreement with the union. When the subcontractor terminated its contract, the respondent unilaterally entered into a new subcontract with a different firm. The Board found that the respondent remained a joint employer of the drivers and thus was required to bargain with the union before entering into the new subcontract. The Second Circuit disagreed, finding insufficient evidence of "immediate control over the employees" by the respondent. 778 F.2d at 138. Notably, the first subcontractor had ultimately reached its own, new collective-bargaining agreement with the union, to which the respondent was not a party. Id. at 135. The Second Circuit found "no basis for concluding that [the respondent] controlled or manipulated the bargaining to an extent indicative of joint employer status." Id. at 139. It emphasized, in turn, that the dispute did not arise under the original collective-bargaining agreement, undercutting the force both of the respondent's initial assurance that the drivers would continue to be the respondent's employees if the first subcontracting arrangement failed and the union's "refusal to recognize that [the respondent] was no longer an employer of the drivers." Id. at 140.

Finally, *District 1199E, National Union of Health Care Employees,* 238 NLRB 9 (1978), remanded on other grounds 613 F.2d 1102 (D.C. Cir. 1979), on which our colleague also relies, is similarly distinguishable. In that case, the successor employer formally hired the predecessor's employees, clothed them in its own distinctive uniforms, informed the union that it was the successor employer, and sought to bargain with the union over new changes in terms of employment. This is in stark contrast to the temporary "payroll transfer" that occurred here.

[41] Again, contrary to our colleague's assertion, we do not hold that an employer remains the joint employer of unit employees whenever it subcontracts the unit's work to another employer and requires adherence to preexisting terms and conditions of employment.

[42] Under the same rationale, it also follows that Respondents HealthBridge and Westport modified the contract in violation of Secs. 8(a)(5) and (1) by failing to reemploy Daye and Harrison.

[43] Article 15(A), cited by the Respondents, applies to employees who work 20 hours or more per week and their eligibility for holiday pay, but does not address the holiday premium or employees who actually work on holidays. Even if Article 15(A) were applicable, it would not be dispositive in view of the Respondents' established past practice. See *Rosdev Hospitality, Secaucus, LP*, 349 NLRB 202, 203 (2007) (finding that, for purposes of establishing existing terms and conditions of employment, "the relevant terms and conditions of employment were those established by [employer's] actual practice, not those contained in the [ ] contract but not followed in practice").

[44] We would therefore reach the same result applying the "contract coverage" standard adopted by some federal appellate courts.

#### 4. Lunch Periods and Calculating Overtime

We also agree with the judge that the Respondents violated Section 8(a)(5) and (1) by unilaterally changing their undisputed past practice of counting the employees' paid half-hour lunch periods toward their hours worked in a day when calculating daily overtime. Article 14 of the CBAs provides that employees must receive time and a half "for hours actually worked in excess of eight (8) hours" in a day.[45] The Respondents' assertion that Article 14 unambiguously excludes lunch periods from the calculation of daily overtime because lunch breaks are not "work," is similarly unsupported by the CBA. Article 14 also provides:

The normal work week for full-time Employees shall be forty (40) hours consisting of eight (8) hours each day including a paid lunch period of one-half (1/2) hour. An Employee who works a shift of six (6) hours or more shall work a shift inclusive of a one-half (1/2) hour paid meal period.

In this provision, "a paid lunch period of one-half (1/2) hour" is explicitly included in the 8-hour workday. We read this to mean that the paid lunch period is deemed time worked, or at least as ambiguous in this regard. Either way, Article 14 does not unambiguously *exclude* the paid lunch period from time worked and does not constitute a clear and unmistakable waiver of the Union's right to bargain over that subject. See *Provena St. Joseph Medical Center*, supra. Accordingly, we find that the Respondents violated Section 8(a)(5) and (1) by unilaterally changing their past practice of treating lunch periods as time worked when calculating daily overtime.[46]

#### Amended Remedy

Under the circumstances here, we have determined that it is appropriate to grant an additional remedy not included in the judge's recommended Order. The Board has ordered that a notice of remedy be read aloud to employees, by an official of the respondent or by an agent of the Board, where the employer's misconduct has been "sufficiently serious and widespread that reading of the notice will be necessary to enable employees to exercise their Section 7 rights free of coercion." *Pacific Beach Hotel*, 356 NLRB 1397, 1404–1408 (2011), enfd. in relevant part *NLRB v. HTH Corp.*, 693 F.3d 1051 (9th Cir. 2012). This remedial action is intended to ensure that "employees will fully perceive that the respondent and its

managers are bound by the requirements of the Act." *Federated Logistics and Operations*, 340 NLRB 255, 258 (2003), enfd. 400 F.3d 920 (D.C. Cir. 2005). See also *Homer D. Bronson Co.*, 349 NLRB 512, 515 (2007), enfd. 273 Fed. Appx. 32 (2d Cir. 2008). A notice-reading requirement is appropriate here.

The large-scale violations here involving all the housekeeping employees at three homes, the layoff of employees without notice at Long Ridge, and the holiday and overtime pay of all unit employees at all six units—were serious and widespread. It is a fair inference that they emanated from the Respondents' upper management. The Respondents' treatment of the housekeeping employees at three centers, in particular, suggested that the Respondents were capable of taking similar drastic action against employees in other classifications. The Respondents' actions, in sum, had a strong tendency to chill employees' exercise of their Section 7 rights or to persuade them doing so was futile. See *J & J Snack Foods Handhelds Corp.*, 363 NLRB No. 21 (2015). Under these circumstances, we find that notice-reading at all six centers, in addition to our standard remedial and make-whole requirements, is "necessary to enable employees to exercise their Section 7 rights free of coercion." *Pacific Beach Hotel*, 356 NLRB at 1410. For the same reason, we shall also order that a common remedial notice, delineating all of the violations found, be posted at all six homes, so that all unit employees will be made aware that these violations were committed and are being remediated.

#### Amended Conclusions of Law

1. The Respondents are employers within the meaning of Section 2(2), (6), and (7) of the Act.

2. The Union is a labor organization within the meaning of Section 2(5) of the Act.

3. Respondents HealthBridge, Westport, Long Ridge and Newington continued to employ the housekeeping employees at those centers and also operated as joint employers with HSG for those employees during the period of February 15, 2009, through May 17, 2010.

4. Respondents HealthBridge and Westport have violated Section 8(a)(1) of the Act by threatening to call the police in response to employees' protected concerted or union activities.

5. Respondents HealthBridge, Long Ridge, Newington, and Westport have violated Section 8(a)(5) and (1) of the Act by modifying the terms of their collective-bargaining agreements without the Union's consent by eliminating their housekeeping employees' seniority, treating them as new employees, and reducing their wages and benefits to the level provided to new employees.

---

[45] Respondent Westport's CBA uses the language "all work in excess" instead of "hours actually worked in excess." We find the difference immaterial.

[46] As with holiday premium pay, we would reach the same result under the "contract coverage" standard.

6. Respondents HealthBridge and Westport have violated Section 8(a)(5) and (1) of the Act by modifying the terms of their collective-bargaining agreement without the Union's consent, by failing to reemploy Newton Daye and Myrna Harrison.

7. Respondents HealthBridge and Long Ridge have violated Section 8(a)(5) and (1) of the Act by failing and refusing to supply timely and complete information requested by the Union on March 2, 2010, April 12, 2010, May 6, 2010, and July 8, 2010.

8. Respondents HealthBridge and Long Ridge have violated Section 8(a)(5) and (1) of the Act by modifying the terms of their collective-bargaining agreement with the Union without the Union's consent, by laying off their employees without providing the Union with a 45-day notice of the layoffs.

9. Respondents HealthBridge, Wethersfield and Danbury violated Section 8(a)(5) and (1) of the Act by modifying the terms of their collective-bargaining agreement with the Union without the Union's consent, by implementing a new eligibility standard for employees regarding holiday pay, personal days, vacation days, sick days, and uniform allowance.

10. Respondents HealthBridge, Long Ridge, Wethersfield, Danbury, Newington, West River and Westport have violated Section 8(a)(5) and (1) of the Act by unilaterally changing the terms and conditions of employment of their employees by discontinuing their practice of including all time encompassed by lunch and breaks in tallying their employees' daily "hours worked" for purposes of calculating overtime payments, by implementing a new policy and practice of excluding time taken on these breaks from that calculation, and by implementing a new eligibility standard for payment at the premium rate for hours worked on holidays.

ORDER

A. The National Labor Relations Board orders that the Respondents, HealthBridge Management, LLC, Fort Lee, New Jersey, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Threatening to call the police in response to employees' protected concerted or union activities.

(b) Failing to continue in effect the terms and conditions of its 2004–2011 collective-bargaining agreements with the Union by doing the following without the Union's consent: laying off unit employees without providing the Union with a 45-day notice of the layoffs; implementing new eligibility standards for unit employees regarding holiday pay, personal days, vacation days, sick days, and uniform allowance; eliminating unit employees' seniority and reducing their wages and benefits to the level of new employees; and not reemploying unit employees without cause.

(c) Refusing to bargain collectively with the Union by unreasonably delaying in furnishing it with requested information that is relevant and necessary to the Union's performance of its functions as the collective-bargaining representative of the Respondents' unit employees.

(d) Unilaterally changing terms and conditions of employment of its unit employees by discontinuing its practice of including lunch breaks in tallying employees' daily "hours worked" for purposes of calculating overtime payments and implementing a new policy and practice of excluding these breaks, and by implementing a new eligibility standard for premium pay for hours worked on holidays.

(e) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Within 14 days from the date of this Order, offer Myrna Harrison and Newton Daye full reinstatement to their former jobs or, if those jobs no longer exist, to substantially equivalent positions, without prejudice to their seniority or any other rights or privileges previously enjoyed.

(b) Within 14 days from the date of this Order, remove from its files any reference to the failure to reemploy Myrna Harrison and Newton Daye, and, within 3 days thereafter, notify each of them in writing that this has been done and that it will not be used against them in any way.

(c) Rescind all the unlawful modifications of its contracts covering employees employed by the Respondents, including changes in seniority, wages, and benefits, and restore employees' terms and conditions of employment to what they were prior to its unlawful modifications of the contracts.

(d) Rescind its new eligibility standards for employees employed by Respondents Wethersfield and Danbury regarding holiday pay, personal days, vacation days, sick days, and uniform allowance, and restore the standards for eligibility that were in place prior to the changes.

(e) Continue in effect all the terms and conditions of employment contained in its 2004–2011 collective-bargaining agreements, or other applicable collective-bargaining agreements, with the Union.

(f) Rescind its practice of excluding lunch breaks in tallying employees' daily "hours worked" for purposes of calculating overtime payments, and its new eligibility standard for premium pay for hours worked on holidays.

(g) Before implementing any changes in wages, hours, or other terms and conditions of employment of unit employees, notify and, on request, bargain with the Union as the exclusive collective-bargaining representative of employees in the following bargaining units:

All full-time, part-time, and per diem/casual service and maintenance Employees, including certified nurse's assistants (CNAs), therapy technicians, housekeeping aides, dietary Employees, laundry aides, central supply clerks, relief cooks, unit secretaries, receptionists, medical records clerks, maintenance Employees, Registered Nurses and Licensed Practical Nurses employed by Respondent Long Ridge, including any new or expanded locations of Long Ridge, but excluding all other Employees, cooks, guards, other professional employees and supervisors as defined in the Act, as amended to date.

All full-time, regular part-time service, and per diem/casual service and maintenance Employees, including certified nurse's assistants (CNAs), dietary aides, cooks, head cooks, housekeeping, laundry and maintenance Employees, central supply clerks, scheduler, rehabilitations aides, recreation assistants and receptionists employed by Respondent Westport, but excluding all other Employees, registered nurses (RNs), social workers, licensed practical nurses (LPNs), and other technical Employees, therapeutic recreation directors, medical records clerks, payroll clerk and guards, professional Employees and supervisors as defined in the Act.

All full-time, part-time, and per diem/casual service and maintenance Employees, including current categories and future new and changed jobs in the service and maintenance bargaining unit including certified nursing assistants, physical therapy aides, housekeeping Employees, central supply clerks, nursing office secretary, secretary-receptionist, receptionists, medical records clerk- receptionist, maintenance Employees, social service designee, therapeutic recreational directors, recreation aides, Registered Nurses and Licensed Practical Nurses employed by Respondent Newington, including any new or expanded locations of Respondent but excluding all other Employees, guards, professional Employees and supervisors as defined in the Act.

All full-time, part-time, and per diem/casual RNs, LPNs, and service and maintenance Employees, including certified nurse's assistants, therapy aides, housekeeping employees, dietary employees, cooks, laundry employees, payroll clerks, rehabilitation aides, therapeutic recreation directors, receptionists, and maintenance employees employed by Respondent Danbury, but excluding the Director of Nurses, the Assistant Director of Nurses, the infection control nurse, the resident care coordinator, the staff development nurses, the employee health nurses, shift supervisors, unit coordinators, but excluding all other Employees, guards, professional Employees and supervisors as defined in the Act.

All full-time, part-time, and per diem service and maintenance Employees, including certified nurse's assistants, porters, activity assistants, housekeepers, dietary aides, cooks, cooks helpers, laundry aides, and maintenance Employees employed by Respondent Wethersfield, but excluding all other professional Employees, all technical Employees, all business office clerical Employees and all guards, professional Employees and supervisors as defined in the Act.

All full-time, part-time, and per diem/casual service and maintenance and clerical Employees, including certified nurse's assistants, occupational therapy aides, ward clerks, dietary aides, cooks, head cooks, housekeeping aides, laundry aides, assistant maintenance supervisor, recreation aides, physical therapy aides, central supply clerk, billing, collections and accounts receivable clerks and medical records clerks employed by Respondent Milford, but excluding, receptionists, payroll/accounts payable clerks, computer operators, data entry clerks, admissions clerks, licensed practical nurses, registered dietetic technicians, rehabilitation therapy technicians, physical therapy assistants, dieticians, registered respiratory therapists, certified respiratory therapy technicians, speech pathologists, social workers, administrative assistants, marketing director, manager of case management, head receptionist/secretary, executive chef, managerial Employees, confidential Employees, technical Employees and all guards, professional Employees and supervisors as defined in the Act.

(h) Make Myrna Harrison, Newton Daye, and all other affected unit employees whole for any loss of earnings and other benefits suffered as a result of the modifications of the contract terms of employment for the housekeeping employees at Respondents Long Ridge, Newington, and Westport; as a result of the unlawful layoff of certified nursing aides employed by Respondent Long Ridge; as a result of the unlawful changes in eligibility standards for employees employed by Respondents Wethersfield and Danbury regarding holiday pay, personal days, vacation days, sick days, and uniform allowance; and as a result of the unlawful changes to the practices of calculating overtime and holiday premiums of

employees employed by Respondents Long Ridge, Wethersfield, Danbury, Newington, West River, and Westport, in the manner set forth in the remedy section of the judge's decision as amended in this decision.

(i) Compensate Myrna Harrison, Newton Daye, and all other affected unit employees for the adverse tax consequences, if any, of receiving lump-sum backpay awards, and file a report with the Regional Director for Region 34, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay awards to the appropriate calendar year(s) for each employee. With respect to the Long Ridge employees laid off in violation of the contractual 45-day notice period, the required backpay will be for 45 days minus the number of days' notice the employees were given of their layoff, plus reimbursement for any expenses ensuing from the unlawful layoff.

(j) Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

(k) Within 14 days after service by the Region, post at its Fort Lee, New Jersey facility and at its facilities in Danbury, Stamford, Newington, Milford, Westport, and Wethersfield, Connecticut, copies of the attached notice marked "Appendix."[47] Copies of the notice, on forms provided by the Regional Director for Region 34, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. If the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees

and former employees employed by the Respondent at any time since November 26, 2009.

(l) Within 14 days after service by the Region, hold a meeting or meetings, scheduled to ensure the widest possible attendance, at which the attached notice, Appendix, is to be read to the employees by the Respondent's responsible management official or, at the Respondent's option, by a Board agent in that officer's presence.

(m) Within 21 days after service by the Region, file with the Regional Director for Region 34 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

B. The National Labor Relations Board orders that the Respondent, 710 Long Ridge Road Operating Company II, LLC, d/b/a Long Ridge of Stamford, Stamford, Connecticut, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Refusing to bargain collectively with the Union by unreasonably delaying in furnishing it with requested information that is relevant and necessary to the Union's performance of its functions as the collective-bargaining representative of the Respondent's unit employees.

(b) Failing to continue in effect the terms and conditions of its 2004–2011 collective-bargaining agreement with the Union by laying off unit employees without providing the Union with a 45-day notice of the layoffs or eliminating unit employees' seniority and reducing their wages, and benefits to those of new employees without the Union's consent.

(c) Unilaterally changing terms and conditions of employment of its unit employees by discontinuing its practice of including lunch breaks in tallying employees' daily "hours worked" for purposes of calculating overtime payments and implementing a new policy and practice of excluding these breaks, and by implementing a new eligibility standard for premium pay for hours worked on holidays.

(d) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Rescind the modifications of its contract, including changes in seniority, wages, and benefits, and restore employees' terms and conditions of employment to what they were prior to its unlawful modification of the contract.

(b) Continue in effect all the terms and conditions of employment contained in its 2004–2011 collective-

---

[47] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

bargaining agreement, or other applicable collective-bargaining agreement, with the Union.

(c) Rescind its practice of excluding lunch breaks in tallying employees' daily "hours worked" for purposes of calculating overtime payments, and its new eligibility standard for premium pay for hours worked on holidays.

(d) Before implementing any changes in wages, hours, or other terms and conditions of employment of unit employees, notify and, on request, bargain with the Union as the exclusive collective-bargaining representative of employees in the following bargaining unit:

> All full-time, part-time, and per diem/casual service and maintenance Employees, including certified nurse's assistants (CNAs), therapy technicians, housekeeping aides, dietary Employees, laundry aides, central supply clerks, relief cooks, unit secretaries, receptionists, medical records clerks, maintenance Employees, Registered Nurses and Licensed Practical Nurses employed by Long Ridge, including any new or expanded locations of Long Ridge, but excluding all other Employees, cooks, guards, other professional employees and supervisors as defined in the Act, as amended to date.

(e) Make its unit employees whole for any loss of earnings and other benefits suffered as a result of the unlawful layoff of certified nursing assistants, the modification of the contract terms of its laundry and housekeeping employees, and the unlawful changes to the practices of calculating overtime and holiday premiums of its employees, in the manner set forth in the remedy section of the judge's decision as amended in this decision. With respect to the employees laid off in violation of the contractual 45-day notice period, the required backpay will be for 45 days minus the number of days' notice the employees were given of their layoff, plus reimbursement for any expenses ensuing from the unlawful layoff.

(f) Compensate affected employees for the adverse tax consequences, if any, of receiving lump-sum backpay awards, and file a report with the Regional Director for Region 34, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay awards to the appropriate calendar year(s) for each employee.

(g) Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form,

necessary to analyze the amount of backpay due under the terms of this Order.

(h) Within 14 days after service by the Region, post at its Stamford, Connecticut facility copies of the attached notice marked "Appendix."[48] Copies of the notice, on forms provided by the Regional Director for Region 34, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. If the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since November 26, 2009.

(i) Within 14 days after service by the Region, hold a meeting or meetings, scheduled to ensure the widest possible attendance, at which the attached notice, Appendix, is to be read to the employees by the Respondent's responsible management official or, at the Respondent's option, by a Board agent in that officer's presence.

(j) Within 21 days after service by the Region, file with the Regional Director for Region 34 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

C. The National Labor Relations Board orders that the Respondent, 1 Burr Road Operating Company II, LLC, d/b/a Westport Health Care Center, Westport, Connecticut, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Failing to continue in effect the terms and conditions of its 2004–2011 collective-bargaining agreement with the Union by eliminating, without the Union's consent, unit employees' seniority and reducing their wages and benefits to the level of new employees, or failing to reemploy unit employees without cause.

(b) Threatening to call the police in response to employees' protected concerted or union activities.

---

[48] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

(c) Unilaterally changing terms and conditions of employment of its unit employees by discontinuing its practice of including lunch breaks in tallying employees' daily "hours worked" for purposes of calculating overtime payments and implementing a new policy and practice of excluding these breaks, and by implementing a new eligibility standard for premium pay for hours worked on holidays.

(d) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Within 14 days from the date of this Order, offer Myrna Harrison and Newton Daye full reinstatement to their former jobs or, if those jobs no longer exist, to substantially equivalent positions, without prejudice to their seniority or any other rights or privileges previously enjoyed.

(b) Within 14 days from the date of this Order, remove from its files any reference to the failure to reemploy Myrna Harrison and Newton Daye, and, within 3 days thereafter, notify each of them in writing that this has been done and that it will not be used against them in any way.

(c) Rescind the modifications of its contract, including changes in seniority, wages, and benefits, and restore employees' terms and conditions of employment to what they were prior to its unlawful modification of the contract.

(d) Continue in effect all the terms and conditions of employment contained in its 2004–2011 collective-bargaining agreement, or other applicable collective-bargaining agreement, with the Union.

(e) Rescind its practice of excluding lunch breaks in tallying employees' daily "hours worked" for purposes of calculating overtime payments, and its new eligibility standard for premium pay for hours worked on holidays.

(f) Before implementing any changes in wages, hours, or other terms and conditions of employment of unit employees, notify and, on request, bargain with the Union as the exclusive collective-bargaining representative of employees in the following bargaining unit:

> All full-time, regular part-time service, and per diem/casual service and maintenance Employees, including certified nurse's assistants (CNAs), dietary aides, cooks, head cooks, housekeeping, laundry and maintenance Employees, central supply clerks, scheduler, rehabilitations aides, recreation assistants and receptionists employed by Respondent at its Westport facility, but excluding all other Employees, registered nurses

> (RNs), social workers, licensed practical nurses (LPNs), and other technical Employees, therapeutic recreation directors, medical records clerks, payroll clerk and guards, professional Employees and supervisors as defined in the Act.

(g) Make Myrna Harrison, Newton Daye, and all other affected unit employees whole for any loss of earnings and other benefits suffered as a result of the modifications of the contract terms of its laundry and housekeeping employees and as a result of the unlawful changes to the practices of calculating overtime and holiday premiums of its employees, in the manner set forth in the remedy section of the judge's decision as amended in this decision.

(h) Compensate Myrna Harrison, Newton Daye, and all other affected unit employees for the adverse tax consequences, if any, of receiving lump-sum backpay awards, and file a report with the Regional Director for Region 34, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay awards to the appropriate calendar year(s) for each employee.

(i) Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

(j) Within 14 days after service by the Region, post at its Westport, Connecticut facility copies of the attached notice marked "Appendix."[49] Copies of the notice, on forms provided by the Regional Director for Region 34, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or cov-

---

[49] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

ered by any other material. If the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since November 26, 2009.

(k) Within 14 days after service by the Region, hold a meeting or meetings, scheduled to ensure the widest possible attendance, at which the attached notice, Appendix, is to be read to the employees by the Respondent's responsible management official or, at the Respondent's option, by a Board agent in that officer's presence.

(l) Within 21 days after service by the Region, file with the Regional Director for Region 34 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

D. The National Labor Relations Board orders that the Respondent, 240 Church Street Operating Company II, LLC, d/b/a Newington Health Care Center, Newington, Connecticut, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Failing to continue in effect the terms and conditions of its 2004–2011 collective-bargaining agreement with the Union by reducing unit employees' seniority, wages, and benefits to those of new employees without the Union's consent.

(b) Unilaterally changing terms and conditions of employment of its unit employees by discontinuing its practice of including lunch breaks in tallying employees' daily "hours worked" for purposes of calculating overtime payments and implementing a new policy and practice of excluding these breaks, and by implementing a new eligibility standard for premium pay for hours worked on holidays.

(c) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Rescind the modifications of its contract, including changes in seniority, wages, and benefits, and restore employees' terms and conditions of employment to what they were prior to its unlawful modification of the contract.

(b) Continue in effect all the terms and conditions of employment contained in its 2004–2011 collective-bargaining agreement, or other applicable collective-bargaining agreement, with the Union.

(c) Rescind its practice of excluding lunch breaks in tallying employees' daily "hours worked" for purposes

of calculating overtime payments, and its new eligibility standard for premium pay for hours worked on holidays.

(d) Before implementing any changes in wages, hours, or other terms and conditions of employment of unit employees, notify and, on request, bargain with the Union as the exclusive collective-bargaining representative of employees in the following bargaining unit:

> All full-time, part-time, and per diem/casual service and maintenance Employees, including current categories and future new and changed jobs in the service and maintenance bargaining unit including certified nursing assistants, physical therapy aides, housekeeping Employees, central supply clerks, nursing office secretary, secretary-receptionist, receptionists, medical records clerk- receptionist, maintenance Employees, social service designee, therapeutic recreational directors, recreation aides, Registered Nurses and Licensed Practical Nurses employed by Respondent Newington including any new or expanded locations of Respondent but excluding all other Employees, guards, professional Employees and supervisors as defined in the Act.

(e) Make its unit employees whole for any loss of earnings and other benefits suffered as a result of the modification of the contract terms of its laundry and housekeeping employees and the unlawful changes to the practices of calculating overtime and holiday premiums of its employees, in the manner set forth in the remedy section of the judge's decision as amended in this decision.

(f) Compensate affected unit employees for the adverse tax consequences, if any, of receiving lump-sum backpay awards, and file a report with the Regional Director for Region 34, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay awards to the appropriate calendar year(s) for each employee.

(g) Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

(h) Within 14 days after service by the Region, post at its Newington, Connecticut facility copies of the attached notice marked "Appendix."[50] Copies of the notice, on

---

[50] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the Na-

18             DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

forms provided by the Regional Director for Region 34, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. If the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since November 26, 2009.

(i) Within 14 days after service by the Region, hold a meeting or meetings, scheduled to ensure the widest possible attendance, at which the attached notice, Appendix, is to be read to the employees by the Respondent's responsible management official or, at the Respondent's option, by a Board agent in that officer's presence.

(j) Within 21 days after service by the Region, file with the Regional Director for Region 34 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

E. The National Labor Relations Board orders that the Respondent, 107 Osborne Street Operating Company II, LLC, d/b/a Danbury HCC, Danbury, Connecticut, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Failing to continue in effect the terms and conditions of its 2004–2011 collective-bargaining agreement with the Union by implementing new eligibility standards for employees regarding holiday pay, personal days, vacation days, sick days, and uniform allowance.

(b) Unilaterally changing terms and conditions of employment of its unit employees by discontinuing its practice of including lunch breaks in tallying employees' daily "hours worked" for purposes of calculating overtime payments and implementing a new policy and practice of excluding these breaks, and by implementing a new eligibility standard for premium pay for hours worked on holidays.

(c) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Rescind its new eligibility standards for employees regarding holiday pay, personal days, vacation days, sick days, and uniform allowance and restore the standards for eligibility that were in place prior to the changes.

(b) Continue in effect all the terms and conditions of employment contained in its 2004–2011 collective-bargaining agreement, or other applicable collective-bargaining agreement, with the Union.

(c) Rescind its practice of excluding lunch breaks in tallying employees' daily "hours worked" for purposes of calculating overtime payments, and its new eligibility standard for premium pay for hours worked on holidays.

(d) Before implementing any changes in wages, hours, or other terms and conditions of employment of unit employees, notify and, on request, bargain with the Union as the exclusive collective-bargaining representative of employees in the following bargaining unit:

> All full-time, part-time, and per diem/casual RNs, LPNs, and service and maintenance Employees, including certified nurse's assistants, therapy aides, housekeeping employees, dietary employees, cooks, laundry employees, payroll clerks, rehabilitation aides, therapeutic recreation directors, receptionists, and maintenance employees employed by Respondent at its 107 Osborne Ave., Danbury, Connecticut location, but excluding the Director of Nurses, the Assistant Director of Nurses, the infection control nurse, the resident care coordinator, the staff development nurses, the employee health nurses, shift supervisors, unit coordinators, but excluding all other Employees, guards, professional Employees and supervisors as defined in the Act.

(e) Make its unit employees whole for any loss of earnings and other benefits suffered as a result of the unlawful changes in eligibility standards regarding holiday pay, personal days, vacation days, sick days, and uniform allowance and in the practices of calculating overtime and holiday premiums of its employees, in the manner set forth in the remedy section of the judge's decision as amended in this decision.

(f) Compensate affected unit employees for the adverse tax consequences, if any, of receiving lump-sum backpay awards, and file a report with the Regional Director for Region 34, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay awards to the appropriate calendar year(s) for each employee.

---

tional Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

(g) Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

(h) Within 14 days after service by the Region, post at its Danbury, Connecticut facility copies of the attached notice marked "Appendix."[51] Copies of the notice, on forms provided by the Regional Director for Region 34, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. If the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since November 26, 2009.

(i) Within 14 days after service by the Region, hold a meeting or meetings, scheduled to ensure the widest possible attendance, at which the attached notice, Appendix, is to be read to the employees by the Respondent's responsible management official or, at the Respondent's option, by a Board agent in that officer's presence.

(j) Within 21 days after service by the Region, file with the Regional Director for Region 34 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

F. The National Labor Relations Board orders that the Respondent, 341 Jordan Lane Operating Company II, LLC, d/b/a Wethersfield Health Care Center, Wethersfield, Connecticut, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Failing to continue in effect the terms and conditions of its 2004–2011 collective-bargaining agreement with the Union by implementing new eligibility standards for unit employees regarding holiday pay, personal days, vacation days, sick days, and uniform allowance.

(b) Unilaterally changing terms and conditions of employment of its unit employees by discontinuing its practice of including lunch breaks in tallying employees' daily "hours worked" for purposes of calculating overtime payments and implementing a new policy and practice of excluding these breaks, and by implementing a new eligibility standard for premium pay for hours worked on holidays.

(c) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Rescind its new eligibility standards for employees regarding holiday pay, personal days, vacation days, sick days, and uniform allowance and restore the standards for eligibility that were in place prior to the changes.

(b) Continue in effect all the terms and conditions of employment contained in its 2004–2011 collective-bargaining agreement, or other applicable collective-bargaining agreement, with the Union.

(c) Rescind its practice of excluding lunch breaks in tallying employees' daily "hours worked" for purposes of calculating overtime payments, and its new eligibility standard for premium pay for hours worked on holidays.

(d) Before implementing any changes in wages, hours, or other terms and conditions of employment of unit employees, notify and, on request, bargain with the Union as the exclusive collective-bargaining representative of employees in the following bargaining unit:

> All full-time, part-time, and per diem service and maintenance Employees, including certified nurse's assistants, porters, activity assistants, housekeepers, dietary aides, cooks, cooks helpers, laundry aides, and maintenance Employees, but excluding all other professional Employees, all technical Employees, all business office clerical Employees and all guards, professional Employees and supervisors as defined in the National Labor Relations Act, employed at the Center, 341 Jordan Lane, Wethersfield, CT 06109.

(e) Make its unit employees whole for any loss of earnings and other benefits suffered as a result of the unlawful changes in eligibility standards regarding holiday pay, personal days, vacation days, sick days, and uniform allowance and in the practices of calculating overtime and holiday premiums of its employees, in the

---

[51] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

manner set forth in the remedy section of the judge's decision as amended in this decision.

(f) Compensate affected unit employees for the adverse tax consequences, if any, of receiving lump-sum backpay awards, and file a report with the Regional Director for Region 34, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay awards to the appropriate calendar year(s) for each employee.

(g) Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

(h) Within 14 days after service by the Region, post at its Danbury, Connecticut facility copies of the attached notice marked "Appendix."[52]  Copies of the notice, on forms provided by the Regional Director for Region 34, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted.  In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means.  Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material.  If the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since November 26, 2009.

(i) Within 14 days after service by the Region, hold a meeting or meetings, scheduled to ensure the widest possible attendance, at which the attached notice, Appendix, is to be read to the employees by the Respondent's responsible management official or, at the Respondent's option, by a Board agent in that officer's presence.

(j) Within 21 days after service by the Region, file with the Regional Director for Region 34 a sworn certifi-

cation of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

G. The National Labor Relations Board orders that the Respondent, 245 Orange Avenue Operating Company II, LLC, d/b/a West River Health Care Center, Milford, Connecticut, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Unilaterally changing terms and conditions of employment of its unit employees by discontinuing its practice of including lunch breaks in tallying employees' daily "hours worked" for purposes of calculating overtime payments and implementing a new policy and practice of excluding these breaks, and by implementing a new eligibility standard for premium pay for hours worked on holidays.

(b) In any like or related manner interfering with, restraining, or coercing employees in the exercise of their rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Rescind its practice of excluding lunch breaks in tallying employees' daily "hours worked" for purposes of calculating overtime payments, and its new eligibility standard for premium pay for hours worked on holidays.

(b) Continue in effect all the terms and conditions of employment contained in its 2004–2011 collective-bargaining agreement, or other applicable collective-bargaining agreement, with the Union.

(c) Before implementing any changes in wages, hours, or other terms and conditions of employment of unit employees, notify and, on request, bargain with the Union as the exclusive collective-bargaining representative of employees in the following bargaining unit:

> All full-time, part-time, and per diem/casual service and maintenance and clerical Employees, including certified nurse's assistants, occupational therapy aides, ward clerks, dietary aides, cooks, head cooks, housekeeping aides, laundry aides, assistant maintenance supervisor, recreation aides, physical therapy aides, central supply clerk, billing, collections and accounts receivable clerks and medical records clerks employed by Respondent at its 245 Orange Avenue, Milford, Connecticut facility, but excluding, receptionists, payroll/accounts payable clerks, computer operators, data entry clerks, admissions clerks, licensed practical nurses, registered dietetic technicians, rehabilitation therapy technicians, physical therapy assistants, dieticians, registered respiratory therapists, certified respiratory therapy technicians, speech pathologists, social workers,

---

[52] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

administrative assistants, marketing director, manager of case management, head receptionist/secretary, executive chef, managerial Employees, confidential Employees, technical Employees and all guards, professional Employees and supervisors as defined in the Act.

(d) Make its unit employees whole for any loss of earnings and other benefits suffered as a result of the unlawful changes to the practices of calculating overtime and holiday premiums of its employees, in the manner set forth in the remedy section of the judge's decision as amended in this decision.

(e) Compensate affected unit employees for the adverse tax consequences, if any, of receiving lump-sum backpay awards, and file a report with the Regional Director for Region 34, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay awards to the appropriate calendar year(s) for each employee. .

(f) Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

(g) Within 14 days after service by the Region, post at its Milford, Connecticut facility copies of the attached notice marked "Appendix."[53]  Copies of the notice, on forms provided by the Regional Director for Region 34, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted.  In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material.  If the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current em-

ployees and former employees employed by the Respondent at any time since November 26, 2009.

(h) Within 14 days after service by the Region, hold a meeting or meetings, scheduled to ensure the widest possible attendance, at which the attached notice, Appendix, is to be read to the employees by the Respondent's responsible management official or, at the Respondent's option, by a Board agent in that officer's presence.

(i) Within 21 days after service by the Region, file with the Regional Director for Region 34 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

Dated, Washington, D.C.  February 22, 2017

_____

Mark Gaston Pearce,                              Member

_____

Lauren McFerran,                                  Member

(SEAL)        NATIONAL LABOR RELATIONS BOARD

ACTING CHAIRMAN MISCIMARRA, concurring in part and dissenting in part.

This case presents multiple issues involving six nursing homes and convalescent care facilities managed by HealthBridge Management, LLC (HealthBridge).  The six health care facilities, together with HealthBridge, are the Respondents.[1]

The most important issue involves two transitions affecting Respondents' represented housekeeping employees at the facilities located in Long Ridge, Newington, and Westport, Connecticut.  First, in February 2009, HealthBridge engaged in the arm's-length subcontracting of housekeeping operations at Long Ridge, Newington, and Westport to an independent company, HSG,[2] under which HSG agreed to hire the incumbent housekeeping employees and to assume the obligations of the relevant

---

[53] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

[1] For ease of reference, I sometimes use "Respondents" or "HealthBridge" when referring to a subset of the actual Respondents—specifically, HealthBridge and the nursing centers in Long Ridge, Newington, and Westport, Connecticut (where housekeeping operations were subcontracted from February 2009 to May 2010).  Likewise, I sometimes refer to the Long Ridge, Newington, and Westport locations as the "affected locations" or the "three locations."

[2] "HSG" stands for "Healthcare Services Group, Inc.," which is a stand-alone entity that has no affiliation with HealthBridge or the other Respondents.  To avoid potential confusion, I use the abbreviation "HSG" when referring to Healthcare Services Group, Inc.

collective-bargaining agreements (CBAs), including the obligation to honor the housekeeping employees' seniority. Second, in May 2010, the HSG subcontracting arrangement ended, and the Respondents resumed responsibility for housekeeping operations at the three locations. The Respondents remained bound by the same CBAs at each location, and Respondents hired back their former housekeeping employees as new employees, which *extinguished* all preexisting seniority. If one considers both transitions together, the record reveals that Respondents made no business changes except for eliminating the housekeeping employees' seniority rights.

Respondents provided no explanation why these events occurred. Moreover, conspicuously absent is record evidence regarding *any* legitimate business reasons for subcontracting and then resuming Respondents' housekeeping operations at the three locations. Given these circumstances, I agree that—for the reasons expressed more fully below—Respondents' May 2010 elimination of housekeeping employee seniority violated Section 8(a)(5) and (1) of the Act.

However, the record establishes that HealthBridge's February 2009 subcontracting of the housekeeping function to HSG was lawful; and contrary to my colleagues, I believe that HSG was the sole employer of housekeeping employees at the three locations during the February 2009-May 2010 subcontracting. Thus, I disagree with the rationales adopted by my colleagues and the judge for finding that HealthBridge's actions violated the Act. My colleagues find that, after housekeeping operations at the three locations were subcontracted to HSG, the Respondents at those locations continued to be an employer (specifically, a joint employer) of the housekeeping employees.[3] This finding is contrary to longstanding case law—including the leading Supreme Court decision that deals with subcontracting, *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203 (1964)—and is contradicted by the record, which establishes that, as a result of the February 2009 subcontracting, HSG was the sole employer of the housekeeping employees at the three locations, and the Respondents did not resume being the employer of housekeeping employees until the subcontracting arrangement ended in May 2010.[4]

This case also invites confusion regarding an important aspect of successorship law that is governed by numerous well-known Supreme Court decisions.[5] If one could view HealthBridge and the Long Ridge, Newington, and Westport Respondents as conventional successor employers at the time of the May 2010 transition, it is well established that (i) these Respondents—although obligated to recognize and bargain with the Union—would have no obligation to assume the HSG collective-bargaining agreement,[6] (ii) they would have the right to unilaterally set new initial terms of employment,[7] and (iii) the Board could not dictate what seniority rights or other wages or benefits the Respondents would provide to newly hired (or rehired) housekeeping employees.[8] However, I believe equally well-established case law supports the conclusion that the Respondents were *not* conventional successor employers in the instant case. Rather, the Board and the courts have routinely found that it violates the Act when an employer seeks to circumvent union obligations in reliance on shutdown-and-reopening or shutdown-and-relocation transactions between "alter ego" entities or by means of other transitions that have no discernible business purpose and produce no material change in business operations.[9]

---

[3] Three additional skilled-nursing centers that did not subcontract their housekeeping operations are also Respondents in this case.

[4] As to other matters, I concur with the finding that Respondents unlawfully threatened to call the police, but I do not reach or pass on whether the threat was "a response to" protected concerted activity. In addition, unlike my colleagues, I believe the facts here do not support the imposition of the special remedy requiring Respondents to read aloud the Board's remedial notice to employees at all the Respondents' facilities.

[5] The term "successorship" is used to describe a new employer's potential labor law obligations associated with a transition resulting from a business transaction (such as a sale of assets), contract rebidding, or other means by which one employer (the successor) is substituted for another (the predecessor). See, e.g., *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27 (1987); *Howard Johnson Co. v. Detroit Local Joint Executive Board*, 417 U.S. 249 (1974); *Golden State Bottling Co. v. NLRB*, 414 U.S. 168 (1973); *NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272 (1972); *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543 (1964); *NLRB v. Deena Artware, Inc.*, 361 U.S. 398 (1960); *Regal Knitwear Co. v. NLRB*, 324 U.S. 9 (1945); *Southport Petroleum Co. v. NLRB*, 315 U.S. 100 (1942).

[6] *NLRB v. Burns International Security Services, Inc.*, 406 U.S. at 281–282; *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. at 40.

[7] *NLRB v. Burns International Security Services, Inc.*, 406 U.S. at 284; *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. at 40. See also *Spruce Up Corp.*, 209 NLRB 194, 196 (1974), enfd. 529 F.2d 516 (4th Cir. 1975).

[8] Sec. 8(d) of the Act states that the duty to bargain collectively "does not compel either party to agree to a proposal or require the making of a concession." See also *H. K. Porter Co. v. NLRB*, 397 U.S. 99, 102, 108 (1970) ("[W]hile the Board does have power under the National Labor Relations Act . . . to require employers and employees to negotiate, it is without power to compel a company or a union to agree to any substantive contractual provision of a collective bargaining agreement. . . . [A]llowing the Board to compel agreement when the parties themselves are unable to agree would violate the fundamental premise on which the Act is based—private bargaining under governmental supervision of the procedure alone, without any official compulsion over the actual terms of the contract.").

[9] See text accompanying fns. 12–13, infra.

Here, the record reveals many facts that are even more indicative of unlawful conduct than what is presented in many other cases:

(1) in contrast to situations where the Board finds that *different* entities are alter egos that have unlawfully circumvented labor obligations, here, *the same employers* (HealthBridge and the Long Ridge, Newington, and Westport Respondents) were in place before the February 2009 subcontracting and after the May 2010 resumption of housekeeping operations by Respondents;

(2) the housekeeping work was performed continuously by the same employees in the same locations before, during and after the period of subcontracting;

(3) between February 2009 and May 2010, the housekeeping employees—though employed by HSG—were providing services for the benefit of the Respondents (as HSG's clients);

(4) the February 2009-May 2010 subcontracting period, during which the Respondents were not the employer of housekeeping employees, was relatively short;

(5) the subcontracting occurred completely within the term of the 2004–2011 CBAs applicable at Long Ridge, Newington, and Westport, respectively;

(6) the Respondents were bound by the same CBAs before, during and after the subcontracting period (i.e., during the subcontracting period, the Respondents' CBAs remained applicable to their non-housekeeping employees);

(7) the record reflects no evidence of business changes except for the elimination of housekeeping employees' seniority rights; and

(8) apart from extinguishing the seniority rights of housekeeping employees, the record is devoid of any explanation by Respondents or any discernible business reason for these events.

There are many situations where an employer engages in arm's-length subcontracting of certain operations to another entity that hires the employer's employees and assumes its CBAs. It is also possible that, at some later time, the original employer might reacquire the same operations for legitimate business reasons; and, as a bona fide successor, it would be permitted to decide who it will hire, establish initial employment terms, and make its own decisions regarding what seniority or other employment terms it will recognize or continue.[10]  However-

er, this is not such a case.  Respondents engaged in lawful subcontracting from February 2009 to May 2010, but the record establishes that Respondents were not bona fide successors in May 2010, and I agree with my colleagues that Respondents violated Section 8(a)(5) and (1) of the Act by extinguishing the seniority rights of healthcare employees when resuming their employment after the subcontracting arrangement ended.  As to other issues, I dissent in part and concur in part as described more fully in the remainder of this opinion.

### DISCUSSION

*A. Background: The February 2009 Subcontracting and Respondents' May 2010 Resumption of Housekeeping Operations*

The Respondents in this case consist of HealthBridge Management, LLC (HealthBridge) and six skilled-nursing centers in Connecticut:  Danbury Health Care Center (Danbury), Newington Health Care Center (Newington), Long Ridge of Stamford (Long Ridge), West River Health Care Center (West River), Westport Health Care Center (Westport), and Wethersfield Health Care Center (Wethersfield).  The Union has long represented bargaining units at each of the centers, and housekeeping employees were one of many classifications in the unit.[11]  Substantially identical collective-bargaining agreements covering the unit employees were in effect at each center at all relevant times.  Specifically, each agreement was effective by its terms from December 31, 2004 to March 16, 2011 (the "2004–2011 CBAs" or "CBAs").

In 2006, HealthBridge entered into "supervisor-only" contracts with HSG—an entirely independent company that is not a respondent in this case—to supervise housekeeping operations at all six centers.  Under these contracts, HSG supplied an on-site account manager to supervise the Respondents' housekeeping employees, but those employees remained employed by the Respondents.  The HSG supervisor, among other duties, directed and oversaw work, created schedules, disciplined employees, handled first-step grievances, and interviewed potential hires.  Aside from administrative functions, the Respondents' direct involvement with the housekeeping employees under the "supervisor-only" contracts was generally limited to handling grievances at the second and third steps and approving hiring recommendations.

On February 15, 2009, HealthBridge entered into "full-service" contracts with HSG at three Connecticut facilities:  Long Ridge, Newington, and Westport.  Under

---

[10] See, e.g., *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. at 40 (stating, citing *Burns*, that "the successor . . . is ordinarily free to set initial terms on which it will hire the employees of a predecessor," that "it is not bound by the substantive provisions of the predecessor's collective bargaining agreement," and that "the successor is under no obligation to hire the employees of its predecessor, subject, of course, to the restriction that it not discriminate against union employees in its hiring") (citation omitted).  See also text accompanying fns. 6–8, supra.

[11] Laundry employees were also within the housekeeping classification. References to housekeeping employees include laundry employees.

these full-service contracts, all responsibility for the housekeeping function at these centers was subcontracted to HSG. Under the 2004–2011 CBAs, the Respondents were required to secure the subcontractor's "agree[ment] in advance to retain the Employees and recognize all their rights, including seniority, under this Agreement." The Respondents complied with their contractual commitment to the Union and secured HSG's agreement to retain the employees who had performed the housekeeping work for the Respondents and to maintain the terms and conditions of their employment set forth in the CBAs. The record contains no evidence that the HSG subcontracting agreements were anything other than arm's-length contracts.

Just before February 15, 2009, HSG informed the housekeeping employees that they were being transferred to HSG's payroll. HSG then required the housekeeping employees to complete new-hire information forms, I-9s, W-4s, authorization forms for background checks, and enrollment forms for HSG's benefit plans. HSG honored its agreement to retain the employees and, as the judge wrote, "followed the union contract with respect to the . . . housekeeping employees" with "virtually no changes" other than payroll (housekeeping employees were paid by HSG, their new employer) and punching in and out (housekeeping employees used separate time clocks installed by HSG).

During the period encompassed by the full-service contract, HSG's on-site account managers continued with their duties as before. In addition, HSG took over all administrative functions related to the housekeeping employees, and HSG managers took over the second and third steps of the grievance process. An HSG manager approved the HSG supervisor's selection of the only new housekeeping employee hired during the subcontract; the Respondents were not involved in this hiring decision. The Respondents no longer had any meaningful effect on matters related to the housekeeping employees' employment, such as hiring, firing, discipline, supervision, or direction.

On May 17, 2010, when the housekeeping employees reported to work at Long Ridge, Newington, and Westport, they were informed by HSG's on-site account managers that HSG would no longer employ them and that they needed to attend a meeting held by the Respondents if they wished to reapply for their jobs. At those meetings, the Respondents told the employees that they would be rehired by the Respondents if they submitted a written application. The housekeeping employees were advised that upon rehiring, they would lose their accrued seniority, they would be deemed new hires with a wage rate of $12.80 an hour (the starting wage under the 2004–2011

CBAs), and they would have to serve a probationary period before they became eligible for benefits.

The record establishes that the subcontracting constituted a bona fide, arm's-length transition of employment responsibility to HSG. However, the record contains no evidence regarding who decided to terminate the HSG subcontracting arrangement in May 2010 or why that decision was made. As the judge found:

> Respondents called no witnesses from any of its facilities or from Respondent Healthbridge. It did call various supervisory personnel from HSG. . . . Their testimony was essentially the same in this area. They were all unaware of who made the decision to cancel the [HSG full-service] subcontract or why that decision was made. . . . In each instance, the HSG representatives were simply informed by higher ranking HSG officials that HSG was no longer going to employ the employees and instructed them to so inform the employees that they would need to apply [to the several Respondents] for jobs with the centers.

On May 17, 2010, representatives of the Respondents met individually with each of the 48 housekeeping employees who reapplied for employment. In some of these meetings, the employee was handed a personalized offer letter that had been prepared in advance. In others, the representative conducted a perfunctory interview by asking one or two questions before giving the employee his or her prepared offer letter. For example, in one interview, an employee who had operated the laundry machines at his center for more than 15 years was asked whether he knew how to use the machines. The Respondents rehired all but two of the employees who reapplied. In contrast to the treatment of other housekeeping employees, the Respondents did not hire Newton Daye (who had 13 years of accrued seniority) or Myrna Harrison (who had 22 years of accrued seniority). Excluding Daye and Harrison, most other employees returned to work that day as employees of the Respondents, continuing to do the same work they had performed both before and during the full-service subcontracting of housekeeping operations to HSG.

### B. The Respondents' Extinguishing of Housekeeping Employees' Seniority Through Subcontracting and Resuming Housekeeping Operations Violated Section 8(a)(5) and (1).

As noted above, the Respondents were parties to the 2004–2011 CBAs. Under the CBAs, the Respondents' housekeeping employees had significant seniority rights that, in turn, substantially affected their wages and benefits. As indicated previously, HealthBridge subcontract-

ed its housekeeping operations to HSG at Long Ridge, Newington, and Westport from February 15, 2009, to May 17, 2010, and HSG hired the incumbent housekeeping employees to continue to perform housekeeping services for Respondents at those locations.  It is uncontroverted that throughout the period of "full-service" subcontracting, (i) the Respondents continued their operations at Long Ridge, Newington, and Westport, and the CBAs remained applicable to non-housekeeping employees; (ii) the housekeeping employees, although employed by HSG, continued working and providing services to the Respondents at these three facilities; (iii) the Respondents advised the Union that HSG agreed "to retain the employees and recognize all their rights, including seniority, under the [2004–2011] Collective-Bargaining Agreement," and HSG similarly advised the Union that "all accrued benefits, seniority and job status will be intact and . . . HSG will agree to all terms and conditions of the contract between the Union and the facilities."  As the judge found, HSG made good on this commitment:  it "followed the union contract with respect to the . . . housekeeping employees" with "virtually no changes" other than payroll (housekeeping employees were paid by HSG as the employer) and punching in and out (housekeeping employees used separate time clocks installed by HSG).

The changes at issue here were made on May 17, 2010.  On that date, the subcontract was terminated, and the Respondents resumed their employment of the housekeeping employees.  Although the Respondents remained bound by the 2004–2011 CBAs, and notwithstanding their prior assurances that all employee rights "including seniority" would be unaffected by the HSG subcontracting, the Respondents conditioned the reemployment of their prior housekeeping employees, on and after May 17, 2010, on the forfeiture by those employees of all their accrued seniority, which entailed as well the forfeiture of all seniority-based wage and benefit improvements.

The Act does not prevent employers from implementing business changes such as subcontracting, and the Board is not empowered to second-guess such decisions, provided that the employer satisfies any obligation to provide the union notice and the opportunity to bargain over the decision or its effects.  See *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. at 213 (bargaining required over subcontracting decisions where the employer "replaced existing employees with those of an independent contractor to do the same work under similar conditions of employment"); *First National Maintenance Corp. v. NLRB*, 452 U.S. 666, 680, 681–682 (1981) (employer had no obligation to bargain over "an

economically motivated decision to shut down part of a business," although it was required to provide the union with the opportunity for effects bargaining "in a meaningful manner and at a meaningful time").

It is well established that an employer violates Section 8(a)(5), however, if the record supports a finding that the employer used a short-duration shutdown and resumption of operations to circumvent union obligations or to extinguish collectively bargained rights or obligations.[12] An employer likewise violates Section 8(a)(5) if it attempts to "escape the economic obligations of its collective bargaining agreement" when it "terminates or transfers its employees and subsequently resumes operations through an alter ego . . . ."[13]

Conspicuously absent from the record in this case is any evidence that the Respondents had legitimate nondiscriminatory business reasons for the February 2009 and May 2010 subcontracting and resumption of housekeeping operations.  The judge found it remarkable that the Respondents failed to introduce evidence regarding the business reasons for taking these actions, and he properly drew an adverse inference that the Respondents' representatives, had they been called as witnesses, would have contradicted the Respondents' version of events.[14]

[12] See, e.g., *El Torito-La Fiesta Restaurants, Inc.*, 295 NLRB 493, 493–496 (1989) (employer violated Section 8(a)(5) by repudiating CBA after reopening restaurant following 14-month hiatus for remodeling, even though only 8 of approximately 200 postreopening employees previously worked for employer), enfd. 929 F.2d 490 (9th Cir. 1991); *Martin Bush Iron & Metal*, 329 NLRB 124, 125, 135 (1999) (employer violated Section 8(a)(5) where it ceased operations for 4-1/2 months and then resumed operations through an alter-ego employer that failed to adhere to the CBA); *Rockwood Energy & Mineral Corp.*, 299 NLRB 1136 (1990) (employer violated Section 8(a)(5) where it repudiated terms of expired CBA when it resumed mining operations following 5-year hiatus), enfd. 942 F.2d 169 (3d Cir. 1991); *Golden State Warriors*, 334 NLRB 651 (2001) (employer violated Section 8(a)(5) where it repudiated terms of expired CBA after 1-year shutdown of Oakland Coliseum for remodeling), enfd. mem. 50 Fed. Appx. 3 (D.C. Cir. 2002).

[13] *International Harvester*, No. 29–CA–10113, 1983 WL 29384 (Advice Mem. May 24, 1983) (citing *Circle T Corp.*, 238 NLRB 245 (1978), enfd. mem. 108 LRRM 2103 (9th Cir. 1980); *Big Bear Supermarkets No. 3*, 239 NLRB 179 (1978), enfd. 640 F.2d 924 (9th Cir. 1980), cert. denied 449 U.S. 919 (1980); *Rushton & Mercier Woodworking Co.*, 203 NLRB 123 (1973), enfd. mem. 86 LRRM 2151 (5th Cir. 1974)).

[14] As the judge observed, "Respondents called no witnesses from any of [their] facilities or from Respondent Healthbridge," and the testimony by HSG supervisors established they "were all unaware of who made the decision to cancel the . . . subcontract or why that decision was made."  The judge noted "the failure of Respondents to present any witness to explain the reasons for their decisions to subcontract the work to HSG in the first place, to cancel the subcontract in 2010 and/or to rehire the employees as new employees in May of 2010," and he "[found] it appropriate to draw an adverse inference against Respondents and conclude that if they had testified, their testimony would not be supportive of Respondents' version of the events"

26                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

This renders the instant case distinguishable from cases in which employers, based on economic reasons, engaged in lawful subcontracting, a shutdown or cessation of operations, or a sale or other transition to a new employer, with a resulting impact on wages, hours, or other terms and conditions of employment. See, e.g., *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. at 208, 211 (addressing bargaining obligations arising from subcontracting for "economic" reasons where the company "replaced existing employees with those of an independent contractor to do the same work under similar conditions of employment"); *Howard Johnson Co. v. Detroit Local Joint Executive Board, Hotel & Restaurant Employees*, 417 U.S. at 259 fn. 5 (addressing transfer of ownership to successor entity where there was "not the slightest suggestion" that the sale "was in any sense a paper transaction without meaningful impact on the ownership or operation of the enterprise").[15]

Section 8(a)(5) makes it unlawful for an employer to "refuse to bargain collectively" with a certified or recognized union, and Section 8(d) defines the duty "to bargain collectively" when a collective-bargaining agreement is in effect as prohibiting parties from implementing any mid-term contract modification absent the other party's consent. See *Milwaukee Spring Division (Milwaukee Spring II)*, 268 NLRB 601, 602 (1984) (quoting Section 8(d)), enfd. sub nom. *Auto Workers Local 547 v. NLRB*, 765 F.2d 175 (D.C. Cir. 1985). In the specific circumstances presented here, I would find that the Respondents' extinguishing of contractual seniority and seniority-based wage and benefit improvements following successive subcontracting and resumption of housekeeping operations during the term of the 2004–2011 CBAs, undertaken for no apparent purpose other than to extinguish that contractual seniority and those seniority-based improvements, constitutes an unlawful refusal to bargain in good faith and an unlawful midterm modification of the Respondents' 2004–2011 CBAs in violation of Section 8(a)(5).

There is no question that all housekeeping employees had accrued seniority rights based on terms "contained in" the 2004–2011 CBAs,[16] and there is also no question that the Respondents, during the term of the CBAs and without the Union's consent, conditioned the employment of all housekeeping employees, after May 17, 2010, on the forfeiture of their accrued seniority. See *Milwaukee Spring II*, 268 NLRB at 602 (quoting Sec. 8(d)). Moreover, the facts in the instant case provide stronger support for a violation than those in other cases where the Board has found Section 8(a)(5) violations based on unilateral changes in contractual wages or benefits attributed to short-duration business changes. Unlike cases where employers were found to have violated Section 8(a)(5) after an actual shutdown and hiatus in operations,[17] the Respondents—though they ceased being the employer of housekeeping employees for a 15-month period—continued to benefit from housekeeping services provided by the same individuals at the same locations without interruption. Thus, the Respondents continued normal operations at the three facilities affected by the full-service subcontracting to HSG, and the housekeeping employees, while employed by HSG, continued providing services to the Respondents. And unlike cases in which employers were found to have violated Section 8(a)(5) based on changes involving separate entities that were found to be alter egos,[18] the housekeeping employees here were employed by the *same* employer—the Respondents—before and after the subcontracting. The Respondents were bound by the 2004–2011 CBAs before the full-service subcontracting to HSG, all housekeeping employees had accrued seniority under those CBAs, and the Respondents resumed housekeeping operations during the term of the *same* 2004–2011 CBAs and required all housekeeping employees to forfeit their accrued seniority. In addition, the Respondents assured the Union that employees affected by the subcontracting to HSG would retain all contractual rights "including seniority," and the Respondents have not introduced *any* evidence regarding business reasons for resuming housekeeping operations while extinguishing accrued seniority.

Consistent with the adverse inference drawn by the judge, the Respondents' failure to tender any explanation

---

(citing *International Automated Machines*, 285 NLRB 1122, 1123 (1987)).

[15] See also *Southport Petroleum Co. v. NLRB*, 315 U.S. at 106 (differentiating between "a bona fide discontinuance and a true change of ownership" and a "disguised continuance of the old employer" "intended to evade" the predecessor's legal obligations); *Helrose Bindery, Inc.*, 204 NLRB 499, 504 (1973) (employer violated the Act by ceasing operations at one location and resuming operations 12 miles away under a different name with "the same machinery, assets, customers, and operating officials" as part of a "scheme to escape the obligations of the contract"); *Johnson Electric Co.*, 196 NLRB 637, 641–642 (1972) (employer violated the Act by creating a partnership under the same name after deciding to "disregard the terms of the collective-bargaining agreement" while engaging in the same business, involving the same type of work, with "common offices, ownership, financial control, directors, and operators").

[16] In the 2004–2011 CBAs, seniority was governed by Article 9, and under Articles 9(C) and 11, employees' wages and benefits were made dependent on bargaining-unit seniority.

[17] See, e.g., *El Torito-La Fiesta Restaurants*, supra; *Martin Bush Iron & Metal*, supra; *Rockwood Energy & Mineral Corp.*, supra; *Golden State Warriors*, supra.

[18] See, e.g., *Circle T Corp.*, supra; *Big Bear Supermarkets No. 3*, supra; *Rushton & Mercier Woodworking Co.*, supra.

for their actions—indeed, their failure even to introduce evidence of who made the relevant decisions—warrants a conclusion that the Respondents implemented these changes for the purpose of extinguishing collectively bargained seniority and related wage rates and benefits. Even without reaching such a conclusion, however, I would find that the other considerations described above warrant a finding that the Respondents' actions constituted an unlawful refusal to bargain and midterm contract modification in violation of Section 8(a)(5).

The facts presented here also stand in contrast to a conventional successorship situation where, for example, an employer acquires or re-acquires business operations for legitimate reasons. For example, in *Howard Johnson Co. v. Hotel & Restaurant Employees*, supra, the Supreme Court found that Howard Johnson was not required to arbitrate disputes pursuant to a predecessor's collective-bargaining agreement, even though Howard Johnson had acquired from the predecessor motel and restaurant operations it had previously franchised to the predecessor. In so finding, the Court emphasized there was "not the slightest suggestion" that the sale of the motel and restaurant to Howard Johnson "was in any sense a paper transaction without meaningful impact on the ownership or operation of the enterprise," Howard Johnson "had no ownership interest . . . prior to this transaction," and "nothing in the record . . . indicate[d] that Howard Johnson had any previous dealings with the Union, or had participated in any way in negotiating or approving the collective-bargaining agreements."[19] The Supreme Court recognized that successorship principles do not apply in cases involving a "mere technical change in the structure or identity of the employing entity, frequently to avoid the effect of the labor laws, without any substantial change in its ownership or management. In these circumstances, the courts have had little difficulty holding that the successor is in reality the same employer and is subject to all the legal and contractual obligations of the predecessor."[20]

Here, by comparison, the transactions between the Respondents and HSG did *not* have a "meaningful impact on the ownership or operation of the enterprise," id., because the housekeeping employees remained working at the same facilities and continued to provide services to the Respondents throughout the duration of the HSG subcontract. And not only did the Respondents have "previous dealings with the Union," id., they were party to the 2004–2011 CBAs both *before* and *after* the subcontract. Finally, the absence of any explanation for the

Respondents' actions—combined with the other uncontroverted facts—warrants a finding that the Respondents sought "to avoid the effect of the labor laws," id., by divesting employees of their collectively bargained seniority.[21]

Moreover, I agree with the judge's conclusion that Respondents' unilateral elimination of seniority and seniority-based wage and benefit improvements for all housekeeping employees was not permitted by the terms of the 2004–2011 CBAs.

Article 9(B)(3) lists only five events that would cause employees to lose their accrued seniority, and none of these events applied to the employees whose seniority was extinguished by the Respondents upon their resumption of housekeeping operations.[22] In addition to Article

---

[19] 417 U.S. at 259 fn. 5.

[20] Id. See also *Southport Petroleum Co. v. NLRB*, supra; *Helrose Bindery, Inc.*, supra; *Johnson Electric Co.*, supra.

[21] Id. For similar reasons, the facts in the instant case are materially different from a conventional successorship situation where, for example, a purchaser, although required to recognize and bargain with the union, is not required to adopt the predecessor's collective-bargaining agreement and is normally permitted to unilaterally set different initial terms of employment. See *NLRB v. Burns International Security Services, Inc.*, supra, 406 U.S. at 281–291. In *Burns*, the Supreme Court held that a predecessor's collective-bargaining agreement was not binding on successor employers when the agreement was "not agreed to or assumed by them." Id. at 283; see also id. at 281–282 (successor employer not required to adopt predecessor's labor contract to which the successor "had in no way agreed"). Here, it is uncontroverted that the Respondents themselves negotiated and agreed to the terms and conditions of the 2004–2011 CBAs. Indeed, the Respondents do not contend that the 2004–2011 CBAs were inapplicable to them after they resumed the housekeeping operations, nor could they prevail on such a contention because—before, during, and after the February 2009–May 2010 subcontracting—Respondents were bound by and continued to apply the 2004–2011 CBAs. As noted previously, during the period that housekeeping operations were subcontracted to HSG, Respondents applied the CBAs to non-housekeeping employees, and the housekeeping employees—although they were employed by HSG—were subject to identical contractual terms because HSG honored the terms of the same CBAs, including the CBAs' seniority provisions.

[22] Article 9(B)(3) provides that employees would lose their seniority only in the event of (a) "voluntary resignation or retirement"; (b) "discharge for just cause"; (c) "failure to return to work upon expiration of an authorized leave of absence, unless prior to such expiration she/he gives the Center satisfactory reason for her/his inability to return to work"; (d) "failure to return to work within ten (10) calendar days after the Center has sent written notice (return receipt requested) to recall from layoff to the Employee's last known address"; and (e) "layoff in excess of recall rights, which shall be equivalent to the Employee's seniority as of the date of layoff, or two years, whichever is less." None of these provisions applies to the affected employees in the instant case. Regarding subpart (e)'s reference to a "layoff in excess of recall rights," even assuming the HSG subcontract effected a "layoff" for purposes of subpart (e), the duration of the HSG subcontract was less than 2 years, and there is no evidence that the duration of the subcontract (approximately 15 months) was greater than any affected employee's seniority as of the date the subcontract became effective. Nor is there evidence that the Respondents relied on such a justification as a basis for extinguishing the accrued seniority of the affected employees. For these reasons, I would find that the Respondents lack a sound arguable basis for interpreting Article 9(B)(3) to permit them to eliminate

9(B)(3), two other provisions in the 2004–2011 CBAs reinforce the protection afforded to the accrued seniority of housekeeping employees in the circumstances presented here.    Article 9(F) deals specifically with "[s]ubcontracting," and it states that "[n]o bargaining unit work shall be subcontracted unless the subcontractor agrees in advance to retain the Employees and recognize all their rights, *including seniority*, under this agreement" (emphasis added).    Thus, the CBAs explicitly provided for all housekeeping employees to retain their accrued seniority when the Respondents engaged in the full-service subcontracting to HSG in 2009.    Additionally, the CBAs contain a "successorship" provision (Article 38 or 39, depending on the particular CBA) binding "all sub-lessees, assignees, purchasers or other successors . . . to such terms and provisions, to which the Employees are and shall be entitled under this Agreement," and that requires the employer to require "any purchaser, transferee, lessee [or] assigns . . . of the operation covered by this Agreement to accept the terms of this Agreement by written notice."    This successorship provision required the Respondents in 2009 to secure HSG's agreement to accept all contractual "terms and provisions" to which employees "are and shall be entitled" under the CBA. The "terms and provisions" HSG accepted included seniority, since the retention of seniority was required under Article 9(F).    These CBA provisions—all made applicable to HSG—contemplate that accrued employee seniority would have similar protection if and when HSG subcontracted or conveyed any "operation covered by this Agreement" to another "purchaser, transferee, lessee [or] assigns."    There is little doubt that—in relation to the May 2010 resumption of housekeeping operations and the reemployment of housekeeping employees—the Respondents at Long Ridge, Newington, and Westport qualified as "transferees" or "assigns" under the CBAs, and (as noted previously) Respondents were separately bound to the CBAs before, during and after the period of subcontracting.

Nor can the Board reasonably find that Respondents' elimination of accrued seniority for housekeeping employees is rendered lawful by Article 8 in the 2004–2011 CBAs, which states: "All newly hired regular full-time employees of the Center who are covered by this Agreement, whether or not previously employed by the Center . . . , shall be deemed probationary Employees."    It is true that the returning housekeeping employees were "previ-

ously employed by the Center" for purposes of Article 8. However, Article 8 does not provide for the forfeiture of accrued seniority.    The only CBA provision that addresses the forfeiture of seniority is Article 9(B)(3), which provides for a loss of seniority based on any one of five events, none of which happened here.

Moreover, Article 8 applies only if individuals are "newly hired," and it indicates that such persons may or may not have been "previously employed."    However, this begs the question of *who* can be deemed "newly hired."    Article 8 provides no explicit guidance as to whether an individual is "newly hired" when he or she has preexisting seniority rights that other CBA provisions require the employer to recognize.    As noted previously, Article 9(F) expressly states that, in the event of subcontracting, all employees must be retained and the employer must recognize "all their rights, *including seniority*, under this agreement" (emphasis added).

Finally, even if Respondents have constructed a plausible interpretation of the wording set forth in Article 8— under which all returning housekeeping employees would be treated as "newly hired" for purposes of the CBA, resulting in probationary status and the extinction of all accrued seniority rights—the Board must evaluate whether this interpretation is supported by "substantial evidence on the record considered as a whole,"[23] which includes the CBAs in their entirety and the particular factual circumstances presented here.    Respondents' position is not compelled by Article 8's plain language, and it is contrary to traditional principles governing the interpretation of collective-bargaining agreements, which require an attempt "to ascertain the intention of the parties,"[24] and under which "collective bargaining agreements like other contracts are to be given a reasonable construction, not one which results in injustice and absurdity,"[25] and relevant terms are to be evaluated "'in the context of the entire agreement's language, structure, and stated purpose.'"[26]

In two respects, Respondents' interpretation of Article 8 would produce absurd results that are contrary to other CBA provisions.    First, as indicated previously, Article 9(B)(3) identifies five discrete events that can result in the loss of seniority, none of which applies to the return-

---

all seniority accrued by the housekeeping employees in connection with the subcontracting and resumption of operations at issue in the instant case.    See *Bath Iron Works Corp.*, 345 NLRB 499, 501–503 (2005), affd. sub nom. *Bath Marine Draftsmen's Assn. v. NLRB*, 475 F.3d 14 (1st Cir. 2007).

[23] Sec. 10(e) ("The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive.").

[24] *M&G Polymers USA, LLC v. Tackett*, 135 S.Ct. 926, 935 (2015) (quoting 11 Williston on Contracts § 30:2, at 18 (4th ed. 2012)).

[25] *Atlantic Coast Line Railroad Co. v. Brotherhood of Railway and Steamship Clerks*, 210 F.2d 812, 815 (4th Cir. 1954).

[26] *Alday v. Raytheon Co.*, 693 F.3d 772, 782 (9th Cir. 2012) (quoting *Trustees of Southern California IBEW-NECA Pension Trust Fund v. Flores*, 519 F.3d 1045, 1047 (9th Cir. 2008)).

ing housekeeping employees here. Therefore, if one construes Article 8 as requiring returning housekeeping employees to be deemed "newly hired" probationary employees, extinguishing their seniority would be directly contrary to Article 9(B)(3). Second, two other CBA provisions—Article 9(F), dealing with subcontracting, and Article 38 or 39, dealing with successors, transferees or assigns—expressly *protect* all contractual rights "including seniority"[27] in the event of subcontracting or other transactions involving transitions to a different employer, and these contract provisions were in the CBAs that bound Respondents *and* HSG. In view of these CBA provisions, it would be absurd and defy common sense to conclude that Article 8's reference to "newly hired" employees applied to the housekeeping employees at issue here, where (i) those employees were previously employed by Respondents and accrued seniority under the CBAs, (ii) during the period of subcontracting to HSG, those employees *continued* performing the same work at the same locations for the benefit of Respondents while retaining (and increasing) their seniority as provided in CBA Article 9, and (iii) after Respondents' resumption of housekeeping operations, which made Respondents either "transferees" or "assigns" under the CBAs (Article 38 or 39), housekeeping employees *again* continued performing the same work at the same locations for the benefit of the Respondents. Applying the standard principles of contract construction described above, I believe the Board can only reasonably interpret the "newly hired" language in Article 8 as follows: (i) to the extent Article 8 applies to the housekeeping employees in the instant case, it places them on "probationary status" for the period specified in the CBAs without affecting their preexisting seniority (which, under Article 9(B)(3), must be considered unbroken), or (ii) to the extent Article 8 presumes that newly hired employees would be on "probationary status" without any preexisting seniority, this was intended *only* to apply to individuals whose prior seniority was broken based on one of the five events enumerated in Article 9(B)(3), and it was *not* intended to apply to individuals whose seniority and other CBA rights were expressly protected by more specific subcontracting and successorship CBA language contained in Article 9(F) and Articles 38/39.

For present purposes, the Board need not definitively resolve this contractual question. Rather, as noted previously, existing case law and the record provide ample support for finding that Respondents violated their *statu-*

tory obligations by relying on their short-duration subcontracting and resumption of housekeeping operations, absent any evidence regarding business justifications, to extinguish the accrued seniority of housekeeping employees. The only contractual question before the Board is whether the CBAs reveal that the parties had already bargained concerning the matters in dispute here and agreed that seniority rights may be extinguished as happened here, which would preclude a finding that extinguishing the seniority rights of housekeeping employees violated the Act.[28] Alternatively, the Board must decide whether the parties' CBAs constitute a clear and unmistakable waiver that would preclude our finding that Respondents unlawfully extinguished housekeeping employees' seniority rights.[29] Under either of these standards, the CBAs do not preclude our finding that Respondents' actions were unlawful. Therefore, I believe that Respondents violated Section 8(a)(5) and (1) when they eliminated the accrued seniority of housekeeping employees who resumed their employment with Respondents in May 2010.[30]

## C. Respondents Were Not an Employer of Housekeeping Employees During the February 2009–May 2010 Subcontracting of Housekeeping Operations.

Under two theories, my colleagues find that the employment relationship between the Respondents and the housekeeping employees continued throughout the HSG subcontract: (1) the Respondents never informed the housekeeping employees that their employment relationship with the Respondents was terminated, and (2) the Respondents were joint employers of the housekeeping employees together with HSG.[31] For the reasons explained below, I believe my colleagues are mistaken as to both theories.

---

[27] As noted above, Article 9(F) states: "No bargaining unit work shall be subcontracted unless the subcontractor agrees in advance to retain the Employees and recognize all their rights, including seniority, under this agreement."

[28] This is the "contract coverage" standard utilized by certain courts of appeals when reviewing Board findings that an employer has violated Sec. 8(a)(5). See, e.g., *NLRB v. Postal Service*, 8 F.3d 832 (D.C. Cir. 1993); see also *Heartland Plymouth Court MI, LLC v. NLRB*, 838 F.3d 16 (D.C. Cir. 2016).

[29] See *Provena St. Joseph Medical Center*, 350 NLRB 808 (2007).

[30] Because I believe Respondents were not bona fide successors that would typically have the right to decide whether or not to offer employment to predecessor employees, I agree with the judge's finding—accepted by my colleagues—that Respondents' failure to rehire employees Daye and Harrison, which was completely unexplained and likewise had the effect of extinguishing their accrued seniority, violated Sec. 8(a)(5) and (1) and constituted unlawful midterm modifications of the seniority and just cause provisions contained in the CBAs.

[31] The majority finds that the Respondents were joint employers of the housekeeping employees during the full-service subcontracts under the Board's traditional joint-employer standard—i.e., the standard that preceded the dramatic transformation of the joint-employer doctrine in *BFI Newby Island Recyclery*, 362 NLRB No. 186 (2015) (*Browning-Ferris*). I dissented in *Browning-Ferris* along with former Member Johnson. See 362 NLRB No. 186, slip op. at 21–47.

30                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

*1. The Respondents' Employment Relationship with the Housekeeping Employees Was Severed When Housekeeping Operations Were Subcontracted to HSG.* On February 15, 2009, HSG, a company entirely independent of the Respondents, took over the Respondents' housekeeping operations and became the employer of the housekeeping employees under an arm's-length subcontracting agreement. Nonetheless, my colleagues disregard the subcontract. They treat the housekeeping employees as continuing to be employed by the Respondents as if the subcontract never occurred. In *CNN America, Inc.*, 361 NLRB No. 47 (2014), the Board majority deemed CNN an employer of its subcontractor's employees based on indirect influence commonly exercised by subcontracting entities to ensure they receive the services for which they have contracted. Here, my colleagues again demonstrate the Board majority's unwillingness to accept the long-established legal effect of subcontracting on the subcontracting entity's employer status.[32] In their view, when an entity subcontracts part of its operations to a third party, and the same employees—now employed by the subcontractor—continue to perform the subcontracted function, the subcontracting entity *continues to employ those employees* unless it communicates to them—by word or deed—that they are employed by the subcontractor.

No such communication was required to terminate the employment relationship between the Respondents and the housekeeping employees when the housekeeping function was subcontracted to HSG. Absent a *sham* subcontract or the subcontracting entity retaining *direct and immediate control* over essential terms and conditions of employment such as hiring, firing, discipline, supervision, or direction, the effect of the subcontract itself is to sever the employment relationship between the subcontracting entity and its former employees.

The Board recognized as much in *District 1199E, Health Care Employees (Greater Pennsylvania Avenue Nursing Center, Inc.)*, 238 NLRB 9 (1978),[33] a case with striking parallels to the instant case. In *District 1199E*, a nursing home—Greater Pennsylvania Avenue Nursing Center (Greater Pennsylvania)—decided to subcontract its housekeeping, laundry, and dietary functions to a third-party service provider, Olympic Management Services (Olympic). Greater Pennsylvania's housekeeping, laundry, and dietary employees were represented by District 1199E, Health Care Employees (the union). After the functions were subcontracted to Olympic, Greater Pennsylvania's former housekeeping, laundry, and dietary employees continued to perform those functions as employees of Olympic "without any interruption in employment or loss of wages, benefits, or seniority." Id. at 12. Olympic recognized the union and requested bargaining, but the union refused to bargain with Olympic, taking the position that the subcontract was "a sham and a subterfuge to circumvent the prior direct relationship between the [u]nion and Greater Pennsylvania as the employer of the dietary, housekeeping, and laundry employees." Id. at 15. The Board rejected the union's position. It found that Greater Pennsylvania was *not* the employer of the dietary, housekeeping, and laundry employees; that Olympic was their sole employer; and that the union had violated Section 8(b)(3) by refusing to bargain with Olympic. Id. at 14–16.

Nowhere in *District 1199E* did the Board condition the severance of the employment relationship between Greater Pennsylvania and the dietary, housekeeping, and laundry employees on Greater Pennsylvania informing those employees that they were no longer employed by Greater Pennsylvania but instead were now employed by Olympic. Rather, the subcontracting itself was deemed to sever the relationship. Nonetheless, in finding that the Respondents continued to employ the housekeeping employees during the term of the subcontract, my colleagues attach controlling significance to the fact that the Respondents did not inform the housekeeping employees that they were no longer employed by the Respondents. As authority for this position, they rely on Restatement (Second) of Agency § 227, comment b, which states:

> In the absence of evidence to the contrary, there is an inference that the actor [i.e., employee] remains in [the general employer's] general employment so long as, by the service rendered another, he is performing the business entrusted to him by the general employer. There is no inference that because the general employer has permitted a division of control, he has surrendered it.

---

[32] As I observed in my separate opinion in *CNN America*:

In *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203 (1964), an employer had union-represented employees performing maintenance work in one of its plants. At one point, the employer contracted out the maintenance work to an independent contractor. The employer "merely replaced existing employees with those of an independent contractor," which prompted the Supreme Court to find that the contracting employer had the obligation to give its union notice and the opportunity for bargaining over the subcontracting decision. Id. Even though the subcontractor's employees continued "to do the same work under similar conditions of employment" and the "maintenance work still had to be performed in the plant," id. at 213, Fibreboard ceased being the "employer."

361 NLRB No. 47, slip op. at 32 (Member Miscimarra, concurring in part and dissenting in part).

[33] Remanded on other grounds 613 F.2d 1102 (D.C. Cir. 1979).

"Evidence to the contrary" of this inference would be a statement by "the general employer" that it no longer employs the employee and that he is now employed by someone else. Absent such evidence, the inference of continuing employment by the general employer remains. This is my colleagues' rationale—and it is based on a logical fallacy: begging the question. That is, my colleagues assume the very conclusion they seek to prove.[34]

Section 227 of the Restatement (Second) of Agency is titled "Servant Lent to Another Master." It states: "A servant directed or permitted by his master to perform services for another may become the servant of such other in performing the services. He may become the other's servant as to some acts and not as to others." The issue addressed by Section 227 is under what circumstances a servant lent by his master to another party may also be the servant of that other party. In other words, Section 227 starts from the assumption that the servant in question *remains* a servant of his master, since it is only in that situation that the master could *lend* the servant to another party. Transposing these archaic terms into this case, by applying Section 227 my colleagues *assume* that the housekeeping employees (the "servants") continued to be employed by the Respondents (the "master") and were merely "lent" to HSG ("another master"). But the issue here is whether the housekeeping employees *did* continue to be employed by the Respondents, and an analysis that purports to demonstrate that they did cannot very well assume the very proposition it seeks to prove![35]

Moreover, even setting aside this logical fallacy, there *is* "evidence . . . contrary" to the housekeeping employees' remaining employed by the Respondents. The Respondents entered into a subcontracting agreement with HSG that ceded all direct and immediate control over the housekeeping function and the employees who perform that function to HSG. This was not an arrangement in which the Respondents "permitted a division of control." Rather, the Respondents *surrendered* their status as employer of the housekeeping employees to HSG. Moreover, the housekeeping employees knew or should have known that HSG was now their employer. First, they were informed by the Respondents that they were being transferred to HSG's payroll. Then HSG required them to fill out new-hire information forms, I-9s,[36] W-4s,[37] authorization forms for background checks, and enrollment forms for HSG's benefit plans. These were clear indicia that the housekeeping employees were being hired by HSG and were no longer employed by the Respondents.

My colleagues find support for their conclusion that the Respondents never ceased their employment relationship with the housekeeping employees during the HSG subcontract in three isolated grievances. To the contrary, the manner in which the Respondents handled these grievances merely shows that the Respondents understood that the individuals who filed them retained their contractual seniority rights entitling them to bid on bargaining-unit positions outside the housekeeping department.

During the HSG subcontract, housekeeping employees Franz Petion, Claudette Parks-Hill, and Michael Cockburn filed grievances contending that the Respondents improperly failed to award them non-housekeeping bargaining-unit positions that they had bid on in reliance on their seniority. The Respondents ultimately agreed to reemploy Petion and Parks-Hill in unit positions in the dietary and nursing departments, respectively, based on their seniority, but they did not agree to reemploy Cockburn in a maintenance department unit position because Cockburn had less seniority than the employee who had been awarded the position. As I discuss above, the housekeeping employees had accrued seniority under the 2004–2011 CBAs that was not extinguished under Article 9(B)(3) when the housekeeping function was subcontracted to HSG.[38] The positions that Petion, Parks-Hill and Cockburn sought were unit positions covered by the 2004–2011 CBAs in non-housekeeping departments the Respondents had *not* subcontracted. Respondents' manner of handling the grievances reflected a recognition

---

[34] See https://en.wikipedia.org/wiki/Begging_the_question (last visited Feb. 16, 2017) ("To beg the question means to assume the conclusion of an argument—a type of circular reasoning. This is an informal fallacy, in which an arguer includes the conclusion to be proven within a premise of the argument, often in an indirect way such that its presence within the premise is hidden or at least not easily apparent.").

[35] In addition, comment c to Sec. 227 makes clear that the lent-servant doctrine—and comment b relied on by my colleagues—does not apply to subcontracting. Comment c relevantly states:

[A] continuation of the general employment is indicated by the fact that the general employer can properly substitute another servant at any time, that the time of the new employment is short, and that the lent servant has the skill of a specialist.

None of these indicia of continuing employment is present here. The Respondents did not retain the authority to substitute other employees for the employees HSG hired to perform the subcontracted housekeeping function; the "time of the new employment" was not short (15 months); and the housekeeping employees did not have the skill of specialists.

[36] "Form I-9 is used for verifying the identity and employment authorization of individuals *hired* for employment in the United States. All U.S. *employers* must ensure proper completion of Form I-9 for each individual *they hire* for employment in the United States" (emphasis added). https://www.uscis.gov/i-9 (last visited Feb., 16, 2017).

[37] The first sentence in the instructions at the top of the W-4 form states: "Complete Form W-4 so that *your employer* can withhold the correct federal income tax from your pay" (emphasis added). https://www.irs.gov/pub/irs-pdf/fw4.pdf (last visited Feb. 16, 2017).

[38] See supra fn. 22 and accompanying text.

that although the grievants were employed by HSG, not the Respondents, they retained their contractual seniority under the 2004–2011 CBAs and with it, a right to bid on open unit positions covered by the CBAs. Under the complex contractual scenario presented in this case, the fact that the Respondents processed these three grievances does not prove that the Respondents employed Petion, Parks-Hill, or Cockburn at that time.[39]

My colleagues also contend that the Respondents "retain[ed] significant control over the [housekeeping employees'] terms and conditions of employment, and they assured the Union at the outset of the full service contracts with HSG that all the employees' rights under the Respondents' CBAs, including seniority, would continue to be honored by HSG." This rationale is as meritless as the previous one. The Respondents did *not* "retain . . . control" over the housekeeping employees' terms and conditions of employment. After subcontracting the housekeeping function to HSG, the Respondents ceded direct and immediate control over those terms and conditions to HSG.[40] Indeed, the record shows that even *before* subcontracting that function—during the supervisor-only contracts with HSG—the Respondents retained direct and immediate control in only limited areas, such as hiring and grievance processing. *After* subcontracting the housekeeping function, the Respondents ceded all remaining direct and immediate control to HSG. For example, HSG independently hired the only new housekeeping employee hired during the subcontract.

My colleagues acknowledge that "the Respondents did not directly supervise the day-to-day work of the housekeeping employees."[41] Their contention that the Respondents nonetheless retained control of the housekeeping employees' terms and conditions of employment rests *entirely* on the fact that the Respondents *complied with the terms of the 2004–2011 CBAs*, which *required* the Respondents, in the event they subcontracted bar-

gaining-unit work, to secure the subcontractor's "agree[ment] in advance to retain the [Respondents'] Employees and recognize all their rights, including seniority, under this Agreement." In other words, under my colleagues' analysis, whenever an employer enters into a collective-bargaining agreement that conditions the subcontracting of bargaining-unit work on a potential subcontractor's willingness (i) to retain the employees who currently perform the subcontracted function, and (ii) to continue the terms and conditions of employment required under the collective-bargaining agreement, then whenever that employer subcontracts unit work and fulfills its duties under its collective-bargaining agreement, *it remains the employer of employees it no longer employs*.[42] This astonishing proposition refutes itself. Moreover, there appears to be no principled basis upon which to limit the reach of this rationale, which threatens to upend settled law governing successorship. If the subcontracting entity's status as employer is preserved whenever its subcontractor (i) hires the subcontracting entity's employees and (ii) maintains the subcontracting entity's terms and conditions of employment, this suggests that whenever a legal successor under *Burns*[43] and *Fall River Dyeing*[44] hires the predecessor's employees and either adopts the predecessor's collective-bargaining agreement or maintains its terms and conditions, *the predecessor would continue to be an employer of the successor's employees*. There is, of course, no authority for such an unprecedented proposition.

*2. The Respondents Were Not Joint Employers with HSG During the Subcontracting of Housekeeping Operations.* My colleagues correctly state that two entities are joint employers of employees if they "share or codetermine those matters governing the essential terms and conditions of employment," provided that the control exercised over those terms and conditions by a putative joint employer is "direct and immediate." *Airborne Express*, 338 NLRB 597, 597 fn. 1, 605 (2002). However, they proceed to find that the Respondents exercised sufficient control to be deemed joint employers with HSG on the basis that they "imposed," "dictated," and "solely determined" that HSG maintain the terms of the 2004–2011 CBAs and retain the incumbent work force. This is the same failed rationale discussed in the preceding section, but applied in support of a joint-employer theory instead of a continuing-employer theory. It works no better here than it did there.

---

[39] Indeed, the Respondents initially told Petion that he had to accept the $12.80-an-hour starting wage of a newly hired employee.

[40] As shown in the Board's joint-employer precedent predating *Browning-Ferris*, an entity must exercise "direct and immediate" control over essential terms and conditions of employment to constitute an employer within the meaning of the Act. See *Airborne Express*, 338 NLRB 597, 597 fn. 1 (2002). As former Member Johnson and I explained in our dissent in *Browning-Ferris*, the Board must apply common-law agency principles in determining who is an employer, and those principles require direct and immediate control. See *Browning-Ferris*, 362 NLRB No. 186, slip op. at 26–32 (Members Miscimarra and Johnson, dissenting).

[41] Contrary to my colleagues, that HSG already supervised the housekeeping employees' day-to-day work under the "supervisor-only" contracts does not mean that day-to-day supervision should be accorded less weight in determining whether the Respondents ceased to employ the housekeeping employees during the term of the subcontract—a proposition for which the majority cites no authority.

[42] My colleagues disclaim this conclusion. I do not see how it can be logically avoided, but I acknowledge, and welcome, the disclaimer.

[43] *NLRB v. Burns International Security Services, Inc.*, supra.

[44] *Fall River Dyeing & Finishing Corp. v. NLRB*, supra.

My colleagues' word choice also misrepresents what occurred in the instant case. The Respondents did not impose, dictate, or solely determine anything done by HSG during the period that housekeeping operations were subcontracted to HSG. Rather, it is uncontroverted that HSG is an independent business that freely chose to enter into the subcontracting agreement with the Respondents as part of an arm's-length business transaction. It is true that the 2004–2011 CBAs made certain terms of the transaction nonnegotiable from the perspective of the Respondents. Therefore, to comply with the CBAs, the Respondents insisted that any subcontractor retain their employees and maintain their terms and conditions of employment. But it does not follow that the Respondents "dictated" or "imposed" those terms. Rather, these types of CBA provisions are not unusual, and HSG *chose* to do business with the Respondents notwithstanding these demands, which undoubtedly affected HSG's position with regard to other terms of the agreement, such as the price it charged the Respondents for services rendered. Moreover, it is not uncommon for successor employers to retain a predecessor's employees and to voluntarily continue or adopt the employment terms and conditions set forth in the predecessor's CBAs. This is not a novel concept, and when a successor employer takes these actions, it certainly does not mean the predecessor has exerted overwhelming "control" over the successor to a degree that warrants finding that both entities constitute a joint employer. Indeed, more than 40 years ago, the Supreme Court in *Burns* stated:

> In many cases, of course, successor employers will find it advantageous not only to recognize and bargain with the union but also *to observe the pre-existing contract rather than to face uncertainty and turmoil*. Also, in a variety of circumstances . . . the Board might properly find as a matter of fact *that the successor had assumed the obligations under the old contract. . . .* Such a duty does not, however, ensue as a matter of law *from the mere fact than an employer is doing the same work in the same place with the same employees as his predecessor.*[45]

Here as well, my colleagues' rationale is premised on the notion that, *after* the successor acquires the predecessor's assets and hires its employees, the predecessor remains their employer—specifically, a joint employer. This is contrary to the cornerstone of successorship law, which is predicated

on the concept that the successor employer is an independent entity that *replaces* the predecessor entity.[46]

In *Summit Express, Inc.*, 350 NLRB 592 (2007), the Board itself rejected the joint-employer rationale that my colleagues now advocate here. Like the situation presented here, *Summit Express* involved two successive employers of a group of employees, where the second employer maintained the first employer's terms and conditions. The Board considered two issues: (i) whether first employer Summit/Great Lakes was a joint employer with second employer SG Construction, and (ii) whether Summit/Great Lakes and SG Construction were alter egos. The Board reversed the administrative law judge's finding that Summit/Great Lakes and SG Construction were alter egos. Id. at 594–596. However, the judge *rejected* the General Counsel's argument that Summit/Great Lakes and SG Construction were joint employers, id. at 617–618, and the Board *affirmed* the judge's finding.[47] The General Counsel contended that the owner of Summit/Great Lakes, Richard Catrambone, "had determined what the initial wages of the SG Construction employees were going to be because SG Construction continued paying employees at the same rate that Catrambone established when they were employees of Summit Express." Id. at 617. However, the judge rejected this argument, stating: "Each case that finds joint employer status . . . relies on continuing elements of supervision of employees and control of labor relations, *not an initial establishment of terms and conditions of employment that simply continue what has gone on before.*" Id. (emphasis added). When adopting the judge's

---

[45] *NLRB v. Burns International Security Services, Inc.*, 406 U.S. at 291 (emphasis added; citation omitted).

[46] As noted previously, the Board's successorship principles do not even apply in cases when the predecessor engages in a disguised continuation of its preexisting operations. See text accompanying fns. 19–20, supra. I have no difficulty in the instant case finding that the Respondents cannot take advantage of successorship principles to escape their contractual requirements, including accrued seniority obligations, when they engaged in their short-duration subcontracting to HSG commencing in February 2009 and, without any explanation to employees or during the hearing in this matter, resumed the same housekeeping operations in May 2010. However, there is no evidence whatsoever in the record that supports a finding that Respondents' subcontracting to HSG was anything other than an independent arm's-length arrangement. Indeed, as noted previously, in the leading Supreme Court case dealing with subcontracting—*Fibreboard Paper Products Corp. v. NLRB*, supra—the employer contracted out its maintenance work and "merely replaced existing employees with those of an independent contractor," and even though the subcontractor's employees continued "to do the same work under similar conditions of employment" and the "maintenance work still had to be performed in the plant," 379 U.S. at 213, Fibreboard ceased being the employer.

[47] Id. at 592. *Summit Express* involved both joint-employer and alter-ego allegations. My colleagues purport to distinguish *Summit Express* based on the Board's analysis of the alter-ego allegation. They do not address the relevant issue in *Summit Express*, which is the joint-employer issue.

reasoning, the Board explained: "In agreement with the judge, we find that *the contract terms, by themselves, do not establish direct and immediate control over the terms and conditions of employment by Summit/Great Lakes required to prove a joint employer relationship with SG Construction.*"[48]

*Summit Express* is directly applicable here, and it precludes my colleagues' joint-employer finding. Here as in *Summit Express*, employees formerly employed by one employer were hired by a second employer, and the terms and conditions of their employment under the first employer were maintained by the second employer. The Board in *Summit Express* found that these circumstances did not establish a joint-employer relationship because "joint employer status . . . relies on continuing elements of supervision of employees and control of labor relations, not an initial establishment of terms and conditions of employment that simply continue what has gone on before." 350 NLRB at 617. And as my colleagues acknowledge, there were no "continuing elements of supervision of employees and control of labor relations" by the Respondents after housekeeping operations were subcontracted to HSG.[49]

---

[48] Id. at 592 fn. 3 (emphasis added). Significantly, the Board's decision on the joint-employer issue in *Summit Express* was unanimous. Former Member Liebman dissented in part, but only regarding the majority's dismissal of the alter-ego allegation. Id. at 599–601.

[49] My colleagues cite two additional factors in support of their joint-employer finding: (1) housekeeping employees could still bid into unit positions in non-housekeeping departments (illustrated by the Petion, Parks-Hill, and Cockburn grievances), and (2) the HSG subcontract was essentially a cost-plus arrangement. Neither factor supports their finding. First, as explained above, the three grievances only demonstrate that the housekeeping employees enjoyed accrued and unextinguished seniority under the 2004–2011 CBAs that entitled them to bid on unit positions covered by the CBAs. That the Respondents processed Petion's, Parks-Hill's, and Cockburn's grievances seeking positions in departments that had *not* been subcontracted does not constitute direct and immediate control over their terms and conditions of employment in positions within a department that *had* been subcontracted to HSG, which alone exercised direct and immediate control over those terms and conditions. Second, cost-plus agreements do not evidence joint-employer status under pre–*Browning-Ferris* law. See *Goodyear Tire & Rubber Co.*, 312 NLRB 674, 677–678 (1993). My colleagues acknowledged as much in their *Browning-Ferris* decision, while pointing out that earlier cases found otherwise. 362 NLRB No. 186, slip op. at 10 & fn. 45. In support of the contrary proposition—i.e., that pre–*Browning-Ferris*, cost-plus contracts *were* probative of joint-employer status—my colleagues cite *CNN America, Inc.*, 361 NLRB No. 47, slip op. at 6 (2014). As I pointed out in my separate opinion in *CNN*, the majority in that case misapplied then-existing joint-employer precedent—as the majority in *Browning-Ferris* would have it, perhaps unwittingly. See id., slip op. at 34 (Member Miscimarra, concurring in part and dissenting in part) (discussing precedent—including *Goodyear Tire & Rubber*, supra—establishing that "specification of wage rates in a cost-plus subcontract does not tend to support a joint-employer finding"). The fact that my colleagues cite *CNN* for a proposition that was not established until *Browning-Ferris* issued a year later

In support of their theory regarding joint-employer status, my colleagues rely on *G. Heileman Brewing Co.*, 290 NLRB 991 (1988), enfd. 879 F.2d 1526 (7th Cir. 1989). However, I believe *G. Heileman Brewing* is clearly distinguishable from the instant case. There, the respondent subcontracted its electrical maintenance work to Lowry Electric Company (Lowry), and Lowry employed the respondent's former employees to perform the subcontracted work. In finding that the respondent was a joint employer with Lowry, the Board did rely, in part, on the fact that the respondent negotiated the electricians' terms and conditions of employment with the union. Id. at 999. This factor was by no means dispositive, however, since the respondent also exercised direct and immediate control over essential terms and conditions of the electricians' employment. Most significantly, "only the [respondent] exercised meaningful supervision over the day-to-day work of" the electricians. Id. In addition, the respondent "initiated disciplinary action, determined what action was warranted, and Lowry, although it might make recommendations, invariably deferred to the [respondent's] decision in this regard." Id. at 1000. The respondent also "informally discussed and resolved grievances with the [u]nion." Id. Accordingly, contrary to the majority, *G. Heileman Brewing* does not hold that joint-employer status may be based solely on establishment of terms and conditions of employment, and *G. Heileman Brewing* cannot be construed to so hold without bringing it into irreconcilable conflict with *Summit Express*.

In short, to support a finding that the Respondents were joint employers of the housekeeping employees together with HSG during the subcontract, it is not enough that HSG maintained the Respondents' terms and conditions of employment. Rather, there must be evidence that during the term of the subcontract, the Respondents "meaningfully affect[ed] matters relating to the employment relationship such as hiring, firing, discipline, supervision, and direction." *Laerco Transportation*, 269 NLRB 324, 325 (1984); *TLI, Inc.*, 271 NLRB 798, 798 (1984), enfd. mem. 772 F.2d 894 (3d Cir. 1985). There is no such evidence in the instant case.[50]

---

merely confirms a major theme of my separate opinion in *CNN*—namely, that the Board majority in *CNN* abandoned the "direct and immediate control" standard, even though that standard remained good law at that time. See *CNN America*, 361 NLRB No. 47, slip op. at 31 & fn. 6.

[50] My colleagues attempt unsuccessfully to avoid the conclusion that their joint-employer finding almost certainly will be dead on arrival in the United States Court of Appeals for the Second Circuit, where the Respondents will most likely file their petition for review. In *AT&T v. NLRB*, 67 F.3d 446 (2d Cir. 1995), the court refused to enforce the Board's order in *Executive Cleaning Services, Inc.*, 315 NLRB 227 (1994), in which the Board found that AT&T and Executive Cleaning

The Respondents ceded all direct and immediate control over "matters relating to the employment relationship" once the housekeeping function was subcontracted to HSG. My colleagues concede that the Respondents "did not directly supervise the day-to-day work of the housekeeping employees," but they fail to recognize that this concession is dispositive of the joint-employer issue. There is no basis here, under pre–*Browning-Ferris* law, to find that the Respondents were joint employers with HSG during the term of the subcontract, just as there is no basis to find that the Respondents never terminated their employment relationship with the housekeeping employees under my colleagues' alternative "continuing employer" theory. In short, from February 15, 2009 to May 17, 2010, HSG was the housekeeping employees' employer, and it was their only employer.

### D. Respondent Westport's Threat to Call the Police Violated Section 8(a)(1).

I agree with my colleagues finding that Respondent Westport violated Section 8(a)(1) of the Act when its administrator, Kimberly Coleman, advised housekeeping employees at a May 17, 2010 meeting that they would not have a job at Westport unless they reapplied and accepted the loss of their seniority and stated that she would "call the cops" if anyone remained at the facility without filling out an application. My colleagues, agreeing with the judge, conclude that the threat was unlawful because it was "a response to the employees' protected activity."

I disagree with Respondents' contention that Coleman could not have spoken about calling police "in response to" protected employee discussions because, according to Respondents, such discussions (pertaining to whether employees would comply with the order to leave the facility and whether they would consult with the Union) only occurred after Coleman made the statement at issue. I believe it is unnecessary to determine whether Coleman's statement preceded or followed employees' protected conversations because the merits of the allegation do not depend on whether Coleman was responding to Section 7 activity. Coleman's threat to call the police was made in the course of a meeting in which the housekeeping employees were advised that they were required to forfeit all accrued seniority as a condition of continued employment. For the reasons explained above, I believe the Respondents' actions prior to Coleman's threat—requiring employees to forfeit their seniority as a condition of their continued employment following the unexplained termination of the unexplained subcontracting of housekeeping operations to HSG—constituted an unlawful refusal to bargain and a midterm contract modification in violation of Section 8(a)(5). In this context, I would find that Coleman's threat to call the police violated Section 8(a)(1) because it reasonably tended to coerce employees into accepting Respondents' unlawful requirement that they forfeit all accrued seniority. Apart from the statement made by Coleman, there is no evidence that employees who failed to apply for continued employment remained in possession of the Respondent's premises, disrupted the Respondent's operations, and refused to leave. Therefore, the instant case does not involve a sit-down strike or similar circumstances that can result in loss of the Act's protection. See, e.g., *NLRB v. Fansteel Metallurgical Corporation*, 306 U.S. 240 (1939); *Quietflex Manufacturing Co.*, 344 NLRB 1055 (2005).[51]

---

Services (ECS), a cleaning-services contractor at a building where AT&T was a tenant, were joint employers—even though "the control exercised over ECS employees by AT&T [fell] . . . far short of the type of control necessary to establish a joint employer," 315 NLRB at 236—on the sole basis that AT&T participated in negotiating wage rates for ECS's employees. In fact, AT&T did not participate in those negotiations, and my colleagues characterize the court's refusal to enforce the Board's order as having been "based largely" on that fact. Thus, my colleagues imply that the court *might* have upheld the Board's decision had AT&T negotiated ECS employees' employment terms, and therefore the court *might* similarly uphold the majority's joint-employer finding here, since the Respondents *did* negotiate the housekeeping employees' terms and conditions. Not so. The court's findings were far broader than my colleagues portray them. In refusing to enforce the Board's order, the court did say that the Board's joint-employer "conclusion [was] contrary to the underlying findings of fact and, hence, unsupported by substantial evidence." 67 F.3d at 451. But the court also held that "the Board erred as a matter of law in concluding that AT&T was a joint employer," id., because *"[t]o be a joint employer, there must be proof of the type of control over a subcontractor's employees that the Board here found AT&T did not have* over ECS employees," id. at 450 (emphasis added). The court found that AT&T's "limited supervision" of ECS's employees was insufficient as a matter of law to support joint-employer status, and that AT&T had "no control over the day-to-day operations of ECS employees, and . . . all hiring, firing, and discipline of ECS's employees was handled exclusively by ECS supervisors," who "also made most of the daily work assignments." Id. at 451–452 (internal quotations omitted). The court stated that participation in collective bargaining is a factor in the joint-employer analysis, but the court faulted the Board for elevating this "single factor" into "an independent alternate basis for finding joint employer status" because this single factor "is not enough." Id. at 451. My colleagues are making the same mistake here, and their finding that the Respondents were joint employers with HSG will predictably suffer the same fate before the Second Circuit as the Board's decision in *Executive Cleaning Services.*

---

[51] Although I agree that Respondents violated Sec. 8(a)(5) and (1) for the reasons explained in the text, I disagree with my colleagues' order that a consolidated common remedial notice be read aloud to employees at all of the Respondents' facilities. Preliminarily, I believe the instant case warrants separate notices tailored to each facility rather than a single notice that consolidates all of the claims found to have merit in the instant case. Only two unfair labor practices were committed at all six facilities. Although our precedent does not foreclose a common notice under these circumstances, see *Wal-Mart Stores, Inc.,*

## CONCLUSION

For the reasons set forth above, I respectfully concur in part and dissent in part.

Dated, Washington, D.C. February 22, 2017

_____

Philip A. Miscimarra,       Acting Chairman

NATIONAL LABOR RELATIONS BOARD

## APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law at six of our nursing home centers in Connecticut—in Danbury, Newington, Long Ridge, West River (Milford), Westport, and Wethersfield—and has ordered us to post and obey this notice.

### FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union

Choose representatives to bargain with us on your behalf

Act together with other employees for your benefit and protection

Choose not to engage in any of these protected activities.

WE WILL NOT threaten to call the police in response to your protected concerted or union activities.

---

350 NLRB 879, 885 (2007) (ordering separate notices where only *one* violation was common across multiple locations), I would order the posting of separate notices. Moreover, I do not believe the circumstances here warrant the special remedy of notice reading. The Board here finds approximately three unilateral-change or contract-modification unfair labor practices per facility. These violations are not "so *numerous* and serious that the reading aloud of a notice is considered necessary to enable employees to exercise their Section 7 rights in an atmosphere free of coercion." *Postal Service*, 339 NLRB 1162, 1163 (2003) (emphasis added); see also *United Rentals, Inc.*, 349 NLRB 853, 853 fn. 3 (2007) (denying the General Counsel's request for notice reading where the Board found several violations). Moreover, all the violations—except for the threat to call the police at the Westport facility—were of Sec. 8(a)(5). I am unaware of any case, and my colleagues cite none, where the Board has ordered notice reading in cases that are limited to violations of Sec. 8(a)(5). I do not discount the significance of the Respondents' unfair labor practices, but requiring make-whole relief for the affected employees and other standard remedies is sufficient in the instant case and consistent with the Board's treatment of comparable cases.

WE WILL NOT refuse to bargain collectively with New England Health Care Employees Union, District 1199, SEIU, AFL–CIO (the Union) by "rehiring" unit employees as "new" employees after assigning them to work under the management of a subcontractor and eliminating their seniority and reducing their wages and benefits to the level of new employees.

WE WILL NOT refuse to bargain collectively with the Union by refusing, without just cause, to reemploy unit employees whom we have temporarily assigned to work under subcontracts with other employers.

WE WILL NOT refuse to bargain collectively with the Union by unreasonably delaying in providing it with requested information that is relevant and necessary for the Union to function as the collective-bargaining representative of our unit employees.

WE WILL NOT refuse to bargain collectively with the Union by implementing new eligibility standards for unit employees regarding holiday pay, personal days, vacation days, sick days, and uniform allowance; WE WILL NOT fail to continue in effect the terms and conditions of its 2004–2011 collective-bargaining agreements with the Union by doing the following without the Union's consent: laying off unit employees without providing the Union with a 45-day notice of the layoffs; implementing new eligibility standards for unit employees regarding holiday pay, personal days, vacation days, sick days, and uniform allowance; eliminating unit employees' seniority and reducing their wages and benefits to the level of new employees; and not reemploying unit employees without cause, and WE WILL NOT attempt to change the terms established by those agreements without bargaining with the Union.

WE WILL NOT unilaterally change your terms and conditions of employment by discontinuing our practice of including lunch breaks in tallying employees' daily "hours worked" for the purpose of calculating payment for overtime, and WE WILL NOT implement a new policy and practice of excluding these breaks from calculating overtime, and WE WILL NOT implement a new eligibility standard for premium pay for hours worked on holidays.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

WE WILL, within 14 days from the date of the Board's Order, offer Myrna Harrison and Newton Daye full reinstatement to their former housekeeping jobs at Westport, or, if those jobs no longer exist, to substantially equivalent positions, without prejudice to their seniority or any other rights or privileges previously enjoyed. WE WILL, within 14 days from the date of the Board's Order, remove from our files any reference to the failure to

reemploy Myrna Harrison and Newton Daye, and WE WILL, within 3 days thereafter, notify each of them in writing that this has been done and that it will not be used against them in any way.

WE WILL rescind the modification of our contracts with the Union covering employees employed at our Newington, Long Ridge, and Westport facilities, including changes in seniority, wages, and benefits, and restore employees' terms and conditions of employment to what they were prior to our unlawful modification of the contracts.

WE WILL rescind our new eligibility standards for employees employed at our Wethersfield and Danbury facilities regarding holiday pay, personal days, vacation days, sick days, and uniform allowance and restore the standards for eligibility that were in place prior to the changes.

WE WILL continue in effect all the terms and conditions of employment contained in our 2004–2011 collective-bargaining agreements, or other applicable collective-bargaining agreements, with the Union.

WE WILL rescind our practice of excluding lunch breaks in tallying employees' daily "hours worked" for purposes of calculating overtime payments, and our new eligibility standard for premium pay for hours worked on holidays.

WE WILL make Myrna Harrison, Newton Daye, and other affected unit employees whole, with interest, for any loss of earnings and other benefits suffered as a result of our modification of the contract terms of the laundry and housekeeping employees at our Long Ridge, Newington, and Westport facilities; as a result of our unlawful layoff of certified nursing assistants employed at our Long Ridge facility; as a result of our unlawful changes in eligibility standards for employees employed at our Wethersfield and Danbury facilities regarding holiday pay, personal days, vacation days, sick days, and uniform allowance; and as a result of our unlawful changes to the practices of calculating overtime and holiday premiums of employees employed at our Long Ridge, Wethersfield, Danbury, Newington, West River, and Westport facilities.

WE WILL compensate Myrna Harrison, Newton Daye, and other affected employees for the adverse tax consequences, if any, of receiving lump-sum backpay awards, and WE WILL file a report with the Regional Director for Region 34, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the back pay awards to the appropriate calendar years for each employee.

WE WILL, before implementing any changes in wages, hours, or other terms and conditions of employment of unit employees, notify and, on request, bargain with the Union as the exclusive collective-bargaining representative of employees in the following bargaining units:

All full-time, part-time, and per diem/casual service and maintenance Employees, including certified nurse's assistants (CNAs), therapy technicians, housekeeping aides, dietary Employees, laundry aides, central supply clerks, relief cooks, unit secretaries, receptionists, medical records clerks, maintenance Employees, Registered Nurses and Licensed Practical Nurses employed at our Long Ridge facility, including any new or expanded locations of Long Ridge, but excluding all other Employees, cooks, guards, other professional employees and supervisors as defined in the Act, as amended to date.

All full-time, regular part-time service, and per diem/casual service and maintenance Employees, including certified nurse's assistants (CNAs), dietary aides, cooks, head cooks, housekeeping, laundry and maintenance Employees, central supply clerks, scheduler, rehabilitations aides, recreation assistants and receptionists employed at our Westport facility, but excluding all other Employees, registered nurses (RNs), social workers, licensed practical nurses (LPNs), and other technical Employees, therapeutic recreation directors, medical records clerks, payroll clerk and guards, professional Employees and supervisors as defined in the Act.

All full-time, part-time, and per diem/casual service and maintenance Employees, including current categories and future new and changed jobs in the service and maintenance bargaining unit including certified nursing assistants, physical therapy aides, housekeeping Employees, central supply clerks, nursing office secretary, secretary-receptionist, receptionists, medical records clerk- receptionist, maintenance Employees, social service designee, therapeutic recreational directors, recreation aides, Registered Nurses and Licensed Practical Nurses employed at our Newington facility, including any new or expanded locations of that facility, but excluding all other Employees, guards, professional Employees and supervisors as defined in the Act.

All full-time, part-time, and per diem/casual RNs, LPNs, and service and maintenance Employees, including certified nurse's assistants, therapy aides, housekeeping employees, dietary employees, cooks, laundry employees, payroll clerks, rehabilitation aides, therapeutic recreation directors, receptionists, and maintenance employees employed at our Danbury facility, but excluding the Director of Nurses, the Assistant Director of Nurses, the infection control nurse, the resident care coordinator, the staff development nurses,

the employee health nurses, shift supervisors, unit coordinators, and all other Employees, and all other Employees, guards, professional Employees and supervisors as defined in the Act.

All full-time, part-time, and per diem service and maintenance Employees, including certified nurse's assistants, porters, activity assistants, housekeepers, dietary aides, cooks, cooks helpers, laundry aides, and maintenance Employees at our Wethersfield facility, but excluding all other professional Employees, all technical Employees, all business office clerical Employees and all guards, professional Employees and supervisors as defined in the Act.

All full-time, part-time, and per diem/casual service and maintenance and clerical Employees, including certified nurse's assistants, occupational therapy aides, ward clerks, dietary aides, cooks, head cooks, housekeeping aides, laundry aides, assistant maintenance supervisor, recreation aides, physical therapy aides, central supply clerk, billing, collections and accounts receivable clerks and medical records clerks employed at our Milford facility, but excluding, receptionists, payroll/accounts payable clerks, computer operators, data entry clerks, admissions clerks, licensed practical nurses, registered dietetic technicians, rehabilitation therapy technicians, physical therapy assistants, dieticians, registered respiratory therapists, certified respiratory therapy technicians, speech pathologists, social workers, administrative assistants, marketing director, manager of case management, head receptionist/secretary, executive chef, managerial Employees, confidential Employees, technical Employees and all guards, professional Employees and supervisors as defined in the Act.

HEALTHBRIDGE MANAGEMENT

710 LONG RIDGE ROAD OPERATING COMPANY II, LLC (LONG RIDGE)

1 BURR ROAD OPERATING COMPANY II, LLC (WESTPORT)

240 CHURCH STREET OPERATING COMPANY II, LLC (NEWINGTON)

107 OSBORNE STREET OPERATING COMPANY II, LLC (DANBURY)

341 JORDAN LANE OPERATING COMPANY II, LLC (WETHERSFIELD)

245 ORANGE AVENUE OPERATING COMPANY II, LLC (WEST RIVER)

The Board's decision can be found at www.nlrb.gov/case/34–CA–012715 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273–1940.



*Thomas E. Quigley, Esq., Margaret A. Loreau, Esq.* and *John A. McGrath, Esq.,* for the General Counsel.
*Jonathan E. Kaplan, Esq., George W. Loveland, III, Esq.,* and *Steven W. Likens, Esq. (Kiesewetter, Wise, Kaplan Prather, PLC),* of Memphis, Tennessee, for Respondents.[1]
*Kevin A. Creane, Esq. (Law Firm of John M. Creane),* of Milford, Connecticut, for the Charging Party.

DECISION

STEVEN FISH, Administrative Law Judge. Pursuant to charges and amended charges filed by New England Health Care Employees Union, District 1199, SEIU, AFL–CIO (the Union or Charging Party), the Director for Region 34 issued a consolidated complaint and notice of hearing on March 21, 2011, alleging that six nursing homes: 107 Osborne Street Operating Company II, LLC d/b/a Danbury HCC (Respondent Danbury); 240 Church Street Operating Company II, LLC d/b/a Newington Health Care Center (Respondent Newington); 710 Long Ridge Road Operating Company II, LLC d/b/a Long Ridge of Stamford (Respondent Long Ridge); 245 Orange Avenue Operating Company II, LLC d/b/a West River Health Care Center (Respondent West River); 1 Burr Road Operating Company II, LLC d/b/a Westport Health Care Center (Respondent Westport); and 341 Jordan Lane Operating Company II, LLC d/b/a Wethersfield Health Care Center (Respondent Wethersfield), collectively called Respondent Health Care Centers, HealthBridge Management, LLC (Respondent HealthBridge) and Care Realty, LLC aka Care One (Respondent Care) violated Sections 8(a)(1) and (5) of the Act.

The complaint also alleged that Respondent HealthBridge, Respondent Care and all six Respondent Health Care Centers constituted a single employer within the meaning of the Act and that the Respondents have also been joint employers at each nursing home.

The complaint further alleges that from February 15, 2009, until May 17, 2010, Respondent (collectively referring to all named Respondents) and Healthcare Services Group, Inc.

---

[1] By the time that briefs were filed, the name of the firm representing Respondents had become Littler Mendelson, PC.

(HSG) co-determined terms and conditions of employment of the housekeeping and laundry employees employed by Respondents Long Ridge, Newington, and Westport and were also joint employers of these employees working at these facilities.

The trial with respect to the allegations in said compliant was held in Hartford, Connecticut, on August 11, 12, 30, and 31, September 1 and 2 and October 17, 18, and 19. The parties entered into a mid-trial agreement containing a number of stipulations, which resolved a number of the factual and some legal issues involved in the compliant. The agreement also provided for a guarantee of certain financial obligations should the violations be found. The agreements were reduced to writing and entered into the record on the last day of the trial. Based upon the stipulations contained in the agreement and conditioned upon fulfillment of all the conditions described, Counsel for General Counsel requested withdrawal of the complaint allegations that concern single employer status between Respondent HealthBridge, Respondent Care and the individual nursing homes. I orally granted the conditional withdrawal request.

On November 29, 2011, General Counsel filed a motion to supplement the record with some additional exhibits and to close the record. On December 5, 2011, I granted General Counsel's motion and set a date for briefs.

Subsequently, briefs have been received from Respondents and from General Counsel and have been carefully considered. Based upon the entire record, including my observation of the demeanor of the witnesses, I, hereby, issue the following recommended:

### FINDINGS OF FACT

#### I. JURISDICTION AND LABOR ORGANIZATION

Respondent HealthBridge is a New Jersey limited liability corporation with its principal office in Fort Lee, New Jersey, and offices in other states, including Massachusetts and Connecticut, where it has been engaged in the management of nursing homes and healthcare facilities, including Respondent Danbury, Respondent Westport, Respondent West River, Respondent Newington, Respondent Wethersfield and Respondent Long Ridge.

During the 12-month period ending February 28, 2011, Respondent HealthBridge derived gross revenues in excess of $100,000 and provided services valued in excess of $5000 in states outside the State of New Jersey.

Respondent Health Care Centers have each been engaged in the operation of nursing homes and long-term care facilities providing convalescent and skilled nursing care. During the 12-month period ending February 28, 2011, each of the Respondent Health Care Centers derived gross revenues in excess of $100,000 and received at their respective facilities goods valued in excess of $5000 directly from points outside the State of Connecticut.

Healthcare Services Group Inc. (HSG) is a Pennsylvania corporation engaged in providing housekeeping, laundry and other service relating to the staffing and management of the Respondent Health Care Centers.

During the 12-month period ending February 28, 2011, HSG provided services valued in excess of $500,000 to Respondent Health Care Centers for use at the facilities located in Connecticut.

Respondent HealthBridge has been at all times material, herein, a joint employer with each of the Respondent Health Care Centers of the employees of each of the Respondent Health Care Centers.

It is admitted, and I so find, that Respondent HealthBridge has been an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act and a healthcare institution within the meaning of Section 2(14) of the Act.

It is also admitted, and I so find, that Respondent Health Care Centers have each been an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act and a healthcare institution within the meaning of Section 2(14) of the Act.

It is also admitted, and I so find, that the Union is a labor organization within the meaning of Section 2(5) of the Act.

#### II. FACTS

### A. Background and Bargaining History

Employees at each of the Respondent Health Care Centers have been represented by the Union since the early 1990s. The facilities were, as now, operated separately by separate companies, often with a common managing company.

The Union had collective-bargaining agreements with Mediplex, which was part of an operating company called Sunridge, covering service and maintenance units at these six facilities. In August of 2003, Mediplex decided that it no longer wished to operate the facilities. Thus, the six named Respondent healthcare entities were formed. They each hired Haven Health Care (Haven) to manage the facilities. At that time, Haven assumed the collective-bargaining agreements with the Union for all the facilities.

In December of 2003, Haven Health Care's management contracts to run the centers were terminated. At that time, a company called HealthBridge Management, Inc. became the manager of the homes and agreed to assume the same contracts that Haven had assumed from Mediplex. Pursuant to a reopener in the prior contracts, negotiations were triggered and HealthBridge Management, Inc. began negotiations with the Union. In the midst of these negotiations, sometime in 2005, the centers all went into bankruptcy. This resulted in the centers failing to make payments into the Union's funds, and litigations between the parties, including a unfair labor practice charge in Case No. 34–CA–10929, where the Region at that time made similar allegations as in the instant case that Care Realty and HealthBridge Management were joint and single employers with the centers and that they violated the Act in various respects.

Ultimately, the parties reached a settlement of all their litigations, which encompassed collective-bargaining agreement between the Union and each of the health care centers. Each of these agreements were all effective from December 31, 2004, to March 16, 2011, and were signed on behalf of each health center by Kevin Breslin, listed as executive vice-president of HealthBridge Management, Inc. and an agent. The collective-bargaining agreements cover units of service and maintenance

employees. The unit inclusions are similar in all contracts but not identical. For example, included in all contracts are certified nursing aides (CNAs) and housekeeping and laundry employees, but the contracts for Respondent Westport excludes registered nurses (RNs) and licensed practical nurses (LPNs) while the contracts for the other centers includes these classifications. The other provisions in the contracts are virtually the same, although there are some variations and differences and different numbering.

Respondent HealthBridge has managed the daily operations of all the health care centers involved since that time. Kevin Breslin is Respondent's executive vice-president and Ed Remillard is Respondent HealthBridge's regional human resources manager. As noted above, the parties have agreed that Respondent HealthBridge has been and is a joint employer of the employees of the six individual Respondent Health Care Centers. Respondent Care Realty, or Care One, owns the properties, where the facilities are located.

As noted above, as a result of the mid-trial stipulations executed by the parties, the General Counsel has withdrawn the single employer allegations in the complaint as to Respondent HealthBridge and Respondent Care Realty. Effectively that withdrawal removed Respondent Care Realty as a Respondent from the instant case.

### B. Subcontracting and Successorship Clauses in Contracts

All six contracts with Respondent's facilities include the following identical "subcontracting" and successorship clauses:

> Subcontracting. No bargaining unit work shall be subcontracted unless the subcontractor agrees in advance to retain the Employees and recognize all their rights, including seniority, under this agreement.

> Successorship

> A. If the Center decides to sell or transfer any of its operations, it will advise the Union at least sixty (60) days prior to the effective date of such sale or transfer. Such notice shall include the name and address of the purchaser.

> B. The terms and provisions of this Agreement shall bind all sub lessees, assignees, purchasers or other successors to the business to such terms and provisions, to which the Employees are and shall be entitled under this Agreement. The Center shall require any purchaser, transferee, lessee, assigns, receiver or trustee of the operation covered by this Agreement to accept the terms of this Agreement by written notice. A copy of such notice shall be provided to the Union at least thirty (30) days prior to the effective date of any sale, transfer, lease assignment, receivership or bankruptcy proceedings.

As noted above, in the spring of 2003, Haven became the manager of all six facilities involved in this case on behalf of each facility and by Care Realty, the owner of the properties. As also reflected above, Haven, when it managed the facilities, agreed to assume the collective-bargaining agreement that had been in effect with the Union and Sunridge (Mediplex). This agreement was reflected in a letter from Roy Termini, president and CEO of Haven, to the Union, dated May 27, 2003, wherein Haven agreed to hire all of the 1199 members, recognize their

seniority and assume the union contracts as well as obligations due under the prior contracts, including accrued benefits earned under Sunridge.

As also reflected above, in late 2003, Haven was replaced as managing agent of the facilities by HealthBridge Management Co. At that time, all six facilities as well as HealthBridge Management Co. also agreed to hire all union members at all locations, recognize the Union and assume the prior contracts in effect between the Union and Haven (actually negotiated between Mediplex and Sunridge and the Union). This agreement was reflected in a letter from the Union to Kevin Breslin of Care Realty and HealthBridge Management Co. The letter states as follows: "This letter confirms our agreement reached today concerning Care Realty's transfer of its management contract from Haven Healthcare to HealthBridge Management Company at the seven facilities represented by Local 1199."[2] The letter goes on to reflect that all union members will be hired at all of the facilities and the collective-bargaining agreements existing between Haven and the Union will be assumed in all respects. It was signed by Kevin Breslin as vice-president of HealthBridge Management, Inc. on November 28, 2003. Thereafter, all the terms of the collective-bargaining agreements were applied by all the Respondent Health Care Centers to its employees.[3]

### C. Subcontracting of Laundry and Housekeeping Employees

On August 1, 2003, Haven subcontracted the housekeeping and laundry employees for all of the centers to Lighthouse Medical, LLC. The laundry and housekeeping employees at all six facilities were employed by Lighthouse from August 2, 2003, until late November or early December of 2003. During that period of time, Lighthouse agreed to assume and honor all terms of the contracts with the Union for these employees, and insofar as the record discloses, complied with that agreement.

In December of 2003, the subcontracting ended at the same time that Haven's management contract was terminated. At that time, HealthBridge and the facilities hired the laundry and housekeeping as nonprobationary employees with their original nursing home, seniority, wages and benefits intact and continued to apply the union contracts to the laundry and housekeeping employees as well as to other unit employees.

In early 2004, the Union and Respondent HealthBridge negotiated several changes in the collective-bargaining agreements between the Union and Respondents, including health coverage, reopener and no strike-no lockout clauses. An agreement reached between the parties was reflected in an agreement signed on February 27, 2004, by Kevin Breslin on behalf of HealthBridge/Care Realty and the six facilities involved herein.

---

[2] There was a seventh facility in Darien, Connecticut, involved at the time. This facility has since closed.

[3] The parties have stipulated that although these two letters were signed by Breslin, a representative of HealthBridge Management Company, Inc., and not Respondent HealthBridge, that these two letters are binding on each of Respondent HealthBridge and Respondent Health Care Centers and constitute agreements by each of Respondent HealthBridge and Respondent Health Care Centers as if made directly by them.

As noted above, the parties entered into collective-bargaining agreements, which were effective from December 31, 2004 through March 16, 2011. These contracts were each signed by Breslin as executive vice-president of Respondent HealthBridge and as an agent for and on behalf of each of the respective facilities.

### D. Subcontracting of Housekeeping and Laundry Services to Healthcare Services Group, Inc.

Healthcare Services Group, Inc. (HSG) provides housekeeping and laundry services to nursing homes in multiple states. HSG has two types of agreements with nursing homes. The first is a more common, and a type of agreement preferred by HSG since it is more lucrative for it, is a "full service" agreement. There, HSG employs all of the employees, plus supplying an on-site supervisor (known as an account manager) as well as providing linens and certain supplies. Another less common type of arrangement is a "supervisor only" contract, wherein HSG does not employ any employees of the facility but provides specified materials and supplies and an account manager to supervise employees onsite.

On various dates in 2006, HSG entered into "supervisor only" contracts with all six of the facilities involved here. These contracts were all signed on behalf of the individual homes by Kevin Breslin, executive vice-president "of HealthBridge Management, Inc. Its Management Agent."

From 2006 through early 2009, these services were provided to all six facilities. During this period of time, all unit employees continued to be on the payroll of the individual homes and were covered by the collective-bargaining agreement between the homes and the Union. However, the employees were directly supervised by the account managers of HSG at each facility. The account managers handled scheduling, minor disciplinary matters and had some involvement in initial steps in the grievance procedure. However, Steps 2 and beyond of the grievance procedure were handled by the homes' administrators as well as by Respondent HealthBridge representatives.

On February 15, 2009, Respondents Newington, Long Ridge and Westport subcontracted their entire housekeeping and laundry departments to HSG by entering into "full service" contracts for these facilities.

On February 5, 2009, Remillard sent identical letters to the Union on behalf of each facility, signed as regional resource manager. The letters read as follows:

Newington Health Care Center

February 5, 2009

Chris Wishart
New England Health Care Employees Union
District 1199
77 Huyshope Avenue
Hartford, CT 06106

Re: Newington Health Care Center, notice of intent to subcontract Bargaining Unit Work

Dear Chris:

I am writing to inform you, that it is the intent of Newington Health Care Center to subcontract Bargaining Unit Work within the Housekeeping and Laundry departments with Healthcare Services Group (HCSG), Inc.

Effect Sunday February 15, 2009 HCSG will be assuming the day to day operations (including staffing) of these departments and agrees in advance to retain the employees and recognize all their rights, including seniority, under the current Collective Bargaining Agreement.

HCSG will be in contact with you regarding their transition plan. We look forward to your cooperation during this transition period.

Sincerely,
Ed Remillard
Regional Human Resources Manager

Cc: Christine M. McKinney, Administrator
Phil Quillard, Senior Vice President
Lisa Crutchfield, V. P. Human Resources
Mary Grabell, Regional Director of Operations
John Pliego, Healthcare Services Group

The very next day, February 6, 2009, Stuart Fishberg, HSG's regional manager, sent a letter to the Union notifying it that as of February 15, 2009, the housekeeping and laundry employees at each of the three facilities will be transferred to the payroll of HSG and that, thereafter, all accrued benefits, seniority and job status will be intact and that HSG will agree to all terms and conditions of the contract between the Union and the facilities. The letter is as follows:

Healthcare Services, Group, Inc.

February 6, 2009

Mr. Christopher Wishart, Organizer
New England Health Care Employees Union
District 1199
77 Huyshope Avenue
Hartford, CT 06106

Dear Mr. Wishart;

Please accept this letter as notification that effective February 15, 2009, the Housekeeping and Laundry employees at Newington Health Care Center will be transferred to the payroll of Healthcare Services Group.

Healthcare Services Group will transfer all employees to our payroll with their seniority dates, accrued benefits, and job status intact. HCSG will make all contributions to specified Union funds based on earnings from February 15, 2009 and forward. HCSG also agrees to all terms and conditions negotiated and agreed to between Local 1199 and Newington Health Care Center.

This change will have no impact on the employees' wages or benefits. An informational meeting is scheduled on February 6, 2009 at 1:30pm. Should you have any questions or concerns, please feel free to contact me at 800-622-6010, or you are invited to attend the informational meeting.

Sincerely,
Stuart Fishberg
Regional Manager

Notified Via Fax 860-251-6049

The employees at these facilities were not informed that they had been terminated or laid off from their employment at the homes, only that they were being transferred to HSG's payroll. They were not interviewed for employment by anyone at HSG, did not fill out any job applications for HSG and HSG did not conduct reference checks as it normally does when it hires new employees. In fact, as is made clear from the letters to the Union, described above, Respondents required HSG to both hire all the housekeeping and laundry employees at each of the three centers and to agree to apply the terms of the collective-bargaining agreement to the employees while they were employed by HSG.

When the employees of the facilities were transferred to the payroll of and "hired" by HSG, they did fill out some paperwork, including I-9 forms, W-4 forms, enrollment forms for HSG's health plans, an authorization for HSG to conduct a background check and submitted copies of investigation, including from consumer reporting agencies,[4] their social security cards and driver's licenses. A personnel file was created for each employee at each home by HSG's account manager. The top document in that file is entitled, "HSG New Hire Form." It is filled out by the account manager and not the employee and included the employee's name, name of the facility, states date of hire as 2/15/09, then date of birth, address, rate of pay, martial status, and number of exemptions. These personnel files were maintained by HSG and were kept locked in the HSG account manager's office. The files were not shared with the centers and the centers' administrators did not put any documents into these files nor give HSG any documents to put into HSG's personnel files.

During the years prior to February of 2009, when HSG provided only supervisory functions at all of Respondents' facilities, HSG did not maintain personnel files for the employees. Although HSG account managers were involved in disciplining employees and would issue counseling and written warnings to employees, these documents would be written on forms provided by the various facilities and after being prepared by HSG account managers, the forms would be placed in the employees' personnel files maintained by the centers.

When HSG district managers assembled the HSG personnel files, they did have access to the personnel files of the employees from the respective centers and used them to help prepare some of the documents in the HSG files.

While the employees were employed by HSG at each of these facilities,[5] various items were placed into the HSG personnel files of these employees by the HSG account officials. They included disciplinary notices, notices of change of job status, changes of shifts, workman's compensation claims, doctor's notes, leave of absence requests, employee incident reports, in-services, or time-off and vacation requests of employees.

After the transition to "full service" when the account manager at the Respondent's three facilities wrote up employees for discipline or processed vacation or time-off requests, they used the forms previously used for these purposes, which were provided by the respective centers.[6] However, while in the pre- and post-transition periods, these forms were sent to the homes' personnel files as was done with respect to these items during the full service period.

The HSG personnel file for employee Florian includes a letter from Vinnie Klimas, the administrator of Respondent Long Ridge, dated May 17, 2010, offering her employment at Respondent Long Ridge at a salary of $12.80 per hour. According to HSG Account Manager William Owusu, he placed this document into Florian's HSG personnel file because it was given to him by Florian and that he did not receive it from Klimas. Owusu explained that Florian asked him to put the document into her HSG personnel file, and he complied with that request. He did not explain why he did so in view of the fact that Florian was no longer an HSG employee at the time, and he apparently no longer used to update these personnel files after the employees were terminated by HSG and rehired by Respondent Long Ridge.

Additionally, the record also discloses that an examination of the personnel files at these three facilities reveals several other documents covering events that occurred in 2010, after the employees were rehired by the respective centers. Apparently, HSG retained these personnel files in the office at the facilities, and, in some instances, the account manager would place certain documents with respect to employees in these files. No testimony was offered by any of the account managers as to why they would continue to place items into these files of these employees after their rehire by the facilities.

Additionally, the files at Respondent Newington contained documents for employees, detailing events and incidents that occurred in 2008, well prior to HSG becoming a full service contractor. No explanations were offered by HSG representatives as to why these documents were included in the HSG personnel files, which were not started until HSG began its full service operations in February of 2009.

These personnel files at Respondent Westport (but not the other two facilities) contained a document entitled, "Employee

---

[4] No evidence was presented that, in fact, HSG conducted any such investigations or background checks on any new employee. In fact, Tom Glaser, the HGS account manager at Respondent Westport testified that HSG did not conduct any reference checks for any of the employees that it hired.

[5] As will be detailed more fully below, employees at these facilities were terminated by HSG on May 17, 2010.

[6] See, for example, employee Yolette Florian's disciplinary notice issued at Respondent Long Ridge on 3/12/09 by Richard Aguilar, HSG's account manager at the time.

New Hire Forms and a Checklist for Account Managers." This document contained various items to be checked off by account managers. These items included the required I-9 forms, social security verification, copy of job description, completion of in-service training and number 9, which reads, "Signed employee receipt for Employee Handbook—place copy in personnel file and give Handbook to employee." This number 9 was not filled out in any of the files for any of Respondent Westport's employees. In most cases, a line was written through the page, in which the employee is supposed to sign for receipt of the manual. In the form for employee Debbie Baldwin, a cross out also appears on the page referring to the employee handbook. The words on the acknowledgement, which employees are apparently required to sign as HSG employees, reads as follows: "By signing below, I acknowledge that I have received a copy of the Healthcare Employee Handbook and that it is my responsibility to read and comply with the policies contained in the Handbook. I understand that if I have any questions about anything in this Handbook, I should direct them to my supervisor." Significantly, on the bottom of this page, the following words were written, "Union contract."[7]

The files at Respondent Long Ridge contained documents entitled, "Hourly Employee Evaluation Forms" for 10 of the 15 HSG laundry and housekeeping employees employed at that facility. These forms were filled out by Owusu between March 12 and April 14, 2010. According to Owusu, these forms appeared on his desk, and he was instructed by Mike Crane, Owusu's supervisory and HSG's district manager that the "evaluations were due." Owusu was not sure if these forms were HSG forms or Long Ridge forms. The forms themselves do not make clear which entity prepared the forms. No name of HSG or Long Ridge or HealthBridge appears on the printed portions of the document. Under the section of the form entitled "facility," the following appears: "Healthcare Services Group Long Ridge of Stamford." The form details various categories, such as skills, knowledge, quality, productivity, teamwork, dependability and customer services, and includes various descriptions of these categories, calling for scores from 1-4 in each area. The scores are totaled and there is a space for comments. There is a section on the form stating, "I do or do not recommend the employee for an increase." This section was not filled out on any of the forms.

In fact, according to Crane, HSG routinely uses these forms for all its employees, but they are not used for wage increases or discipline. The purpose of the forms is to let the employees know how they were performing and communicate with them and have an opportunity for feedback from them. Crane testified further that these forms are supposed to be filled out yearly for all HSG employees at all facilities that it supervises or when it employs the employees. However, no such evaluation forms were included in the personnel files in Respondent Westport and Respondent Newington.

Prior to becoming HSG employees, the housekeeping and laundry employees at the three facilities punched in and out using their respective center's time clock. Once HSG became a

"full service" contractor in February of 2009, HSG installed its own separate time clock, which these employees used during the period of time of their employment with HSG. Hours of employees were completed and calculated for HSG payroll confirmation sheets from HSG timecards and sent to HSG payroll department for processing and payment.

The number of hours worked for the employees was determined by HSG and was implemented by the account managers at each facility.

Glaser, the account manager for Respondent Westport, testified that during the full service period at that facility, he hired one per diem employee on behalf of HSG when an employee went out on medical leave. At first, Glaser posted for the position outside of his office so that if anyone from the home was interested in the position, they could apply. No one from the center applied, so Glaser then obtained applications that the center had and picked out an applicant and called him in for an interview. Glaser interviewed the applicant, who had not been a previous employee of Respondent Westport, received approval from his supervisor, Chris Ricci, and hired the employee as a per diem worker for HSG. Glaser did not discuss the hire with anyone from Respondent Westport.

Glaser did not testify as to the name of this individual, but an examination of the Respondent Westport's personnel files reveals only one totally new hire, that of Marvin Williams on September 1, 2009. Glaser's testimony did confirm that he hired someone to fill this vacant position as a per diem employee and that this individual was not a former employee of the facility. Williams appears to meet those criteria since he (unlike the other HSG employees hired) filled out a job application and listed his prior employment. Interestingly, Williams is the only HSG employee hired at any of the facilities, who filled out and signed the employee handbook receipt, apparently signifying that he, unlike the other employees hired by HSG, received an HSG handbook.

Will Parkmond, the account manager for HSG at the Respondent Newington facility, testified that he had an opening for a temporary housekeeper position in June of 2009. On June 7, 2009, Parkmond used a Respondent Newington form and posted for the opening in the employee breakroom, where postings are posted for anyone at the center to apply. Ultimately, Parkmond gave the position to a per diem employee from within the housekeeping and laundry department. He did not testify whether any employees from other departments, who were employees of the home, applied for that position.

During the "full service" period, it is undisputed that HSG followed the union contract with respect to the laundry and housekeeping employees as it had been instructed to do by Respondents. Union dues were deducted from the salaries of employees and forwarded to the Union. Contractual seniority, wages, vacations and other provisions were utilized by HSG during this period in nearly every area. Indeed, from the perspective of the laundry and housekeeping employees, there were virtually no changes other than in payroll and punching in from prior to the change to the "full service" contracting.

The only other changes were that the employees had direct deposit of their checks when they were employees of the cen-

---

[7] The record does not reflect who wrote the works "Union contact," but I suspect that it was Baldwin herself, who was a union delegate.

44                           DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

ters.[8] HSG did not provide this service, and some employees made complaints about this to HSG account managers. They were informed that HSG was looking into obtaining this service for the employees. HSG never provided direct deposit for its employees at these three facilities involved. This required paychecks to be passed out to the employees. In that regard, HSG would often leave the check with the receptionist at the centers, and the employees would sign a sheet left by the account manager to acknowledge their receipt of their checks.

Additionally, although HSG had agreed to apply the contractual benefits to the laundry and housekeeping employees at these three facilities, it had different health plans than did the centers. However, it agreed to provide equivalent benefits. Thus, although HSG's plans had the same benefits, there were some differences in co-pays for doctors and prescriptions. HSG reimbursed the employees for the differences in these co-pays from what they had been paying at the three centers.

HSG also continued to follow the contractual grievance procedure. The procedure involves three steps. Step 1 is the account manager. This was the same before and after the "full service" change since, as noted, HSG had been supervising the employees since 2006. Step 2, however, was the administrator of the facility prior to February of 2009. After February of 2009, Step 2 became the HSG district manager at the respective facilities. Step 3, prior to February of 2009, was Remilard, the human resources director for Respondents, while Step 3 subsequent to February 12, 2009, was Stu Fishberg, regional manager of HSG.

In actual practice, there were very few grievances filed at any of the three facilities, but there was some evidence adduced with respect to several of the specific grievances, which General Counsel asserts, demonstrates joint employer status of the laundry and housekeeping employees.

Franz Petion was employed by Respondent Westport since 1998. He worked in the dietary department from 1998 to 2004 when he transferred to housekeeping. In February of 2009, Petion learned that the housekeeping department at Respondent Westport was going to cut back on hours starting in April. At about that time, Respondent Westport posted for a position in dietary (where Petion had previously worked). He decided to apply for this position. On February 12, 2009, he submitted a written request to Respondent Westport's kitchen supervisor to transfer him back to dietary. His request states that he has "seniority and qualifications for that position. I was hired 6/23/98." Petion gave the request to Simmons, but they had no conversation about it. Subsequently, the position was awarded to someone else, and Petion filed a grievance. The grievance was filed on February 25, 2009. At that time, Petion had been transferred to HSG's payroll and was an HSG employee. Nonetheless, the grievance was filed with and processed through Respondent Westport. The Step 1 grievance was answered by Simmons, who stated that it is the position of the center that the contract was not violated.

On March 18, 2009, Petion met with Kimberly Coleman, administrator of Respondent Westport, and Emily Jones, union organizer. Glaser, HSG's account manager, was not present at

_____
[8] This benefit was not set forth in the contracts.

this grievance meeting.

Coleman denied the grievance in writing on March 29, 2009, stating the "center did not violate the union contract when it denied Franst's [sic] request to transfer from housekeeping/laundry to dietary. The position was filled by another employee who had more seniority than Franst[sic]."

On April 21, 2009, the parties met for a Step 3 meeting. Present were Remillard, Coleman, Jones, Petion, a union delegate (Leone Spence) and a witness. Neither Glasner nor any representative from HSG was present at this meeting. Remillard issued a decision on April 23, 2009, stating that based "upon the information by the Union at the Step 3 hearing, I have determined that Mr. Petion possessed greater seniority and experience than Mr. Desvallon." Therefore, Remillard granted the Union's grievance, and Petion was transferred to the dietary department on May 23, 2009.

After Petion won the grievance but before the transfer was effectuated, Coleman informed Petion that when he is transferred to dietary, his pay rate would be cut to $12.80 per hour from $15.65. Apparently, Coleman gave no explanation to Petion as to why his pay was going to be reduced. Petion told her that she cannot do that and that he was going to call the Union. Instead, Petion called Remillard and complained about Coleman's decision to cut his pay. Remillard overruled Coleman, and Petion's pay was not reduced. He continued to work for Respondent Westport as a dietary aide.

Coleman did not testify, so no explanation was provided as to why she informed Petion that his rate was to be cut to $12.80 when he transferred to dietary as a result of the grievance being sustained. It is noteworthy that the $12.80 rate that Coleman sought to reduce Petion to was the identical rate that the laundry and housekeeping employees received as new hires in May 23, 2010, as will be detailed more fully below.

Claudette Parks-Hill has worked in various capacities at the Long Ridge facility since 2005. She started out as a dietary aide and then switched to housekeeping. She was terminated from her full-time position in housekeeping in 2007, the Union grieved and an arbitrator offered her reinstatement. In 2008, she had been reinstated to her full-time position in housekeeping for Respondent Long Ridge and began to pick up come hours in the nursing department as a per diem CNA.

When HSG became the employer of the laundry and housekeeping employees on February 15, 2009, Parks-Hill was hired as a part-time employee in housekeeping. At that time, she began receiving two pay checks. One for her regular part-time hours at HSG and the other from Respondent Westport for the hours that she received a per diem CNA.

In April of 2009, HSG laid off Parks-Hill (among others), and she lost her regular hours as a part-time employee for HSG. She, however, remained an employee of HSG as a per diem in the housekeeping department. Union Representative Patrick Atkinson met with Mike Crane, HSG's district manager, to discuss Parks-Hill's layoff. He did not, at that time, discuss the possibility of Parks-Hill bumping into nursing because, according to Atkinson, Crane "has nothing to do with nursing."

Subsequently, Parks-Hill went to ask Atkinson about bumping into the nursing department. They initially discussed the issue with Anna Durkovic, the administrator for Respondent

Long Ridge. Atkinson requested that Parks-Hill be allowed to bump into the nursing department to obtain regular hours as a CNA. Durkovic said no, that Parks-Hill could not bump into nursing. Thereafter, the Union filed a grievance, and Atkinson along with Union Representative Anne—told Durkovic during this meeting that Parks-Hill should be allowed to bump from housekeeping into nursing and that Respondent Long Ridge would be in violation of the contract if it did not allow Parks-Hill to bump. Anne referred to Article 8, the seniority clause in the contract. Durkovic replied at the meeting that she would get back to the Union on the matter. Shortly after that meeting, Durkovic notified Atkinson that Parks-Hill will be allowed to bump into the nursing department, and she should see Joyce Ricci, Respondent Long Ridge's scheduler about the hours. She did so, and Ricci initially told her that the schedule was made-up but that Parks-Hill would be on the schedule the next month. At one point, Ricci told Parks-Hill that she would be regularly scheduled for 8 hours. Subsequently, Parks-Hill's hours steadily increased up to nearly 40 hours.[9]

During the spring and summer of 2009, Parks-Hill continued her status as a per diem employee at HSG in housekeeping and received some hours from time to time from HSG at the same time that she was receiving hours from Respondent Long Ridge as a CNA in nursing. In September of 2009, Parks-Hill as well as other nursing employees received a notice of layoff due to current census and federal reduction of medical/Medicare reimbursement. The notice states that this "layoff is not temporary." On September 23, 2009, Parks-Hill met with Respondent Long Ridge's Administrator Durkovic, Agnes Mirto, director of nursing, and Crane, district manager for HSG. Atkinson, the union delegate, was also present. At that time, the layoff was explained to her, and she was given a document to sign entitled, "Long Ridge of Stamford Layoff Effective September 20, 2009." The document contains Parks-Hill's name, lists her status as CNA 8 hours and has a box checked off for termination letter, which was checked off. Parks-Hill signed the document and added the following comments, "No other positions were offer to me. CP Hill 9/23/09." Also, on this document, there is a listing of the average hours worked by Parks-Hill in both laundry and nursing. According to Parks-Hill, these notations were made by Mirto, and the information with regard to her hours worked in laundry was obtained from Crane at the meeting. Apparently, this information was included to assist Parks-Hill in filing for unemployment. The document reflected that Parks-Hill worked no hours in laundry for the weeks of 8/29, 9/12 and 9/19/09 and 8 hours for the week of 9/5/09. It also stated that in August 2009, she averaged 11.5 hours and in July of 2009 averaged 11.25 hours. Although these hours were as an HSG employee, it is noteworthy that the form did not mention HSG at all nor reflect that these hours were as an HSG employee. The form also stated that Parks-Hill had averaged 27

hours in nursing from September 2009 to present and 41 hours in August and 33.625 hours in July. According to Parks-Hill, she believed that at that meeting that she was being laid off "from the building" and that she would also no longer be a per diem employee of HSG. Neither Crane nor anyone else at the meeting informed Parks-Hill that she would still be an employee of HSG notwithstanding the layoff notice from Respondent Long Ridge.

During this meeting, Atkinson stated that in his view Parks-Hill should be allowed to bump back into housekeeping and that the contract states that her seniority continues. Durkovic responded that she did not believe that Parks-Hill could bump into housekeeping. Crane, although present, made no comment about this subject.

Subsequent to this meeting, Atkinson met with Durkovic and Crane and again requested that Parks-Hill be allowed to bump back into housekeeping. According to Atkinson, both Crane and Durkovic stated that they would not allow Parks-Hill to bump back into housekeeping. Atkinson asked why the home wouldn't allow her to bump back into housekeeping when it had previously allowed her to bump from housekeeping to nursing. Neither Durkovic not Crane responded to Atkinson's inquiry.

After the September 23 meeting, as noted above, Parks-Hill believed that she had been terminated by both HSG and Respondent Long Ridge, and, in fact, she received no calls from HSG for jobs in 2009. She was, at some point undisclosed by the record, subsequently informed in a letter from unemployment insurance that she had not been laid off from HSG but that it simply had no work for her. Apparently, Parks-Hill did receive unemployment insurance based upon her layoff from Respondent Long Ridge.

She still did not receive any calls for work from HSG but since she had a baby in December of 2009, it was not an issue, and she was not available for work in any event. In March of 2010, she called HSG and notified HSG that she was now available for work and did start to receive some calls from HSG for per diem work.

After the May termination by HSG, she was rehired by Respondent Long Ridge as a per diem housekeeping employee and received some hours. In July, Respondent Long Ridge offered her a full-time position as a CNA in the nursing department, which she accepted.

Anthony Lecky was employed by Respondent Long Ridge for 16 years as an employee in housekeeping and laundry. Prior to the transfer of Respondent's Long Ridge's laundry and housekeeping employees to HSG's payroll, Lecky was employed in the laundry department. Lecky had been a union delegate for 6 years. As a union delegate, he along with all of the other delegates represented all employees in the bargaining unit, and it was not unusual for an employee in one department to be represented by a delegate employed in a different department. Thus, Lecky has represented employees in his capacity as union delegate, who work in departments other than laundry and housekeeping. In the fall of 2009, Lecky stayed after his shift ended to attend a grievance meeting. He was not paid for his time spent at the grievance meeting. In the past, employees had always been paid for time spent at grievance meetings at

---

[9] It appears that she was regularly scheduled for the 8 hours but picked up additional hours as needed. As will be discussed below in connection with another issue, Respondent's centers had a practice wherein they would guarantee a certain amount of hours to employees, known as "control" hours. This is apparently what Parks-Hill received in the spring of 2009.

Respondent Long Ridge.

When Lecky noticed that he had not been paid for the time, he complained to fellow delegate Atkinson. Atkinson and Lecky spoke to Durkovic together about the issue. No one from HSG was present. Atkinson and Lecky explained the situation to Durkovic. She told them that this was "her building" and "if there were changes, she needs to know." She told Atkinson and Lecky that she would look into the matter and get back to them.

Atkinson testified that he approached Owusu about the issue, and according to Atkinson, Owusu replied that "Chris from corporate" instructed him not to pay Lecky. Although Atkinson testified that he believed that Chris was an employee of Respondent HealthBridge, but he conceded that he never met Chris and did not know Chris's last name. Atkinson did assert that a payroll employee named Cassandra,[10] whom he had dealt with in the past on payroll, informed him that Chris had instructed her not to pay employees for hours for whatever reason. Cassandra allegedly told Atkinson that "Chris" was an employee of HealthBridge. There is no other record evidence that Respondent HealthBridge employs any corporate official named "Chris." The record does disclose, however, that Respondent HSG employed a Chris Ricci as a district manager.

Subsequent to the conversation between Atkinson, Lecky and Durkovic about Lecky's complaint, Atkinson approached Crane. Atkinson told Crane that Lecky had not been paid for his time that he spent in a union grievance meeting. Crane informed Atkinson that HSG was not going to pay Lecky for that time. Atkinson did not testify whether or not Crane provided him a reason for why HSG did not pay Lecky.

Both Crane and Owusu testified that Crane instructed Owusu not to pay Lecky for this time because Lecky's grievance meeting did not involve HSG business or HSG employees but involved other union matters involving other employees of the facility.

Although Durkovic had promised Atkinson and Lecky that she would look into Lecky's complaint and get back to them, she never did. Accordingly, on September 17, 2009, Atkinson prepared a grievance on the issue, which was also signed by Lecky. The union grievance form under the section facility lists HCS, which stands for Healthcare Service (HSG). However, Lecky and Atkinson met with Durkovic and handed this grievance to her. She accepted it and informed Atkinson and Lecky that she was "still looking into it," Durkovic never got back to Lecky or Atkinson about the issue or the grievance.

Atkinson subsequently contacted Anne—[11] about it, and she told him that as soon as he received a response to the grievance, he should let her know.

Neither Atkinson nor the Union ever received a response to the grievance from either HSG, Respondent Long Ridge or Respondent HealthBridge.[12]

[10] Atkinson did not testify whether "Cassandra" is an employee of Respondent's Long Ridge or of Respondent HealthBridge.

[11] While Atkinson did not recall the last name of the union representative, other record evidence reflects that the union organizer for the facility was Anne Fenelon.

[12] I note the record does not reflect whether HSG ever received a copy of this grievance, which, as noted, was given by Atkinson to Durkovic.

Victor Rodriguez was a per diem housekeeping employee employed at Respondent Newington. He was transferred over to HSG's payroll and hired by HSG in February of 2009 along with Respondent Newington's other laundry and housekeeping employees.

On February 27, 2009, Sue Simone, a union delegate and a laundry employee, filed a grievance on behalf of Rodriguez with Respondent Newington. She met with Respondent Newington's administrator Chris McKinney with respect to this grievance although Rodriguez was an HSG employee as of February 27, 2009. McKinney answered and denied the grievance in writing. The grievance alleged that Respondent Newington had violated the contract by not permitting Rodriguez to transfer to the maintenance department. The maintenance department is not part of the laundry and housekeeping unit, and the maintenance department employees were not employees of HSG. That is why Simone filed the grievance with the administrator and did not speak with anyone from HSG about Rodriguez's complaint.

In fact, it turns out that this position had been posted in July 2008, and Rodriguez did not apply for it. It was apparently given to a per diem employee from the maintenance department. Rodriguez was complaining that this employee was receiving 32–40 hours, which McKinney denied in her response.

Simone conceded that she had previous conversations with Lewis—, the supervisor of the maintenance department and an employee of Respondent Newington about getting Rodriguez some hours as a maintenance employee as far back as 2008 and had not been successful.

After this grievance was denied by Respondent Newington by the administrator, it was not taken any further by the Union.

On July 16, 2009, Simone filed a grievance on behalf of Michael Cockburn, a laundry and housekeeping employee, concerning the failure of Respondent Newington to award him a posted position in the maintenance department. She met with McKinney about the grievance and discussed it. McKinney responded in writing on August 4, 2009, that the grievant Cockburn had been rehired by Respondent Newington on October 23, 2008, and that the employee, who received the posted position, Miguel Colon, who was in the maintenance department, was hired on October 21, 2008. Therefore, when the 8 hours per week maintenance position became available and was posted, Colon had more seniority and was awarded the position based on more seniority and following "past practice and union contract rules in regards to the proper employee bidding for the position."

Debbie Baldwin was a laundry employee and a union delegate employed by Respondent Newington. Eva Fal was also a union delegate but was employed as a dietary aide at Respondent Newington. Baldwin became an HSG employee after the "full service" phase of Respondent Newington's relationship with HSG began in February of 2009.

As union delegate, Baldwin continued to represent the housekeeping and laundry employees employed at Respondent Newington's facility, even after she became an HSG employee. In this capacity, during the "full service" period, she several times raised the direct deposit issue with Will Parkmond,

HSG's account manager. Parkmond informed Simone that HSG did not offer direct deposit to its employees.[13]

Additionally, both Simone and Fal filed a number of grievances during the full service period, which were ultimately handled by Parkmond on behalf of HSG. However, Fal and Baldwin would not file them with HSG but would give them to Respondent Newington's administrator McKinney. McKinney, in turn, would put the grievances into Parkmond's box, and he would handle them. Parkmond also testified that he told both Simone and Fal several times that the grievances concerning HSG during this time period should be filed with him and HSG and not the home.

At one point in his testimony, Parkmond conceded that he had some discussions about the substance of these grievances themselves with McKinney. At another point in his testimony, he denied that he discussed the substance of the grievances with McKinney, but only that they discussed that the grievances should have been filed directly with HSG.[14]

The particular grievances involved are as follows. A grievance was filed by Fal on behalf of housekeeping employee Francisco Hernandez for loss of wages on March 20, 2009. Parkmond received this grievance directly from Fal. The grievance was filed on a union grievance form and lists the facility as "Newington." The grievance does not mention HSG. Parkmond responded in writing to this grievance and testified that neither the administrator nor anyone else from HSG was involved in resolving this grievance. The issue involved was that Hernandez lost pay when he was taken off the payroll because after he was hired by HSG on February 15, 2009, HSG discovered that Hernandez and another housekeeping employee had social security numbers that could not be confirmed. According to Parkmond, he discussed this grievance with Rich Dunn, his district manager and supervisor, who confirmed HSG's policy that the employees must be taken off until their social security numbers are confirmed. Hernandez was given time to correct the situation, but he did not do so, and so he was taken off the schedule and then off the payroll entirely, pursuant to HSG policy. Ultimately, Hernandez returned to Puerto Rico, straightened out the problem and obtained a correct social security number. He was then reinstated to the payroll.

Parkmond's response to the grievance was filed on March 24, 2009, and essentially described the above facts and concluded that Hernandez was given ample time to attain confirmation of this social security number just as the other employee was. "All actions were taken according to policy."

The Union did not take this grievance any further and filed no further steps in the process.

On March 23, 2009, Fal filed a grievance on behalf of employees alleging that "new insurance policy differs from previous benefits." Parkmond received a copy of this grievance in his box from McKinney with whom Fal had filed the document. On the top left hand corner of the document, the words "for Will Parkmond" appear, written by McKinney. The grievance

filed by Fal was again filed on union grievance form, listing facility as "Newington" and made no mention of HSG. The remedy requested was "correct all benefits to previous ins." This grievance refers to the fact, as detailed above, that HSG agreed to reimburse the laundry and housekeeping employees for any differences in co-pays for prescriptions or doctors' visits from what they had to pay while on the payroll of the Respondent Centers, including Respondent Newington. According to Parkmond, he resolved this grievance by contacting HSG's benefits coordinator and sending a note to the coordinator reflecting that employee Luz Maria Morales "had been charged a fee also for prescriptions" and instructing the coordinator to "check all new benefits to match old benefits for employees." Parkmond also included in his submission to the coordinator a copy of a receipt reflecting that employee Chinette Brown had paid a co-pay to Express Scripts and a copy of Brown's Blue Cross Blue Shield card.

Parkmond responded to this grievance in writing on March 26, 2009. The response states that "there have been some concerns brought to my attention in reference to the present coverage from previous benefits, I have made my benefits coordinator aware and we have been taking steps toward rectifying these issues."

Parkmond asserts that he had no discussions about this grievance with the administrator or anyone else from Respondent Newington. This grievance was not taken by the Union any further.

On August 17, 2009, Fal, Simone and several laundry and housekeeping employees filed a grievance alleging that "facility refuses to acknowledge the union contract for housekeeping/laundry." Parkmond responded in writing to this grievance on August 20, 2009, as follows:

> The union is acknowledged by facility & Healthcare Services Group Inc. Union contract being followed. All further grievances should be addressed to Healthcare Services, not administrator of NHCC as of 2/15/09. Step 1 Will Parkmond, HCSG; Step 2 Rich Dunn HCSG; Step 3 Stu Fishberg HCSG.

According to Parkmond, he did not discuss this grievance with the administrator or with anyone from HSG. He prepared the above cited response himself. Parkmond also testified that he discussed the grievance with Simone, but doesn't recall what specifically the delegates were complaining about or from whom the home or from HSG had allegedly refused to "acknowledge the union contract for housekeeping and laundry employees." The Union never took the grievance any further.

On January 29, 2010, Fal filed a grievance also signed by several employees alleging that "employees are being charged for insurance, long-term, vision, etc. Double charges." Parkmond responded to this grievance on February 3, 2010, as follows:

> 2/3/10
>
> Answer to Greivance[sic] from 1199 dated 1/29/10
>
> Re: Payroll Deductions: disability, long/short, vision coverage, double charges.

---

[13] As noted above, the employees at Respondent Newington as well as the other facilities involved herein had received direct deposit while they were employed by the centers.

[14] McKinney did not testify.

New payroll system in effect. Hcsg is working out some discrepancies in checks with insurance, vision, long and short term disability deductions. Hcsg will remedy these issues.

Will Parkmond
Acc. Manager
HCSG

Parkmond explained that this grievance involved HSG's commitment to honor the contract's provision so that employees will not have to pay any higher premiums for health insurance, including the related benefits such as vision and disability than they had paid while on the payroll of Respondent Newington. Apparently, there had been a payroll glitch so that employees were charged more than they should have for premiums for a period of a couple of weeks. His explanation in his response that HSG is taking care of the discrepancies and will remedy the issues apparently satisfied the Union, and no further action by the Union concerning this grievance. Parkmond did not discuss this grievance with anyone from Respondent Newington.

After the housekeeping and laundry employees were transferred to HSG's payroll at the three centers on February 15, 2009, issues arose about the amount of leave time the employees carried with them to HSG and accrued while working for HSG. Since HSG assumed the union contracts at that time, it accepted the liability for time accrued before February 15, 2009. The employees' accrued time during the remainder of the year (while employed by HSG) were based on their accruals prior to February 15 (while employed by the centers). HSG used figures provided by the centers and HealthBridge to determine the amount of time employees had accrued prior to that date. During the "full service" period, there were numerous instances of problems that arose, where employees complained that they were not receiving the proper benefits based on these prior accruals. In this regard, employees would complain to HSG account managers as well as to the center administrators about these issues. HSG managers would attempt to resolve these issues and would often have to consult with representatives of the centers and to obtain centers' records in order to do so.

Suzanne Clark was a union organizer, who became assigned to service the Respondent Centers in July of 2009, when Emily Jones, the prior union organizer for these facilities, left the Union. Clark became involved in these issues. She received complaints from housekeepers that they had not received the proper amount of time after the transfer to HSG, that they had tried to resolve it themselves with Kim Coleman, the administrator at Respondent Westport, and had not been successful, and there were still more errors.

Clark discussed the issues with both officials of HSG and Coleman. HSG representatives told Clark that HSG had used the information given from Respondent Westport to make the calculations. Clark then made an information request to Respondent Westport in November of 2009 for information pertaining to accrued time for the laundry and housekeeping employees. Coleman responded to that request on November 10, 2009 with a copy of the accrual records for the twelve Re-

spondent Westport employees, who had been transferred to HSG's payroll.[15]

Clark also received a complaint in late April of 2010 from Lecky about supervisors doing bargaining unit work at Respondent Long Ridge. In this connection, Clark met with Owusu and Crane about the issue. Apparently, a survey had been conducted by someone or some entity, which had shown deficiencies in cleaning at the facilities. In reaction to that survey, HSG used some supervisors to perform bargaining unit clean-up work. When Crane and Owusu explained this to Clark as an explanation for this conduct, Clark responded that it was not acceptable for supervisors to do bargaining unit work and noted that HSG had effectuated layoffs over the last few months, and that caused the cleaning not being up to par as a result of the staffing reduction. Crane and Owusu told Clark that this was not under their control that HSG could not put in more staff. Clark replied that this shows that the layoff did not work and that HSG needs to bring back the staff since it "can't bring in somebody else to do our work instead of having us do it." Clark again emphasized that "we need these bodies." Crane and Owusu reiterated that it wasn't under their control and added that they "weren't going to get the approval from HealthBridge to be able to have more people." Clark then said that HSG could not bring in someone else to be able to come and to do this work, and that it would have to deal with overtime for the existing employees. Crane then agreed to not have any supervisors or nonbargaining unit people doing bargaining unit work.

Clark then observed that if HealthBridge was telling HSG that it couldn't get more people that HealthBridge would not like more overtime either and that in Clark's view, overtime was more painful than more people.

Crane repeated that it wasn't something that he had control over, but he was going to make sure that there was going to be no more supervisors doing the work.

In April of 2010, Clark was discussing the accrual issue problems at Respondent Westport with Chris Ricci, HSG's district manager in charge of that facility. Ricci informed Clark that he didn't think that it was going to be a problem because the employees were going to be transferred back to the Westport payroll and that, therefore, the time would go back on the book for the employees when they got transferred back over to Westport. Clark replied that she wanted to make sure that the employees' time is there.

A few days later, Ricci called Clark back and told her that he had misspoke and that the transfer back to Westport was not a set plan and was just something that was a possibility and added that "I shouldn't have said that."[16]

Sue Simone, as noted above, the union delegate at Respond-

---

[15] Similarly, in August of 2010, after the employees were rehired by the Respondent Centers in May of 2010, as will be detailed below, issues also arose concerning accruals for time spent on HSG's payroll. Clark asked Respondent Newington for information about these issues and dealt with Will Parkmond of HSG and Patricia Rodriguez of Respondent Newington. On August 31, 2010, Parkmond forwarded to Clark, the accruals for the department from January 2009 through May of 2010.

[16] Based on the undenied testimony of Clark. Ricci did not testify.

ent Newington, discussed with Parkmond the possibility of obtaining direct deposit for the employees, a benefit the employees had received when they were employed by Respondent Newington. Parkmond initially informed Simone that HSG was looking into providing direct deposit for its employees when she first brought up the issue sometime in March of 2009. Subsequently, Simone would go back every month and ask Parkmond when are employees going to get direct deposit. On these occasions, Parkmond informed Simone that the employees would eventually be going back to Respondent Newington's payroll, so they would be getting direct deposit then. Parkmond did not tell Simone when the employees would be going back to the payroll of Respondent Newington.

Similarly, in early 2010, Crane, HSG's district manager for the Respondent Long Ridge facility, told union delegate Anthony Lecky that maybe the employees would be going back to becoming employees at Long Ridge.[17]

### E. The Termination of the Laundry and Housekeeping Employees by HSG and the Rehire by the Centers.

On May 17, 2010, the laundry and housekeeping employees at the three facilities reported to work as scheduled. They were all called together by HSG's on-site supervisors and five district managers and handed letters of termination by HSG. All the letters were signed by Kevin McCartney, HSG's divisional vice-president. They were virtually identical at all three facilities in that they advised the employees that as of 12 or 12:01 a.m. on May 17, 2010, the employees will no longer be employed by HSG. The letters given to the employees at Respondent Newington facility added the following sentence. "Payroll services [will] not be provided for Newington Health Care Center."

The employees at the three facilities were told that they would need to apply for jobs at their respective centers. The employees were then sent to a meeting, where the administrators and/or Respondent HealthBridge representatives held group meetings with employees. They were told that they could apply for jobs at their respective facilities, but they would have to fill out new job applications, be interviewed and be subject to background and drug tests. The employees learned that they would be treated as "new hires" at a starting rate of $12.80 per hour.[18]

Some of the employees, particularly the union delegates were reluctant to file the applications and accept pay cuts and asked to call the Union. Eventually calls were made to Clark, who advised the employees to file and sign the applications "under protest."

Ultimately, all of the 48 laundry and housekeeping employees at the three facilities applied for jobs with the Respondent Centers, except for Lurline Wray, who had been employed by

Respondent Long Ridge. The Centers hired 45 of the 47 employees, who applied.[19]

The "interviews" that were conducted, insofar as the record discloses, were nonexistent perfunctory or cursory. That is not surprising since nearly all of the employees had previously been employed at the centers before the subcontracting to HSG. For example, when Debbie Baldwin was rehired by Respondent Westport, she met with administrator Kim Coleman. Coleman asked Baldwin to fill out a job application and to sign a paper accepting employment with Respondent Westport. The letter reflects her position and her new salary and that she will be eligible for benefits in accordance with the collective-bargaining agreement. After checking with Clark, Baldwin signed the letter of acceptance. Coleman asked Baldwin no questions about experiences or qualifications or any other interview type of questions. Baldwin asked Coleman why Respondent Westport is "doing this to us." Cole replied, "It's not me, it's corporate." Coleman added that Respondent Westport is following the union contract. Baldwin was then instructed to go upstairs for orientation and then to start work.

Sue Simone met with Administrator Gary Caserta at Respondent Newington along with Respondent HealthBridge Vice-President Lisa Crutchfield. Simone asked Caserta why did this happen and why did we do all this. Caserta said that he was sorry that it happened, but if she wanted to be employed, she needed to fill out the application and the letter. Crutchfield reiterated that if Simone wanted to be employed, she needed to sign the letter of acceptance or if not, she could just leave. Simone signed the letter and the application listing her desired pay as "what I am making" and signing the code of conduct form, adding the words "under duress."

Simone learned that her pay would drop from $19.14 per hour to $12.80 per hour as a result of her being hired as a new employee.

At Respondent Long Ridge, administrator Vinnie Klimas went through the motions of conducting an interview, brief as they were. Union Delegate Lecky filled out his job application and after consultation with Clark signed it and added the words "sign under protest" in several places on the application. Lecky gave the application to Klimas. Klimas asked Lecky if he knew how to work with the laundry machine and the dryer. Lecky said yes.[20] Klimas then informed Lecky, "Okay, you are hired. Welcome to Long Ridge of Stamford." Klimas then handed Lecky a previously prepared "offer of employment" letter, which Lecky also signed, adding the words "under protest."

Parks-Hill, during her "interview" with Klimas, was asked if she ever worked in laundry and housekeeping. Parks-Hill replied yes. Klimas asked if she can lift 50 pounds. Parks-Hill replied yes. Klimas stated, "You're hired." Klimas handed her a hiring letter and asked her to sign it. Parks-Hill did so but added the words "under protest" and put her initials next to that comment.

---

[17] While Crane and Parkmond denied making the above statements to Lecky and Simone respectively, I credit the mutually corroborative testimony of Simone and Lecky in this regard, which is also corroborative of the undenied credited testimony of Clark of Ricci's comments to her, as described above.

[18] This resulted in pay reductions for nearly all employees, some quite substantial. For example, Debbie Baldwin's pay at Respondent Westport was reduced from $15.70 to $12.80 per hour.

[19] The two employees not rehired were Myrna Harrison and Newton Daye at Respondent Westport. The facts concerning the failure to rehire these employees will be detailed more fully below.

[20] Lecky had been employed in the laundry and housekeeping department for 16 years at the center.

At Respondent Westport, it appears that 5 employees missed their normal workdays on May 17 and 18 as Glaser admitted that he and his managers cleaned the facilities themselves on these 2 days. Employees attended orientation on May 18 as new hires. Respondents stipulated that the 45 laundry and house-keeping employees employed at the Newington, Long Ridge and Westport facilities, who were terminated at midnight on May 17, 2010, and hired either on Monday, May 17 or Tuesday, May 18 did not receive pay for either one or both of these days.

In addition to the reduction in pay, the "newly hired" employees were classified at all the facilities as "probationary," thereby, affecting eligibility for a number of benefits under the contract, resulting in loss of medical coverage for some employees for some period of time.

Respondents called no witnesses from any of its facilities or from Respondent HealthBridge. It did call various supervisory personnel from HSG, as detailed above, including Parkmond, Glaser, Owusu and Crane. Their testimony was essentially the same in this area. They were all unaware of who made the decision to cancel the subcontract or why that decision was made. They conceded that generally HSG prefers a "full service" contract to a "supervisory only" contract since the former contract generally produces more revenue for HSG. In each instance, the HSG representatives were simply informed by higher ranking HSG officials that HSG was no longer going to employ the employees and instructed them to so inform the employees that they would need to apply for jobs with the centers. Their testimony is slightly different as to what specifically they were told.

Parkmond, the account manager for Respondent Newington, was told by his District Manager, Rich Dunn, that the employees were going to be terminated and to give them a termination letter the next day and instruct them to see the administrator. Parkmond asked Dunn why this was happening. According to Parkmond, Dunn provided some "vague answers," but he did not recall what Dunn stated.

Glaser, the HSG account manager at Respondent Westport, was informed by his District Manager, Chris Ricci, of the terminations and that Respondent Westport was going to be hiring them back. Ricci informed Glaser that he (Ricci) was going to be there the next day and that the "payroll is coming back to HealthBridge." Ricci told Glaser that HealthBridge is taking the "payroll back" and "they're going to be their employees." Glaser asked what does that mean. Ricci replied that the employees would be filling out new applications and the center is going to hire them back. Ricci did not tell Glaser at that time whether the employees would be hired as new employees. On May 17, 2010, after the employees were rehired, employees informed Glaser that they were treated as new employees by the center. On that day, Glaser discussed the issue with Ricci, who confirmed that Respondent Westport would be hiring the employees as new employees and they would not be retaining their seniority. Glaser conceded that he was surprised by this development, but he did not ask Ricci why this decision was made nor did he discuss it with Coleman, the administrator.

Owusu, HSG's account manager at Respondent Long Ridge, testified that Crane (his supervisor) informed him to come in early on May 17, 2010, because the employees would no longer

be on HSG's payroll. Crane also informed Owusu that the employees would be going to the "payroll of the home."

Crane testified that he was told by his boss, Stu Fishberg, that HSG was terminating the employees and that he (Crane) should report to Respondent Long Ridge to help with the transition back to "Long Ridge of Stamford." Fishberg added that Crane would be receiving a letter to present to the employees on May 17, 2010. Fishberg did not tell Crane who made the decision to terminate the subcontract or to terminate the employees. Nor was he told that the employees would be hired by the center as new employees. According to Crane, he learned on Monday, May 17 that the employees were being hired at lower wages than they had been receiving while employed at HSG and that employees were upset about it.

### F. The Failure to Rehire Daye and Harrison by Respondent Westport

Newton Daye worked as a full-time housekeeper at Respondent Westport's facility for 13 years. In February of 2009, he became an employee of HSG as a result of the subcontracting described above. Daye suffered a stroke in 2009 and was out of work on leave of absence for eight months. During that period of time, he received payments from HSG's long-term disability program.

On May 17, 2010, Daye reported for work as scheduled. He discovered that his timecard was missing, and there was a 7 a.m. meeting scheduled with the staff.

Chris Ricci was present and informed him that HSG was not going to be his employer anymore and that he should attend a meeting with Coleman. At the meeting, Daye, as well as other employees, received a letter of termination from HSG and were told to fill out an application to apply for a job with Respondent Westport. Coleman also informed the employees that they would be starting at a salary of $12.00 per hour, which resulted in considerable complaints from employees that this was unfair. The employees decided to contact the Union before filling out any applications. Coleman informed the employees that if they were not filling out job applications, they should leave the premises.

The employees left the meeting and tried to contact the Union but were initially unsuccessful. Daye went back inside the facility and observed Coleman arguing with employee Myrna Harrison and heard her inform Harrison that she needed to leave the building if she was not filling out an application.

Daye asked Coleman to deliver a message for him to another coworker, Junior Stanley, that he (Daye) was leaving and would come back for him later. Coleman replied that she would pass the message on.

Daye left the premises and went home. At home, he received a call from a coworker, who informed him that the Union had been contacted and employees should fill out the applications.

Daye then returned to the center and met with Coleman. He filled out a job application form and gave it to her. Coleman asked Daye three questions about residents' rights of which he could remember only two. She asked Daye what he would do if he saw a resident getting abused. Daye replied that he would go and report it to his supervisor. Coleman also asked a question about working together, but the record does not disclose his

response. At the close of the meeting, Coleman did not offer Daye a position and told him that she would get back in touch with him. Coleman did not contact Daye. Subsequently, Daye called on several occasions and finally reached her on Friday, May 21. During this conversation, Coleman informed Daye that Respondent Westport was "no longer in need of your services." Daye asked why. Coleman provided no explanation, and the discussion ended.

Myrna Harrison was employed as a housekeeper at the Westport facility for 22 years, including the 14 months as an employee of HSG. When she arrived for work on May 17, 2010, Chris Ricci informed her not to punch in because there would be a meeting with employees in the dining room right off the lobby. At the meeting, Ricci informed the employees that he had received an email message and gave employees a paper stating that they were terminated by HSG. At that point, Ricci left, and Coleman entered.

Coleman told the employees that they were all going to be hired again by Respondent Westport, but they needed to fill out new job applications and would be paid at about $12 per hour.[21] Coleman informed the employees that they had to leave the premises if they were not going to fill out job applications. Coleman added that she would "call the cops" if the employees did not leave. At that point, the employees left the premises, went outside, and the employees attempted to contact the Union. Harrison went outside with the employees but then went back inside because she had an Avon package that she wanted to be delivered to an employee, which was in her locker. Harrison asked Coleman if she could go to her locker. Coleman accompanied Harrison to her locker to retrieve the package. While in the lobby, Coleman again told her (Harrison) that she had to leave the building. When Harrison did not immediately leave, Coleman repeated her previous comment that if Harrison did not leave, she would call the police.

Harrison then went outside the building, and by that time, she was told by coworkers that the Union had been reached and instructed employees to fill out job applications. Harrison then went back inside the building, filled out the job application and gave it to Coleman. Coleman did not conduct any kind of interview and did not ask Harrison any questions. Coleman informed Harrison that she was not going to hire Harrison that day. Harrison asked why. Coleman replied that she was sending Harrison home and would get back to her on Tuesday.

Harrison did not hear from Coleman on Tuesday as promised. Harrison called and left a message, but Coleman did not return her call. Thus, the next day, May 19, 2010, Harrison went to the home and met with Coleman. Harrison was informed at that time by Coleman that Respondent Westport was not hiring her back. Harrison asked why, but Coleman did not furnish any reason or explanation. Harrison asked Coleman for something from Respondent in writing. Coleman instructed her to go to the payroll office, where she could obtain a paper about her employment status. Harrison did so and received the following signed letter, signed by Jeanette Quinteros, payroll coordinator.

May 19, 2010

Re: Myrna Harrison

To Whom It May Concern:

Myrna Harrison is a former employee of Westport Health Care Center with a position as a Housekeeper with a date of time of 12/13/1989. Myrna was terminated on 2/15/2009. If you have any questions or concerns please feel free to contact me at 203-349-4627.

Thank you.

Jeanette Quinteros
Payroll/Benefits Coordinator

Baldwin, the long-term delegate and housekeeper at Respondent Westport, testified that Daye and Harrison were good workers and that she never received any complaints about them as their delegate.

Glaser, as noted, the onsite supervisor for HSG, testified that he had contacts and discussions with Coleman on a daily basis. Glaser was not asked by Coleman for his opinion of the skills and abilities of any of the housekeeping and laundry employees and that he did not express any concerns about or make any complaints about any of the employees, who were under his supervision to Coleman, including Harrison and Daye.

According to Glaser, a day or two after most of the employees were rehired by Respondent Westport, Coleman informed Glaser that Harrison and Daye were not being retained as employees by Respondent Westport and that she had interviewed them and had found them to be "unacceptable candidates." Glaser states that Coleman did not tell him why or what she found "unacceptable" about Harrison or Daye, and Glaser did not ask. In fact, he made no response to Coleman's statement that Respondent Westport would not be retaining Harrison or Daye.

Harrison and Daye were both full-time employees, who had been working 40 hours each while employed by HSG (as well as by Respondent Westport prior to the subcontracting). According to Glaser, in order to fill these slots, he and Ricci consulted the seniority list and bumped up some part-time employees to give them more hours as required in the contract.

On further questioning, however, Glaser conceded that Daye's full-time hours had, in fact, been given to Marvin Williams. Williams had been employed by HSG as a per diem employee[22] and, in fact, had not been called for several weeks prior to Williams being hired by Respondent in May of 2010.

### G. The Union's Post-Transition Grievances and Requests to Meet

Clark was on vacation in Iowa when the above described

---

[21] Harrison's salary at that time was $16.75

---

[22] I note that Williams had been the only employee, insofar as the record discloses, that was hired directly by HSG and who had not been previously an employee of any of the centers.

Additionally, Williams was the only HSG employee, who received an HSG handbook during the "full service" period.

events concerning the termination of the laundry and house-keeping employees and their rehire as new employees occurred. When she returned from vacation on May 25, 2010, Clark was informed by her colleague, Paul Fortier, about the events of the prior week. Fortier told Clark that "everyone was just floored," and they'd never seen anything like that. Fortier informed Clark that he had gone to Respondent and spoken to Coleman about what had happened. Fortier told Clark that he had protested to Coleman that Respondent could not do what they done. Coleman replied that they had done it and added that she didn't like the way Fortier was talking to her about it and ordered him to leave the facility.

The Union filed grievances against each of the three homes, protesting the terminations and the rehire with loss of benefits and reductions in wages. In follow-up letters, the Union asked to meet to discuss the grievances.

Responses to the grievance were made by Remillard on behalf of each of the Respondent Centers. He rejected the grievances for various reasons, including that the Union had no standing to file the grievances, that the grievances were not arbitrable, and/or that the grievances should be filed with HSG.

The grievances, the Union's requests to meet on these grievances, and the responses filed by Remillard on behalf of the Respondent Centers are set forth below:

GRIEVANCE FORM

Facility:  Long Ridge of Stamford
Grievant(s) Name:    All Housekeeping and Laundry Employees
Job Title: All Housekeeping and Laundry Employees
Worksite:  Long Ridge of Stamford
Date Grievance Occurred:  05/17/10
Contract Article(s) Violated:    Article 1, Article 2, Article 4, Article 5, Article 9, Article 10, Article 11, Article 21, Article 25, Article 38 and all other related.
Statement of Grievance: Employees in housekeeping and laundry were terminated and/or re-hired, had their wages cut, medical insurance cancelled and accrued benefits cut or lost.
Step One Date Filed:
Step Two Date Filed:
Step Three Date Filed:  05/24/10
Remedy Requested:    Members to be made whole in all ways including wages, benefits, medical insurance claims pending and future claims, vacatlon·time. Holidays, differential and any and all other loss as a result of being terminated.

June 7. 2010
Vincent Klimas,
Long Ridge Health Care
Stamford, CT 06902
Fax: (203) 329-4039

Mr. Klimas,

The Union would like to offer dates to discuss the following-outstanding step II grievances:

1. Step II grievance regarding the termination of Health-Bridge's subcontracting agreement with Healthcare Services Group and the subsequent transfer of employees back onto HealthBridge payroll. Dates offered: Thursday June 10 at 2:30pm, Friday June 11 at 2:30pm, Monday June 14 at 2:30pm.

2. Step II grievance-termination of Mashid Hassantalebi. The facility provided the some information regarding her case; please provide any documents from her personnel file that were relevant to your investigation. Dates offered: Thursday June 10, 1 pm or 2 pm, Thursday June 22 at 11 am, or Friday June 25 at 11am.

3. Step II grievance-termination of Marie Rose Henri. The facility provided the some information regarding her case; please provide any documents from her personnel file that were relevant to your investigation. Dates offered: Friday June 25 at 12:30pm, or Tuesday June 29 at 2:30pm.

4. Step II grievance-Holiday pay: Dates offered: Friday June 25 at 12pm, Tuesday 29 at 2pm

Suzanne Clark
Elected Organizer, District 1199

June 11, 2010
Paul Fortier, Vice President
New England Health Care Employees Union, District 1199
77 Huyshope Avenue
Hartford, CT 06106

Re: Long Ridge of Stamford

Dear Mr. Fortier:

I am writing in response to the May 24, 2010 Grievance Form from NEHCEU District 1199 ("District 1199") that you signed and submitted to Long Ridge of Stamford ("Stamford") concerning newly hired housekeeping and laundry employees.

This Grievance is invalid for several reasons:

1. Insofar as this Grievance purports to contest HSG's decision to terminate its own employees, it has been filed against the wrong Employer and has nothing to do with Stamford. If District 1199 wants to contest those terminations, it must file a grievance with the correct Employer – HSG.

2. The Stamford Housekeeping and Laundry employees referenced in this Grievance were all hired by Stamford on or about May 17, 2010, and therefore, they are all in their two-month probationary period. Accordingly, this Grievance is improper under Article 8, Section C of the CBA, which provides that: "no action of the Center with respect to such probationary employees shall be subject to the grievance and arbitration provisions of this Agreement."

3. Assuming there was a valid basis for this Grievance (as noted above, there is none), Article 28, Section D of the CBA provides that a grievance involving a "substantial number or class of Employees" may be initially presented at Step 2 of the grievance procedure. The Grievance Form you submitted says it is being presented at Step 3, which is not authorized by the CBA.

Based on the above, it is clear that District 1199 does not have any jurisdiction or standing to file any grievances against Stamford to challenge HSG's decision to terminate its own employees. Likewise, District 1199 does not have any jurisdiction or standing to file any grievances against Stamford on behalf of any probationary employees.

Stamford will not respond further to this invalid grievance, and states affirmatively that this invalid grievance is not arbitrable.

Sincerely,
Ed Remillard
Regional Human Resources Manager

cc: Vincent Klimas, Administrator Long Ridge of Stamford
Lisa Crutchfield, Vice President of Human Resources HealthBridge Management
Suzanne Clark, Elected Organizer, District 1199

GRIEVANCE FORM
Facility:    Westport Health Care Center
Grievant(s) Name:    All Housekeeping and Laundry Employees
Job Title:    All Housekeeping and Laundry Employees
Worksite:    Westport
Date Grievance Occurred:    05/17/10
Contract Article(s) Violated:    Article 1, Article 2, Article 4, Article 5, Article 9, Article 10, Article 11, Article 21, Article 25, Article 38 and all other related.
Statement of Grievance:    Employees in housekeeping and laundry were terminated and/or re-hired, had their wages cut, medical insurance cancelled and accrued benefits cut or lost.
Step One Date Filed:
Step Two Date Filed:
Step Three Date Filed:    05/24/10
Remedy Requested:    Members to be made whole in all ways including wages, benefits, medical insurance claims pending and future claims, vacation·time. Holidays, differential and any and all other loss as a result of being terminated.

June 7, 2010

Kim Coleman
Westport Health Care
1 Burr Rd.

Norwalk, CT 06880
Fax: 203-221-4766

Ms. Coleman,

Following up on your discussion with Paul Fortier, and the subsequent letter from Lisa Crutchfield on May 24, 2010. The union offers the following dates to discuss the termination of HealthBridge's subcontracting agreement with Healthcare Services Group and the subsequent transfer of employees back onto HealthBridge payroll:

Friday June 18 at 12:00 pm
Monday June 21 at 3:30 pm
Wednesday June 23 at 3:30 pm

Please contact me as soon as possible regarding your availability.

Suzanne Clark
Elected Organizer, District 1199


June 11, 2010

Paul Fortier, Vice President
New England Health Care Employees Union, District 1199
77 Huyshope Avenue
Hartford, CT 06106

Re: Westport Healthcare Center

Dear Mr. Fortier: 1199

I am writing in response to the May 24, 2010 Grievance Form from NEHCEU District 1199 ("District 1199") that you signed and submitted to Westport Health Care Center ("Westport") concerning newly hired housekeeping and laundry employees.

This Grievance is invalid for several reasons:

1. Insofar as this Grievance purports to contest HSG's decision to terminate its own employees, it has been filed against the wrong Employer and has nothing to do with Westport. If District 1199 wants to contest those terminations, it must file a grievance with the correct Employer – HSG.

2. Insofar as this Grievance purports to contest Westport's decision not to hire certain former HSG employees, since those individuals are not employees of Westport, they have no rights under the parties' Collective Bargaining Agreement ("CBA") and the Union has no standing or jurisdiction to file any grievances on their behalf

3. The Westport and Laundry employees referenced in this Grievance were all hired by Westport on or about May 17,

54          DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

2010, and therefore, they are all in their two-month probationary period. Accordingly, this Grievance is improper under Article 8, Section C of the CBA, which provides that: "no action of the Center with respect to such probationary employees shall be subject to the grievance and arbitration provisions of this Agreement."

4. Assuming there was a valid basis for this Grievance (as noted above, there is none), Article 28, Section D of the CBA provides that a grievance involving a "substantial number of class of Employees" may be initially presented at Step 2 of the grievance procedure. The Grievance Form you submitted says it is being presented at Step 3, which is not authorized by the CBA.

Based on the above, it is clear that District 1199 does not have any jurisdiction or standing to file any grievances against Westport to challenge HSG's decision to terminate its own employees. Similarly, District 1199 does not have any jurisdiction or standing to file any grievances against Westport on behalf of any former HSG employees who were not hired by Westport. Finally, District 1199 does not have any jurisdiction or standing to file any grievances against Westport on behalf of any probationary employees.

Westport will not respond further to this invalid Grievance and states affirmatively that this invalid Grievance is not arbitrable.

Sincerely,
Ed Remillard
Regional Human Resources Manager

cc: Kimberly Coleman, Administrator Westport Health Care Center
Lisa Crutchfield, Vice President of Human Resources HealthBridge Management
Suzanne Clark, Elected Organizer, District 1199

GRIEVANCE FORM
Facility:    Newington Health Center
Grievant(s) Name:      All Housekeeping and Laundry Employees
Job Title:    All Housekeeping and Laundry Employees
Worksite:    Newington
Date Grievance Occurred:    05/17/10
Contract Article(s) Violated:     Article 1, Article 2, Article 4, Article 5, Article 9, Article 10, Article 11, Article 21, Article 25, Article 38 and all other related.
Statement of Grievance:      Employees in housekeeping and laundry were terminated and/or re-hired, had their wages cut, medical insurance cancelled and accrued benefits cut or lost.
Step One Date Filed:
Step Two Date Filed:
Step Three Date Filed:    05/24/10
Remedy Requested:      Members to be made whole in all

ways including wages, benefits, medical insurance claims pending and future claims, vacation·time. Holidays, differential and any and all other loss as a result of being terminated.

June 7, 2010

Gary Caserta
Newington Health Care
240 Church St
Newington., CT 06111
Fax: (860)667-6367

Mr. Caserta.
The Union offers the following dates to discuss the termination of HealthBridge's subcontracting agreement with Healthcare Services Group and subsequent transfer of employees back onto HealthBridge payroll:

Wednesday June 16 at 11:00 am
Wednesday June 23 at 3:00 pm
Monday June 28 at 3:00 pm

Please contact me as soon as possible regarding your availability.
Suzanne Clark
Elected Organizer, District 1199
Cc: Chris Wishart

June 11, 2010

Paul Fortier, Vice President
New England Health Care Employees Union, District 1199
77 Huyshope Avenue
Hartford, CT 06106

Re: Newington Health Care Center

Dear Mr. Fortier:

I am writing in response to Suzanne Clark's June 7, 2010 letter to Gary Caserta (copy attached) concerning newly hired housekeeping and laundry employees at Newington Health Care Center ("Newington"). While NEHCEU District 1199 ("District 1199") has not yet filed a Grievance against Newington regarding this matter, I am responding to Ms. Clark's letter so there is no misunderstanding as to Newington's position on this matter.

If District 1199 were to file a Grievance against Newington concerning this matter (as it has done at two other Centers), said Grievance would be invalid for several reasons:

Any Grievance that purports to contest HSG's decision to terminate its own employees cannot be filed against Newington, as Newington was never the Employer of HSG's em-

ployees. If the Union wants to contest those terminations, it must file a grievance with the correct Employer—HSG.

All Newington Housekeeping and Laundry employees were hired by Newington on or about May 17, 2010, and therefore, they are all in their two-month probationary period. Accordingly, District 1199 cannot file a valid Grievance against Newington concerning any such probationary employees since Article 8, Section C of the Collective Bargaining Agreement provides that: "no action of the Center with respect to such probationary employees shall be subject to the grievance and arbitration provisions of this Agreement."

Based on the above, it is clear that District 1199 does not have any jurisdiction or standing to file any grievances against Newington regarding HSG's decision to terminate its own employees. Likewise, District 1199 does not have any jurisdiction or standing to file any grievances against Newington on behalf of any probationary employees.

Since District 1199 has not and cannot file any valid Grievance against Newington concerning this matter, Newington will not respond further to Ms. Clark's June 7, 2010 letter.

Sincerely,
Ed Remillard
Regional Human Resources Manager

cc: Gary Caserta, Administrator Newington Health Care Center
Lisa Crutchfield, Vice President of Human Resources HealthBridge Management
Suzanne Clark, Elected Organizer, District 1199

The further processing of these grievances have been held in abeyance pending the disposition of the instant complaint.

Clark did have one conversation, however, with Vincent Klimas, Respondent Long Ridge's administrator, about the grievances (prior to the receipt of Remillard's letter, detailed above). Clark told Klimas that in her view what Respondent Long Ridge had done was preposterous and that the employees were forced to become new employees and lost their seniority. Clark added that "it was odd that everyone went back to exactly the same hours, the same positions when they wouldn't be bound by seniority in their mind." Clark emphasized that Respondent Long Ridge should have just transferred the employees back, like when they transferred them out in the first place. Clark added that many of the employees built up a lot of seniority and that was appalling for them to lose it overnight.

Klimas became very emotional, "kept looking down" and said that he knows, he understands, but "this is above my head." Klimas added that he was here to listen, but it was a corporate decision (referring to Respondent HealthBridge) and that Respondent Long Ridge was "following the contract."

No direct testimony was offered by any official of HSG or Respondents as to who made the decision to cancel the subcontracting with HSG or why that decision was made.

As noted, various HSG managers were called as witnesses but were not informed by their supervisors or anyone else of the answers to these questions.

Anthony Lecky testified that after the employees were rehired as new employees, he complained to Crane of HSG about the fact that he had lost benefits as a result of being hired as a new employee by Respondent Long Ridge. Crane responded to Lecky that it was Long Ridge's decision and that HSG didn't fire the employees and the Long Ridge decided to "take it over," the same way that HSG "took it over" from them. Lecky repeated that it was unfair. Crane replied that isn't HSG's fault and that he would have to speak to Long Ridge about the employees' benefits.

Baldwin testified that shortly after she was rehired by Respondent Westport as a new employee, she asked Ricci and Glaser why the decision was made to terminate the employees from HSG and rehire them as employees of Respondent Westport. Baldwin testified that she said to Ricci and Glaser that they should be honest with her and tell her what is going on. According to Baldwin, both Ricci and Glaser responded that they believed that Respondent Westport owed HSG money and that HSG had not received all its money. Therefore, they informed Baldwin that "we sold you all back over to them." They added that they thought that when the employees got sold back everything was supposed to be the same and that they had no idea that the employees and benefits were going to get cut.[23]

### H. The March 2010 Layoff and Related Information Requests at Respondent Long Ridge

On February 23, 2010, Clark, Union President Baudier and Vice-President Fortier met with Klimas and Lisa Crutchfield, Respondent HealthBridge's vice-president of human resources, at Respondent Long Ridge. Respondents had recently received a negative report from the state, had closed their admissions and were considering closing down the first floor wing of the home. They asked the union representative if it would waive the 45-day notice provision in the contract for layoffs. Baudier responded on behalf of the Union that it would not waive its rights since the parties did not have "a good relationship of trust" to be able to do something like that. Klimas stated that he was disappointed that there hadn't been lines of communication open (Klimas had only recently become the administrator and offered to commit to regularly meet with the Union to be able to air grievances). Neither Klimas not Crutchfield informed the Union at the meeting that there would be a layoff or when or how it might commence.

Within a few days of this meeting, Respondent began laying off CNAs by taking some CNAs off the schedule for certain days or shifts. Clark learned that CNAs had lost anywhere from one to three days of work per week, and some were denied the chance to use sick or vacation time so as not to lose pay for the lost hours.

On March 2, Clark raised the issue at a joint labor-management meeting with Klimas. Clark asserted that Re-

---

[23] Ricci did not testify. Glaser denied making the remarks attributed to him by Baldwin. Neither Coleman nor any representatives from Respondent Westport was present during the conversation.

spondent Long Ridge's actions were improper, that the Union was not notified as required by the contract and demanded that Respondent Long Ridge rescind the layoffs immediately and that the employees be paid for any loss of day's work. The record does not reflect what response Klimas made to Clark's comments.

On March 2, Clark sent the following information request to Klimas regarding the layoffs.

3/2/10

Vinny Klemas[sic]

Information Request regarding layoffs.

1) List of all Bargaining unit members employed since September (information covering all layoffs between the fall and the present day) including

    a. Name
    b. Job Title
    c. Shift
    d. Pay Rate
    e. Date of Hire
    f. Hours (prior to layoffs)
    g. Hours (after layoff)
    h. Affected by layoff (laid off or transferred or bumped)
    i. Date Laid off
    j. Date recalled

Sincerely,
Suzanne Clark

On March 11, the Union received a notice of layoff in writing as required by the contract involving a layoff of RNs, LPNs and CNAs to take effect on April 25, 2010. The Union had not received such a letter concerning the layoffs, which had begun in early March after the Union declined its contractual rights to notice, as described above.

By March 17, the Union had still not received the information requested on March 2. On that same day, the Union file a grievance protesting the layoffs as violative of the contract, requested that the layoffs be rescinded and added and included an additional information request. It is set forth below.

March 17, 2010

Mr. Vincent Klimas
Long Ridge of Stamford
710 Long Ridge Road
Stamford, CT 06902

Dear Mr. Klimas:

Following up on our conversation yesterday, the union files a step II class action grievance regarding the gross continued violation by Long Ridge of Article 9, section D-layoffs and any all other related articles.

The Union was notified of the layoffs on 3/11/10 and the facility has already begun removing employees from the schedule. In addition to the 45 day notice violation, the facility has violated the implementation by not applying reverse seniority and providing no notification to employees that they have been laid off prior to being removed from the schedule.

Beyond the obvious violation of our contract, by not notifying employees of hour changes, the facility has also violated Connecticut State Department of Labor statutes Chapter 558, Section 31-71f.

We insist that employer immediately cease and desist its unlawful layoff practices and work with the union to discuss the proper execution of the employers planned layoff.

All members who have been improperly laid off must be made whole in every way, including but not limited to any loss in accrual of benefits (vacation, sick, pension, etc) due to improper removal, payment for days in which they were removed from the schedule and days in which they used their own time to cover the improper removal.

The union requests the monthly master schedule and daily schedules for January, February, and March 2010.

The union is disturbed by what is yet another case of a systematic violation of the Collective Bargaining Agreement to add to current grievances and pending arbitrations regarding these same issues.

Sincerely,
Suzanne Clark

Klimas responded to Clark on March 22, 2010, stating that employees removed from the schedule on the first floor have been placed back on the floor. Clark received that document on March 25, 2010, and added the following handwritten notation to document, which Klimas signed. "Improper layoff, in order to make employees whole employees must be repaid. No hours should have been reduced until after the 45-day period."

The Union advanced the grievance to Step 3 by letter dated April 12, 2010, as follows:

April 12, 2010
Ed Remillard
HealthBridge Management
57 Old Road to Nine Acre Corner
Concord, MA 01742

Dear Mr. Remillard,

This letter follows up the hand delivered step 3 request presented on April 8th, 2010.

We are extremely disappointed that while the center claims interest in, finally, processing grievances and has begun scheduling and holding more frequent meetings with the union, no tangible progress is being made. We re-explain the

same issues week after week and after being promised answers are met with the need to clarify our position yet again and wait another week for an answer.

Absent another week without decisions, the union files to step 3 the following grievances:

- On March 17th the union rued a step 2 class action grievance regarding the gross continued violation of Article 9 section D—layoffs and requested the center immediately cease and desist and make members whole by restoring any vacation or personal time they used to supplement their improper removal from the schedule and/or payment for the wages lost when they were improperly removed from the schedule. Since then, the union has met and fulfilled the centers request for reclarification on 3/18/10, 3/25/10, 4/1/10, and most recently on 4/8/10. The union finds management request to wait yet another week for a potential response unacceptable. The grievance is moved to step 3.

On May 6, 2010, Clark met with Remillard with respect to the Step 3 grievance. Remillard conceded that the layoff had been improper but noted that it had been rescinded and the staff had been placed back on the schedule. Remillard also committed to working with the Union in making the employees whole. Clark reminded Remillard that the Union had still not received information requested from Respondent Long Ridge to be able to establish the amounts of money due to employees. Remillard summarized the Step 3 meeting and responded in a letter dated May 20, 2010, as set forth below:

May 20, 2010

Suzanne Clark
New England Health Care Employees Union
District 1199
77 Huyshope Avenue
Hartford, CT 06106

RE: Step Three Grievance Hearing-Illegal Layoff

Dear Ms. Clark:

I am writing in response to the Step 3 grievance presented on May 6, 2010 regarding the Unions claim that the Center failed to make members whole for an illegal layoff that the Center attempted to conduct.

The Union argued that while the Center rescinded the layoff and placed staff back on the schedule, that the Center never made the employees whole.

The Union stated that some staff went unpaid for the days they were taken off the schedule, or had to use vacation time. The Union is demanding that the employees be made whole.

Please note that the Center has determined to make all employees whole who were affected by this action.

Please be further advised that the Center's willingness to take this non-precedent setting action does not constitute an admission that its previous decision to remove members from the schedule constituted a violation of the collective bargaining agreement. Rather, the Center is willing to make this accommodation as a good faith gesture to advance labor relations between the Center and the Union.

Sincerely,
Edmund Remillard
Regional Human Resources Manager

Respondent responded to the Union's information requests on June 25, 2010, when Klimas provided Clark with a listing of "employees that were paid directly per payroll or were given back vacation time, etc. related to the past 3/11/2010 layoff Notice." Clark met with Klimas and told him that the response was insufficient since it did not accurately demonstrate to the Union everyone, who was affected by the layoffs, and she needed to see payroll records so she could see whose hours had been reduced.

On July 8, Clark met with Klimas again. She reiterated to him that she needed to see the payroll records so she could compare these records to their "control" hours and asked to see "any other call outs or any other things that would show, including what the daily schedule or the master schedule any kind of requests for personal time, any kind of sick time, or anything like that, so that I could establish that it was not that they were forced to take sick time so they didn't lose their pay, but it was—it was on their own behalf." Although Clark had indicated to Klimas that payroll records would disclose this data most accurately, it was not provided to the Union until July 22, 2010, when it received the payroll and other records that it had requested.

The Union filed a demand for arbitration on August 24, 2010, concerning the layoff and the failure to make whole employees for lost wages and time lost.

The Union and Respondent Long Ridge have been continuing to negotiate concerning the amounts due to employees, but some issues are still unresolved. The arbitration is in abeyance.

*I. The Discontinuance of Paying Employees Time and a Half for Holidays*

It is undisputed that in late 2009 and in early 2010 employers, all of Respondent Centers discontinued their practice of paying all bargaining unit employees time and one half for hours worked on holidays. Prior to that time, all employees had received time and a half pay when working on a listed holiday, no matter how many hours a week they had worked or whether the employee was considered full-time, part-time or per diem.

With some variations in wording,[24] the CBAs at all facilities

---

[24] The CBAs at some of the facilities contain slightly different wording that does not seem to make a substantive difference to this dispute. Thus, the CBAs at Wethersfield, Newington, and Westport differ very slightly but with no substantive difference in the wording of the first half of Article 15A, and contain the same provision in Article 15B

58                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

contain a section (Article 15) entitled "Holiday Provisions." Article 15(A) provides "holiday pay at their regular straight time hourly rate" for nonprobationary full or part-time employees, who work 20 or more hours per week, prorated for part-time employees, and lists nine specific holidays. Article 15(B) states that:

> In the event that an Employee is required to work on any of the holidays listed above, she/he shall be paid at the rate of one and one half times her/his hourly regular rate of pay for all hours worked on such holiday, and shall in addition receive an extra day's pay at her/his regular rate, or an additional day off with regular pay, scheduled by mutual agreement with her/his supervisor.

As noted below, during the grievance process, in one of its answers Respondent HealthBridge relied upon another portion of the Westport CBA, its Article 14(H), Hours and Overtime, which provides as follows:

> 14.H. Part-time employees who regularly work an average of twenty (20) hours or more per week shall receive the following fringe benefits on a pro rata basis: holidays, personal days, vacation, sick leave, funeral leave, jury duty leave and uniform allowance. All paid hours, including sick time, vacation time, holidays, funeral days and personal days, will count as time worked for the purpose of calculating benefit eligibility.

Respondents, at some point in late 2009, began to change its prior practice and ceased paying holiday pay to part-time and per diem employees at all of the centers.

Clark first received reports after Thanksgiving of 2009 that employees at various centers had not been receiving their holiday pay. The Union subsequently filed grievance against all of the Respondent Centers, alleging that they unilaterally changed conditions of employment by denying time and a half pay for part-time and per diem employees, who worked on holidays.

Gwen Dewkett is an LPN employed at Respondent Danbury as a part-time employee. She worked 15 hours a week regularly scheduled (control hours) but often worked more than 16 hours per week. She would average 24 to 32 hours a week depending upon availability of work. She began working 8 control hours in 2007. Since 2007, Dewkett had always received time and a half pay when she worked on a holiday regardless of how many hours she worked in any week.

In September of 2010, Dewkett worked on Labor Day but did not receive time and a half pay as in the past. She complained about this failure in a conversation with Christine Gottlieb, a clerical employee of Respondent Danbury and Administrator Mike Pescatello. Dewkett informed Pescatello and Gottlieb that "the contract was being broken. That was in the contract that we should get paid for working a holiday, you get paid time and a half and that you got prorated holiday time if you worked 20 hours a week." Pescatello responded that it

wasn't his decision, that it was upper management's decision and that it would probably go to arbitration.

On June 15, 2010, Clark met with Pescatello at a Step 2 grievance meeting and tried to discuss the issue. Clark asked the payroll employee, who was also present, when she started doing things differently (in regard to holiday pay) and when she was told to start doing it differently. Clark added that it looks like from the records that Clark had that it was on Thanksgiving. Clark asked her if she had received a memo stating to start changing it. Pescatello instructed the employee not to answer Clark's question.

Clark also had a Step 2 meeting with Administrator Klimas at Respondent Long Ridge sometime in late June of 2010, where the issue was discussed. Clark reminded Klimas that employees had always received time and a half before and that Respondent Long Ridge had stopped. Clark said, "You can't just change that." Klimas responded that "It's above me, it's from corporate. We believe that we are following the contract."

Respondents presented no witnesses from Respondent HealthBridge. Thus, it has not provided any explanation as why it changed its practice and policies with regard to payment of holiday pay in 2009 and 2010. Respondents substantively responded to the Union's grievances with regard to Respondent's Danbury, Long Ridge and Westport.

Administrators Klimas and Pescatello responded to the Step 2 grievance meetings concerning the holiday issues at their facilities.

Remillard responded to the Step 3 grievance by the Union on behalf of Respondent Westport.

These responses are set forth below.

July 7, 2010
Suzanne Clark
New England Health Care Employees Union
District 1199
77 Huyshope Avenue
Hartford, CT 06106

RE: Step Two Grievance Hearing--Holiday Pay

Dear Ms. Clark:

I am writing in response to the Step 2 grievance presented in your Grievance Form regarding holiday pay for bargaining unit employees working at Long Ridge Health Care Center.

The Union suggested that Long Ridge Health Care Center violated Article 15-Holidays Provisions by denying time and one half pay for those part time and per diem employees who worked the given holidays specified in the Collective Bargaining Agreement.

Contradictory of the Union's claim, Article 15-Holiday Provisions Section A-B states that, "non-probationary full-time or part-time Employees, who work twenty (20) hours or more a week, shall be entitled to holiday pay at their regular straight time hourly rate (prorated for eligible part-time Employ-

---

contained herein. The CBA in Westport contains additional language following the above: "If an Employee elects not to take their holiday pay, they have 90 days to take the day off on a mutually agreeable date. If they do not take the day off, they will be paid in the next paycheck following 90 days."

ees…Section B...in the event an Employee is required to work on any of the holidays listed,...she/h[e] shall be paid at the rate of one and one half times his/her regular rate of pay for any hours worked on such holiday..." Therefore, part-time employees working less than twenty (20) hours per week and per diem employees are not eligible for holiday pay.

It would appear that the center has not violated Article 15-Holiday Provision of the Collective Bargaining Agreement. As such, the Step II grievance on holiday pay is denied.

Sincerely,
Vincent J. Klimas
Administrator

cc: Ed Remillard, RHRM

June 17, 2010

Ms. Suzanne Clark
SEIU Healthcare – 1199
77 Huyshope Avenue
Hartford, CT 06106

Re: Step II Meeting – June 15, 2010

Dear Ms. Clark:

After careful review of your position presented at the June 15, 2010 meeting I have reached the following decision:

Holiday Pay – Article 15, Holiday Provisions, Section "A" indicated that "Non-probationary full-time or part-time employees who work twenty (20) or more hours a week shall be entitled to holiday pay at their regular straight-time hourly rate (prorated for eligible part-time employee for each of the following holidays."

As you are aware, Danbury HCC reviews each employee's work hours on a quarterly basis to determine benefit eligibility. The provision of holiday pay is subject to benefit eligibility. Employees who work 20+ hours would be eligible for benefits thus eligible for holiday pay. Those employees who fail to meet the eligibility requirements would not then be eligible for holiday pay.

Article 5, Management Rights, specifically delineates management's right to "determine and modify the operational measures and means; and to carry out the normal functions of management." There is no provision for union discourse in determining the management and operation of the nursing home.

Sincerely,
Michael J. Pescatello, BA, NHA
Administrator, Danbury HCC

Cc: Edmund Remillard, Regional Human Resources Manager
Lisa Crutchfield, Vice President of Human Resources

July 9, 2010

Suzanne Clark
New England Health Care Employees Union
District 1199
77 Huyshope Avenue
Hartford, CT 06106

Re: Step Three Grievance Hearing – Holiday Pay: Part-Time and Per Diem Employees

Dear Ms. Clark

I am writing in response to the Step 3 grievance presented on July 1, 2010, regarding holiday pay for part-time and per diem bargaining unit employees at Westport Health Care Center.

The Union argued that Westport Heath Care Center violated Article 1 (recognition and definitions) and Article 15 A & B (holiday provisions) by denying time and one half pay for part-time and per diem employees who work less than 20 hours per week.

The Union failed to explain how the Center has violated Article 1. In particular, the relevant language in the contract expressly provides that:

Article 14, H

Part-time employees who regularly work an average of twenty (20) hours or more per week shall receive the following fringe benefits on a pro rata basis: holiday, personal days, vacation, sick leave, funeral leave, jury duty leave and uniform allowance. All paid hours, including sick time, vacation time, holidays, funeral days, and personal days, will count as time worked for the purpose of calculating benefit eligibility.

Article 15, A

Effective upon ratification, non-probationary full-time or part-time employees who work twenty (20) hours or more a week shall be entitled to holiday pay at their regular straight time hourly rate (prorated for eligible part-time employees) for each of the following holidays:

| | |
|---|---|
| New Year's Day | Independence Day |
| Martin Luther King Day (1/1/07) | Labor Day |
| President's Day (effective 1/1/06) | Thanksgiving Day |
| Easter | Christmas Day |
| Memorial Day | |

Therefore, part-time employees working less than twenty (20) hours per week and per diem employees are not eligible for holiday pay.

Given the clear and unambiguous language in the contract, it is clear that the Center has not violated Article 1 or Article 15 A/B of the CBA. Accordingly, the grievance is denied. The Employer reserves its right to challenge the procedural and/or substantive arbitration of the grievance.

Sincerely,

Edmund Remillard

Regional Human Resources Manager

CC  Kimberly Coleman, Administrator
      Lisa Crutchfield, Vice President of Human Resources

### J. The Changes in Calculating Overtime

It is undisputed that at various times in 2010 all of Respondent Centers stopped including the half-hour paid periods as time worked in calculating daily overtime.

Following Respondents' 2010 institution of a new policy requiring employees to state whether or not they had an "uninterrupted break" when they punch out for the day, Respondents began changing the past practice of including that paid half-hour in hours totaled for overtime computations. Since March 2010, Respondents have been paying employees for their lunch period regardless of whether they take a true break at that time but are excluding that half-hour lunch period from the tally of hours used for the computation of overtime unless the employee certifies that they took no lunch.

This issue involves application of contract provisions that vary slightly among the six facilities. The provisions are the same at Respondents Wethersfield, Long Ridge and Newington facilities, where Article 14, Hours and Overtime, provides in pertinent part that:

A. The normal work week for full-time Employees shall be forty (40) hours consisting of eight (8) hours each day including a paid lunch period of one-half (1/2) hour. An Employee who works a shift of six (6) hour[s] or more shall work a shift inclusive of a one-half (1/2) hour paid meal period.

B. Employees working a full shift shall be entitled to two (2) rest periods of fifteen (15) minutes in each working day, or for every four (4) hours worked, a fifteen (15) minute rest period. Breaks shall not be unreasonably denied by the Center.

E. Employees who, at management's request, work in excess of eight (8) hours per day shall receive one and one-half (1-1/2) times their regular straight time hourly rate for hours actually worked in excess of eight (8) hours per day or forty (40) hours per week in anyone work week.

F. For the purpose of determining hours worked in order to compute weekly overtime, any leave with full pay except sick leave shall be included. Paid sick leave and unpaid leave of any kind shall not be included.

The Danbury and West River language in Article 14(E) is worded somewhat differently, with two separate paragraphs, one for hours in excess of 40 hours and one for employees who work over 8 hours. Nonetheless, both clauses refer to payment for "hours actually worked."[25] At Westport, the computation of overtime is addressed in the first two sentences of Article 14(A). The first two sentences differ from Wethersfield's in that they contain no proviso about the work being done at the request of management. Further, they contain only a provision for daily overtime pay, not overtime for hours in excess of 40.[26]

Several employees from different homes testified about the "lunch punch" issue, which Respondent concedes was implemented all six facilities. Eva Fal, a leading union delegate in Newington, testified that in 2010 the Newington facility introduced a new system asking employees when they punched out for the day to "agree or disagree" that they took an uninterrupted lunch break. The memo concerning this issue, dated February 26, 2010, stated inter alia that "we will now be asking employees to validate that they took a meal break . . . if you reply "No" you will need a supervisor to override your punch out . . . Please let me know if you have any questions about this change."

Fal explained the practical impact of this change. She testified that for the previous 14 years if an employee worked a 12-hour shift, they received four hours of overtime. But now, since the new policy went into effect, an employee who works that same 12-hour shift must "agree or disagree" that she received an uninterrupted lunch break, and if she says yes, she loses a half hour of overtime pay. According to Fal, "If you punch 'disagreed', they tell you 'don't forget to agree.'" The Union had no advance knowledge of the issuance of this memo.

By July 15, 2010, Respondent had added two sentences near the end of the memo it released to the other homes. "As a reminder, information entered into the time clock must be honest and accurate. Falsification of time, including whether a meal break was or was not taken, is a serious matter and may result in progressive discipline." Atkinson testified that the memo released at Long Ridge was never negotiated with the Union before it went into effect. The Long Ridge memo, dated July

---

[25] Specifically, Danbury's Article E is as follows:

> Employees who work in excess of forty (40) hours in anyone work week shall receive one and one half (1-1/2) times their regular straight time hourly rate for hours actually worked in excess of forty (40) hours in anyone work week.

> Employees, who, at management's request, work in excess of eight (8) hours per day shall receive one and one-half (1-1/2) times their regular straight time hourly rate for hours actually worked in excess of eight (8) hours in anyone day.

The former clause does not make payment contingent on the work having been at management's request, but the "at management's request" language was never mentioned by Respondents in its grievance answers.

[26] Specifically, the Westport CBA's first two sentences of Article 14(A) state that "All work in excess of eight (8) hours per day shall be paid at time and one-half (1-1/2). This does not include members who work doubles as part of their regular schedule."

15, 2010, is identical to the one issued at the Westport facility, only the administrator's name was changed.

According to Gwen Dewkett, an LPN at Danbury, in the past if an employee "worked" 8-½ hours in a day, e.g. from 7 a.m. to 3:30 p.m., including the paid half-hour lunch period, she was paid 8-½ hours for that day with the extra half-hour at the over-time (time and a half) rate, even if she took a true break during the half hour lunch. She testified that in about April 2010, Respondent introduced a new addition to the time clock requiring employees "to punch out if you got your lunch break." Employee had to "agree or disagree" that they received a half-hour lunch break when punching out. Up until then, employees had "never had to punch out whether we got our lunch break or not." Dewkett immediately lost an hour of overtime pay in April 2010 due to the new "system."

Coladarci, who rarely works overtime at the Danbury home, confirmed Dewkett's testimony that in 2010 Respondent introduced a new feature on its time clock, a change, which impacted one's amount of credited overtime on a given shift. The amount of overtime you receive "all depends on how you—when you punch out on the time clock . . . your choices are that you have to accept that you've taken a break or you don't accept . . . If I were to accept they would be deducting me a half hour (of overtime pay)." According to Coladarci, she was pressured into answering "accept" even when not taking her break because the first time she answered "no" she received a phone call from the scheduler, who told her that she had to hit "accept," even if she didn't take a break. Coladarci refused to play along and has continued to decline to lie because she never leaves the floor without taking a proper half-hour break.

The Union first raised the issue at Danbury during a "joint study meeting" in May 2010 when Clark asked administrator Pescatello and DNS Betty Aikens whether this new lunch punch question would create a new area of discipline and whether there were any other new changes along with this new system. Pescatello mentioned something about Wal-mart and urged the nurses to be honest with their answers. As noted above, Respondents did not dispute the existence of the change.

Once the Union discovered that this new policy had been instituted and began hearing that as a result employees were losing overtime hours, it began to file grievances with the centers over the matter. The grievances filed against Respondent Danbury and Respondent Newington on this issue are as follows:

June 2, 2010
Michael Pescatello
Danbury Health Care Center
107 Osborne St
Danbury. CT 06810

Mr. Pescatello,

It has been brought to my attention that Danbury Health Care Center has changed its past practice regarding the calculation of employees' lunch period.

This is, especially disturbing since the employer was presented with the opportunity to address any such changes in the

terms and conditions of employee's employment in our last labor management meeting held May 3, 2010. In fact, at this meeting we discussed why the employer had begun added an additional question onto their time clock functions asking employees to verify at the end of the shift if they had been offered a lunch break and whether they had taken it.

Your response related to department of labor requirements and new requirements from corporate. At no time did you state that the facility would be instructing a new manner of calculating employees pay and benefits.

To be clear: any and all changes terms and conditions of union employees must be negotiated with the union prior to implementation. The company has clearly changed its past practices and must immediately cease and desist and provide a detailed account of the new procedure that it has attempted to implement and that exact date on which it was enacted.

The union files a step II class action grievance for violations of Article 1 and 14 and any and all related articles that may apply once the facility provides the union with the entirety of its new policy. In order to remedy the situation, the union requests that all calculations contingent on the facility's new lunch period calculations be restored and all employees be made whole in every way.

Suzanne Clark
Organizer, District 1199

June 14, 2010

Gary Caserta
Newington Health Center
240 Church St
Newington, CT 06111

Mr. Caserta,

It has been brought to my attention that Newington Health Care Center has changed its past practice regarding the calculation of employees' lunch period.

As you are aware, any and all changes to terms and conditions of union employees must be negotiated with the union prior to implementation. The company has clearly changed its past practices and must immediately cease and desist and provide a detailed account of the new procedure that it has attempted to implement and that exact date on which it was enacted.

The union files a step II class action grievance for violations of Article 1 and 14 and any and all related articles that may apply once the facility provides the union with the entirety of its new policy. In order to remedy the situation, the union requests that all calculations contingent on the facility's new lunch period calculation be restored and all employees be made whole in every way.

Christopher Wishart
Organizer, District 1199

Cc: Suzanne Clark. Organizer District 1199; Atty John Creane

Administrator Pescatello responded to the Union's grievances on behalf of Respondent Danbury, in writing on June 17, 2010.

That response is set forth below:

June 17, 2010

Ms. Suzanne Clark
SEIU Healthcare -1199
77 Huyshope Avenue
Hartford, CT 06106

Re: Step II Meeting – June 15, 2010

Dear Ms. Clark:

After careful review of your position presented at the June 15, 2010 meeting I have reached the following decision:

Employee Lunch Period – Article 14, Hours and Overtime, Section E clearly states that "employees who, at management's request, work in excess of eight (8) hours per day shall received one and one-half (1 ½) times their regular straight time hourly rate for hours actually worked in excess of eight (8) hours in any one day". We concur completely with this provision. However, we differ on the definition of what constituted the definition of "work". Webster defines works as an "exertion or effort directed to accomplish something; labor; toil; something on which exertion or labor is expended; a task or undertaking, a productive or operative activity."

In article 14 we agreed to provide full-time employees with "a paid lunch period of one-half (1/2) hour". However, we feel that the paid lunch break does not constitute work. There is no "exertion or effort directed to accomplish something." There is no "labor or toil or something on which exertion or labor is expended." There is no "task or undertaking, nor is there a productive or operative activity".

Consequently, since there is no work being done during a lunch break, we consider it to be non-productive time outside the purview of this contractual provision.

Article 5, Management Rights, specifically delineates management's right to "determine and modify the operational measures and means; and to carry out the normal functions of management." There is no provision for union discourse in determining the management and operation of the nursing home.

Sincerely,

Michael Pescatello, BA, NHA
Administrator, Danbury HCC

Cc: Edmund Remillard, Regional Human Resources Manager
Lisa Crutchfield, Vice President of Human Resources

Gary Caserta, Respondent's Newington Administrator responded to the Union on July 1, 2010, with respect to this grievance at Step 2. Subsequently, a Step 3 meeting was held on September 29, 2010, with Remillard. On October 7, 2010, Remillard issued Respondent HealthBridge's Step 3 response concerning this grievance. These responses are as follows:

Date: July 1. 2010

Mr. Chris Wishart
New England Health Care Employees Union
District 1199
77 Huyshope Avenue
Hartford, CT 06106

Grievance Dated, Employees are entitled to half hour lunch break and 2 fifteen minute breaks when working 40 hours.

Grievance Response: The need to ensure that eligible employees are being given the opportunity to take an uninterrupted meal break, and to track those instances when an eligible employee has not taken the break.

Any additional questions please contact me.

Thank you.
Gary Caserta
Administrator

October 7, 2010

Mr. Chris Wishart
New England Health Care Employees Union
District 1199
77 Huyshope Avenue
Hartford, CT 06106

RE: Step 3—Article 1 and 14, Half Hour Lunch

Dear Mr. Wishart:

I am writing in response to the Step 3 meeting held on September 29, 2010. During this meeting the Union argued that Newington Health Care Center was violating Articles 1 and 14 of the Collective Bargaining Agreement (CBA) based on the Center's requirement that staff confirm that they were able to take a 30 minute lunch break during their shift.

At the onset, the grievance appears untimely and is no longer viable subject to the grievance an arbitration provisions in the CBA. Notwithstanding, and with respect to the merits of the

grievance, the Union (via its letters dated June 3, 2010 and June 14, 2010—Step 2 Request by Christopher Wishart) argued that Union members "need to be paid for all hours of overtime after 8 hours in a day or 40 hours in a week, which includes break time," and that "the Center has changed its past practice regarding the calculation of employee's lunch period, which was a change in the terms and condition of employment" without negotiating with the Union.

Contrary to the Union's arguments the Center has not violated Articles 1 or 14 of the CBA.

To begin with, as it relates to how the Center is calculating the lunch time break, the Center is not in violation of the CBA. While the lunch break is paid, it is not time worked. As such, based on the language in Article 4 section E, it is clear that the 30 minute break period should not be calculated at an overtime rate.

> Employees, who, at management's request, work in excess of eight (8) hours per day shall received one and one-half (1 ½) times their regular straight time hourly rate for hours actually worked in excess of eight (8) hours in any one day or forty (40) hours per week in any one work week (emphasis added).

Additionally and in conclusion, the Union failed to make its argument that the Center made a change in the terms and conditions of employment. As a matter of fact, contrary to the Union's position, the Center's conduct directly correlates with the terms and conditions negotiated by the member's business agents.

Accordingly, the grievance is denied. The Employer reserves its right to challenge the procedural and/or substantive arbitrability of the grievance.

Thank you for your attention to this matter.

Sincerely,
Edmund Remillard
Human Resources Manager
HealthBridge Management

CC: Jarrett McClurg, Administrator
    Lisa Crutchfield, Senior Vice President of Labor Relations

Respondent made no substantive response to the Union's grievances over this issue concerning the other centers but instead made procedural objections complaining that the grievances were not properly filed.

As in the case of the holiday pay changes, detailed above, Respondents produced no witnesses to explain its deviation from past practice with respect to overtime calculations for lunch periods.

### K. Respondent Wethersfield's and Respondent Danbury's Implementation of New Eligibility Standards for Employees to Receive Various Benefits

Respondents stipulated that Respondent Wethersfield and Respondent Danbury changed the way that they determined eligibility for part-time employees to receive prorated holiday pay, personal days, vacation days, sick days and uniform allowance. In that regard, sometime in mid-2010, these Respondents implemented a new policy (without bargaining with the Union) that various benefits would henceforth be available only to those employees specifically hired or "on the books" for positions over 20 hours per week, regardless of the actual number of hours worked. As a result of the Respondents' new interpretation of existing policies and practices, employees in those two homes lost benefits they had previously enjoyed, including holiday pay, personal days, vacation days, sick days and the uniform allowance. Evidence presented at the hearing revealed that before mid-2010 employees in those two homes, who regularly worked over 20 hours per week, were eligible for benefits regardless of the position to which the employees were hired or regularly scheduled.

The record reveals that in late July 2010, employees at Danbury and Wethersfield began to lose benefits (beyond those discussed above) that they had previously enjoyed. Respondents simply created and imposed a new standard. After mid-2010, benefit eligibility was now based on whether the employees were hired for 20 or more hours per week, known generically within their respective facilities as one's "control hours" (Danbury) and hours "in/on the book(s)"(Wethersfield). Clark testified that the control hours and "on the books" hours refer to the same concept of hours that an employee is guaranteed to receive each week. Whatever those hours are labeled, they are the hours that the employees are regularly scheduled for as opposed to hours they "pick up" after the schedule is posted, hours which are often quite substantial.

The relevant contract language is contained in the Wethersfield labor agreement in Article 14(H). The identical language is found within the Danbury CSA at paragraph 14(I):

> Part-time employees who regularly work an average of twenty (20) hours or more per week shall receive the following fringe benefits on a pro rata basis: holidays, personal days, vacation, sick leave, funeral leave, jury duty leave and uniform allowance. All paid hours, including sick time, vacation time, holidays, funeral days and personal days, will count as time worked for the purpose of calculating benefit eligibility.

Article 16, Personal Days, in each contract, provides:

> A. Non-probationary full-time Employees at the conclusion of their probationary period shall begin to accrue personal days on the basis of one (1) day for each three months of employment. Upon reaching their anniversary date, the Employee shall be entitled to three (3) personal days for use over the next anniversary year. Non-probationary part-time Employees who work twenty (20) hours a week or more will receive three (3) personal days on a pro rata basis.

Similar, but not identical, provisions offering prorated bene-

64          DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

fits for part time employees "who work twenty (20) hours or more a week" are contained in the articles concerning holiday pay, vacation, sick leave and uniform.[27] Other provisions for various types of paid leave and unpaid leave (Article 19 and 20) simply refer to eligibility for "employees" without distinguishing categories or hours of service.

LPNs Virginia Coladarci and Gwen Dewkett testified concerning the 2010 change in benefit eligibility standard at Danbury. Dewkett, who works the 11 p.m. to 7 a.m. shift at Danbury, testified that she has had 16 "control hours" for three of the past four years she worked for Danbury. An LPN since 1971, she explained that the term "control hours" refers to one's guaranteed hours, not the hours one actually works. When hired in 2007, she was only given 8 control hours, but that amount was increased a year later to 16. Despite having 8 "control hours" in 2007 and 16 control hours from 2008 to 2010, she has regularly worked an average of 20 hours or more per week since being hired, averaging 16 to 24 hours a week in the years 2007 through 2009, and 24 to 32 hours a week in 2010. As such, Dewkett is considered a "part-time" employee.

Dewkett provided evidence regarding the 2010 loss of eligibility for certain benefits, including both categories of "holiday pay" benefits, described above, plus the uniform allowance. Since 2008, she had received benefits, including time and a half pay for working a holiday, plus prorated time, a uniform allowance and sick time. Her "control hours" had never before been a factor until a change in the summer or early fall of 2010 deprived her and others of benefits.

Dewkett, who saves her pay records, testified that she received the proper pay for both the Easter and Memorial Day 2010 holidays. She worked on both holidays and received the time and a half hourly rate for hours she worked that day and received prorated holiday pay. For the July 4 holiday, which she did not work, she received prorated "holiday hours."

As noted above, in August 2010, Dewkett had heard from a coworker of a change in the benefit eligibility standard. She went directly to speak to HR representative Christine Gotthard and Administrator Pescatello and told them that the contract was being broken and "that this was in the contract that we should get paid for working a holiday, you got paid time and a half and you got prorated holiday time if you worked 20 hours a week." Pescatello told her that this wasn't his decision and attributed the practice to upper management.

Dewkett worked Labor Day 2010 but only received straight time pay. Her pay records also reveal that after July 4, 2010,

she did not accrue or receive any additional "holiday hours," the prorated pay she had always received when not working a holiday. According to Dewkett, after July 4, 2010, she "did not get paid any longer for holiday time for holidays, whether I worked them or not." In September 2010, Dewkett did not receive the annual uniform allowance, which she had received in the previous two years. She also discovered that she could no longer get paid for her accumulated personal days, another change in past practice.

Coladarci, another part-time nurse at Danbury, testified that, like Dewkett, she has averaged 24 to 30 hours a week since at least 2007, despite having just 16 "control hours." Beginning in 2005 or 2006 and continuing to July 2010, she received full-time benefits, "sick pay, vacation, holiday, time and a half for holiday, which, I'd always gotten, uniform allowance." She also received a uniform allowance in mid-September of each year. Respondent Danbury's payroll and Human Resources representatives had told her years ago that she was eligible for these benefits by virtue of working 24 to 30 hours a week.

All this changed in July 2010, when she was called to the administrator's office, where she met with him, DNS Aikens and Gotthard, who told her that she "would no longer be getting sick pay, vacation pay, holiday and uniform allowance." Pescatello told Coladarci that Respondent was "going to interpret the 'control' differently." Coladarci protested, "I said why? I said you can't do this. I said I've been here 21–20 years last year. And they said well, it's not up to us. It's all corporate. And we're going to interpret the contract differently."

A few days later, she asked Gotthard if these changes would affect her pension. She was told no. When Coladarci asked when this would start, Gotthard replied, "For you, August 1." But Coladarci kept "bugging" Aikens about this matter and saying "you can't do this to me." Aikens replied that "it's not up to me, it's corporate." When for the first time, Coladarci failed to see the uniform allowance paid out in September, Gotthard simply told her that she would not be receiving it. However, as a result of her persistence in bugging Aikens, in September, Respondent increased her control hours from 16 to 20, and with the exception of the uniform allowance, she began again receiving full-time benefits. All throughout this entire time, Coladarci's actual hours worked had not changed as she explained. She is considered part-time despite working full-time hours.

At Respondent Wethersfield, similar changes occurred. Evidence provided at this home was offered by two CNAs, Gail Blair and Pauline Dunchie-Legg (herein Dunchie).

Dunchie has worked at Respondent Wethersfield facility since 1995 and is also a long-time union delegate. She explained that at Wethersfield the term "in the book" refers to hours that are used to prorate one's benefits. Dunchie had 32 hours "in the book" in 2010. Dunchie was "in the books" for 24 hours from 2006 through 2008 yet worked 40 hours a week and received the same benefits as a "full-time" employee. She testified that in 2010 she began hearing that, perhaps since 2009, Respondent was basing benefits not on hours actually worked but on hours "in the books." When this matter came to her attention, she raised it with Larry Condon, then the administrator at Wethersfield. In August 2010, she approached him in his

---

[27] Article 15 Holiday Provisions (see quotation in section concerning the holiday pay changes, above)

     Article 17(A) Vacations: Non-probationary full-time and part-time Employees who work twenty (20) hours or more a week shall be entitled to accrued vacations each year with pay (pro-rated for eligible employees) as follows: (portions deleted)

     Article 18(A) Sick Leave: Part-time Employees who work twenty (20) hours a week or more shall accrue sick leave days on a pro-rata basis.

     Article 24(A) Uniform Allowance: The center will provide an annual uniform allowance of Three Hundred Dollars . . . for full-time Employees, prorated for part time Employees, who work twenty (20) or more hours a week. . ."

office and told him that she had learned that employees were not receiving pay for the holiday. Condon said that he knew and that the Union had filed grievances already.

Dunchie believed that there was a change concerning the home's interpretation of "in the books." According to Dunchie, part-time employees lost benefits, some entirely and others lost in prorated amounts. Dunchie testified that these changes affected all of the unit employees and that about 20 or more CNAs at Wethersfield lost or had their benefits reduced as a result of these changes.

For example, Dunchie testified that when she was "in the book" for 32 hours in 2010, but working 40 hours, she received a full-time benefit for working on a holiday, 8 hours of time and a half-pay for working, and an additional 8 hours pay. However, since the 2010 change, she receives a prorated "extra" benefit of only 6.4 hours for a holiday rather than 8 hours. It appears that Respondent began prorating these benefits using as its baseline the hours "in the book": 6.4 is 80 percent of 8. Dunchie explained that on July 4, 2009 she received 8 hours holiday pay for not working the holiday, but now only employees with 40 hours "in the books" receive that benefit. Employees with less than 40 hours "in the books" have that benefit prorated.

Dunchie testified that in July 2010 Blair reported to her that Condon had told Blair that she was no longer getting any benefits because she was "in the books" for only 16 hours. Blair has regularly worked 40 hours a week for many years. After Dunchie spoke to management on numerous occasions, Blair's additional 24 "in the books" hours were restored.

CNA Gail Blair testified that since 2007 she has been "on the books" for 24 hours, regularly scheduled but that she has always averaged 40 hours or more per week. Blair, who started working as a CNA in 2003, was laid off by Wethersfield in 2006. When she returned after the layoff she was given 24 hours "on the books," yet actually worked 40 hours per week. Blair testified that in 2006 she received full benefits (vacation, sick time, etc.) as an employee "on the books" for 40 hours.

Blair began to experience changes on July 4, 2010, when she did not receive her proper "holiday hours" for not working. In previous years, if she did not work the holiday she would receive 8 hours pay. Her records revealed that just months before July 4, 2010, she had received 8 hours of pay for not working on Easter and Memorial Day 2010. When she discovered that her pay was short for the July 4, 2010 holiday, she spoke to Condon regarding this matter, but he merely suggested that she "take it up with the Union."

Many months later, after a grievance had been filed, Blair was paid 4.8 hours. She testified that she worked the July 4, 2011 holiday and for the first time in over a year received time and a half pay for working, but only 4.8 "holiday hours" in addition rather than the 8 she had received in years prior to 2010. It appears that since July 2010, Blair only receives 4.8 hours for not working a holiday. She has never received an explanation for this reduction in her benefits. Clark testified that she only learned from attending the instant hearing that Respondents had begun reducing the prorated amounts for one's "holiday hours" when not working a holiday, as with Blair.

Moreover, when Blair did not receive her yearly uniform allowance in September 2010, the Union filed a grievance. Later, in December 2010, Blair received $180 for her allowance instead of the $300 she had always received. When she asked why she was only receiving $180 instead of $300, she was told by the administrator that she is "only 24 hours on the book."

The above-described changes affected employees on several levels. First, as detailed above, all employees, who were not considered full-time lost their time and a half pay for working on a holiday, including per diems and part-time employees. Second, at Wethersfield (like Danbury), the part-time employees suffered an additional layer. They found themselves losing out on benefits they had long enjoyed as Respondent suddenly began cutting benefits for part-timers they categorized as less than 20 hours "in the book," regardless of how many hours those employees actually averaged per week.

On August 9, 2010, Clark filed identical Step 2 grievances against Respondents Wethersfield and Danbury with respect to these issues. The grievances alleged that the Respondent "denied benefits including, but not limited to holidays, personal days, vacation days, sick days, medical benefits, pension, training fund, and uniform allowance to eligible Employees as defined by Article 14, section I." Clark served the grievances separately by faxing them to each facility. Clark testified without contradiction that the Union had received no prior notice of any of these changes. As noted previously, Remillard refused to respond substantively to these grievances, claiming that they had been filed incorrectly simply because Clark listed two nursing home names on a single grievance form. Respondent refused to meet on the grievances.

The Union subsequently filed grievances against both Respondent Wethersfield and Respondent Danbury. The grievances were identical, filed on the same document, addressed to both facilities, alleging that the two centers violated various sections of the contract by denying various benefits to eligible employees. The Union served each center separately with copies of these grievances. Respondents never substantively responded to this issue. I note Remillard in writing refused to process the grievances further because the Union failed to file separate grievances with each center. Remillard's responses in this regard, which are identical for each center, are as follows:

August 30, 2010

Suzanne Clark
Organizer
New England Health Care Employees Union
77 Huyshope Avenue
Hartford, CT. 06106

RE: Grievance Processes for Wethersfield Health Care Center

Dear Ms. Clark:

I am writing in response to your letters dated August 17, 2010, related to how the Union "is disheartened by the employer's refusal to abide by the grievance process."

66      DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

For purposes of clarity, neither the Center nor I "refuse to hold Step 2 or Step 3 grievance hearings." However, based on the manner in which the Union is requesting meetings, it is our position not to schedule meetings until the Union files for Step 2 and Step 3 hearings correctly.

Please be aware that each Center operates and reviews their respective requests independently, as they are separate entities and employers and operate under separate Collective Bargaining Agreements. As such, the Union needs to provide each Center's Administrator/Regional Human Resources representative with separate grievance form/letter in order to schedule any Step 2 or Step 3 grievances at each location.

What is perplexing is that the Union understands that it needs to file for Arbitrations separately, as evidenced by its recent filing of eight arbitrations, yet it fails to understand or follow its contractual obligations for filing its grievances.

Consequently, your request to have a Step 2 hearing due to the Center's "refusal of the Employer to abide by Article 28 of the Collective Bargaining Agreement and participate in the grievance process...", and all other grievances requested in this fashion, we will not schedule these meetings until the Union files for them correctly, as clearly outlined above.

Thank you for your attention to this matter.
Sincerely,

Edmund Remillard
Regional Human Resources Managers
HealthBridge Management

Cc: Lisa Crutchfield, Senior Vice President of Labor Relations
  Larry Condon, Regional Director of Operations
  Tom Harris, Administrator
  Carmen Boudier, President, NEHCEU District 1199
  Almena Thompson, Vice President, NEHCEU District 1199
  Paul Fortier, Vice President, NEHCEU District 1199
  Anne Fenelon, Organizer

As was the case with the holiday pay and lunch overtime calculation changes, Respondents offered no witnesses or explanations for its decision to change its prior practices with respect to calculation of these various benefits at Wethersfield and Danbury vis a vis on the "books" versus hours worked.

III. ANALYSIS

*A. The Alleged Failure of Respondents HealthBridge, Newington, Long Ridge and Westport to adhere to the Collective-Bargaining Agreement with respect to the Laundry and Housekeeping Employees*

The complaint allegations regarding this conduct relates to the actions of the three centers in May of 2010 when they "re-hired" their former employees, who had been employees of HSG for 14 months, as new employees, which resulted in loss of wages, seniority and other contractual benefits.

General Counsel contends that HSG and the Respondents during this period of time co-determined the terms and conditions of employment of housekeeping and laundry employees at Respondents Newington, Long Ridge, and Westport facilities, that HSG and Respondents were joint employers with respect to these employees and that these employees remained within the collective bargaining unit recognized by the respective Respondent Centers.

Thus, the principal issue to be determined is whether HSG and the Respondents were joint employers of the laundry and housekeeping employees employed at these three facilities during the "full service" period from February 15, 2009, through May 17, 2010. The test is which of the two employers or both control in the capacity of employer, the labor relations of a given group of workers. Thus, the joint employer concept recognizes that the business entities involved are separate but that they share or co-determine these matters governing the essential terms and conditions of employment. *NLRB v. Browning-Ferris Industries*, 691 F. 2d 1117, 1123 (3rd Cir. 1982).

I conclude that the record evidence establishes that virtually all the terms and conditions of employment of the laundry and housekeeping employees at these facilities during this period of time was determined by the collective-bargaining agreement between Respondents and the Union, which Respondents imposed upon HSG and which HSG agreed to and, in fact, did apply to those laundry and housekeeping employees.

In these circumstances, I find it hard to imagine any clearer evidence that, in fact, the Respondents co-determined the terms and conditions of employment of these employees for the 14 months that they were employed by HSG. The employees received the same wages as they did when employed by the centers, the same or equivalent benefits, utilized the same seniority and were subject to the same grievance procedure, all of which were encompassed in the contracts between the Respondents and the centers, and which terms Respondents required HSG to apply to the employees as set forth by Respondents' contracts with the Union.

Moreover, it appears that HSG hired all of the former employees of the centers without any interviews and without following HSG's normal procedures of interviewing employees for positions, conducting background checks or providing them with HSG's handbook.[28]

Therefore, I conclude that Respondent HealthBridge along with each of the Respondent Centers were joint employers with HSG for the "full service" period of the laundry and housekeeping employees at the three centers since Respondent and HSG shared and codetermined the matters governing the essential terms and conditions of employment of these employees. *G.*

---

[28] The only exception to this practice, insofar as the record discloses, was the only employee hired by HSG during this period, who had not been a former employee of any of the Respondent Centers, Marvin Williams. Notably, Williams, who was hired in late 2009, went through HSG's normal interviewing process and unlike the former employees of the centers, who HSG hired in February of 2009, filled out all the HSG application forms and received and signed for a copy of the HSG handbook.

*Heileman Brewing Co.*, 290 NLRB 991, 999–1000 (1988), enfd. 879 F.2d 1526, 1531 (7th Cir. 1989); *Executive Cleaning Services, Inc.*, 315 NLRB 227, 235 (1994), enf. denied 67 F.3d 446(2nd Cir. 1995).[29]

Respondent conveniently ignored *Heileman Brewing*, supra and the Board's *Executive Cleaning* decision and instead rely on *Summit Express Inc.*, 350 NLRB 592, 617 (2007), wherein the Board agreed with the judge's conclusion that no joint employer relationship existed. The judge observed, therein, that "each case that finds joint employer status, however, relies on continuing elements of supervision and control of labor relations—not an initial establishment of terms and conditions of employment that simply continue what had gone on before." Thus, the contractor, there, presumably was free to change the terms of employment if it so chose at any future time. In fact, the agreement between the contractor and the employer stated future wages of the contractor would be determined by negotiations between the contractor and employer. Significantly, the judge in *Summit Express* did discuss *Heileman Brewing*, supra and distinguished it as follows: "Lowery (the contractor) supplied employees to Heileman, but Heileman negotiated with the Union for almost all of the terms and conditions of employment of the Lowery employees, the Lowery employees retained their seniority with Heileman while they were supposedly Lowery employees," 350 NLRB at 618. The judge observed that employees could determine the minimum qualifications of employees although the employer could reject them and subsequent adjustment of wages could be negotiated. He concluded that "I find nothing that indicates that the ability to reject employees or a procedure of co-determination of future wages, without more, suffices to establish a joint employer relationship." Id at 618.

Here, as in *Heileman Brewing*, Respondents negotiated for almost all of the terms and conditions of employment with the Union for the HSG employees, and the HSG employees retained their seniority with Respondents while they were employed by HSG.

---

[29] I recognize that the Board's *Executive Cleaning*, supra has been reversed by the Second Circuit. Nonetheless, I am bound to follow Board law until it is reversed by the Supreme Court, even where it is contrary to Circuit Court precedent in the Circuit where the unfair labor practice takes place. *Manor West, Inc.*, 311 NLRB 655, 667 fn. 43 (1993). Even apart from that issue, the facts in *Executive Cleaning* are distinguishable from the facts here, as well as from the facts in *Heilemen Brewing*, supra. The judge in *Executive Cleaning* relied on the involvement of the contractor (AT&T) in the negotiations for the contract with the union that the contractor (ECS) ultimately signed. However, during these negotiations between AT&T and the Union, an agreement was reached that the contractor would pay lesser rates than in the union contract, but here would be in a catch-up in the next agreement. No such catch-up provision was provided for in the contract signed by the contractors. The Court in reversing the Board noted this fact and observed the "Board's conclusion that labor rates for ECS employees is contrary to the Court's own specific findings of fact, 67 F.3d at 449 and 451. Thus, here, unlike *Executive Cleaning*, supra, the labor rates for the HSG laundry and housekeeping were negotiated by Respondents and the Union and imposed upon HSG as in *Heileman Brewing*, supra.

I, therefore, find *Heileman Brewing*, supra (and *Executive Cleaning*, supra) more dispositive precedent and find that *Summit Express*, supra, is easily distinguishable, as detailed above.

My conclusion that a joint employer relationship existed between the Respondents and HSG during this period is fortified by several other factors.

Here, unlike all the prior cases discussing this issue, which have been detailed above, HSG previously (i.e. for several years prior to February 17, 2009) had been the subcontractor providing supervisory services to the Respondents' employees. Thus, when the employees were subcontracted and became HSG employees in February of 2009, there was no change in their supervision, which both before and after the "full service" period had been performed by HSG supervisors. Therefore, the absence of day-to-day supervision of employees by Respondents during this time had little significance, since both before and after the transition when the employees were admittedly employees of Respondents, they were directly supervised by HSG personnel.

The record established that from the perspective of the employees, the subcontracting was little more than a payroll transfer with virtually no change in their terms and conditions of employment. Indeed, that is what the employees and the Union were essentially told when the subcontracting was announced and was how the officials of HSG viewed the significance of the "full service" period. Thus, the record establishes that in Remillard's letters to the Union on February 5, 2009, he announced that the respective centers would be subcontracting bargaining unit work within the housekeeping and laundry departments. The letter further noted that HSG will be assuming operations, including staffing of the departments, and "agrees in advance to retain the employees and recognize all the rights including seniority under the current collective bargaining agreement." The letter added that HSG would be in contact with the Union "regarding their transition plan. We look forward to your cooperation during this transition period."

As promised in Remillard's notification, HSG by letter from Fishberg notified the Union that effective February 15, 2009, the housekeeping and laundry employees at the centers "will be transferred to the payroll" of HSG. The letter further assures the Union that HSG "will transfer all employees to our payroll with their seniority dates, accrued benefits and job status intact. HSG will make all contributions to specified Union funds based on earnings from February 15, 2009, and forward. HSG also agrees to all terms and conditions negotiated and agreed to between Local 1199 and the respective centers. This change will have no impact on employees' wages and benefits."

These letters, which accurately characterizes the actual events that occurred during the "transition" or "full service" period *vis a vis* employees' terms and conditions of employment, establish that the subcontract to HSG was in effect little more than a transfer of payroll and that the laundry and housekeeping employees continued to be jointly employed by HSG and Respondents during this "transfer" or "full service" period.

It is true, as Respondents point out, that there were some changes in the terms and conditions of employment after the subcontracting, but these changes were minor and insignificant.

The only change that seemed to be of any significance was the loss of the direct deposit, which service had been provided by the centers, but which was not offered by HSG. Notably, this benefit was not mentioned in the collective-bargaining agreements between the Union and the respective centers, so HSG was not obligated to and did not provide it to the employees that were transferred to its payroll.

Further, the evidence discloses the health coverage was provided to the employees was not identical since HSG used a different carrier. However, HSG agreed and did provide "equivalent" coverage to these employees, and where employees had to pay additional co-pays for prescriptions or doctors' visits, over and above to what they had paid while employed by the centers, HSG reimbursed them for the differences.

Finally, while HSG continued to utilize the grievance procedure set forth with the centers with respect to grievances filed by or on behalf of laundry and housekeeping employees, the Step 2 and Step 3 personnel were different. Thus, prior to the subcontracting, Step 2 and Step 3 of the grievance procedure would be directed to the administrator of the center and to Remillard of HealthBridge (acting on behalf of each center), respectively. After the subcontracting, these steps were directed to HSG officials.

I conclude, as noted, that these changes in employment conditions of the employees were minor and insubstantial and do not detract from my conclusion stated above. The subcontracting in 2009 was little more than a payroll transfer vis a vis its affect on employees' employment conditions.

This conclusion is fortified by evidence of how the "transition" of the employees back to the centers was handled. The letters given to employees at each center by HSG notified them that as of May 17, 2010, they will no longer be employed by HSG. The letter to Respondent Newington employees added the following sentence. "Payroll services will not be provided for Newington Center." This letter accurately encapsulated the significance of HSG's services while the employees were employed by HSG. HSG was little more than a "payroll service" during this period.[30]

Additional support for this conclusion can be found in the testimony of various HSG officials concerning what they were told by Fishberg or other HSG representatives concerning the transition back to employees of the centers. Glaser was told by District Manager Ricci that the employees at Respondent Westport would be terminated and that Respondent Westport was going to be hiring them back. Ricci informed Glaser that the "payroll is going back to HealthBridge" and that HealthBridge is taking the "payroll back" and they're going to be their employees. Ricci further explained that the employees would be filling out new applications and the center is going to hire them back.

Similarly, Owusu was told by Crane, his district manager, that the employees of Respondent Long Ridge would no longer be on HSG's payroll as of May 17, 2010, and that the employees would be going to the "payroll of the home." Finally, Crane

was told by Fishberg that HSG was terminating the employees at Respondent Long Ridge and that he should report to the facility to help with the transition back to "Long Ridge of Stamford."

Respondent argue in this regard that the employees were terminated by the centers in February of 2009 and that they were free to treat them as new employees when they were rehired in May of 2010 after the cancellation of the subcontract. However, this statement misrepresents the record. No probative evidence was adduced that employees were terminated by any of the centers in February of 2009 when the subcontracting was announced and which was, as I detailed above, little more than a payroll transfer *vis a vis* employees' terms and conditions of employment. Respondent relies on a letter handed to Myrna Harrison on May 29, 2010, an employee of Respondent Westport, who had been employed by HSG but was not rehired by Respondent Westport. When Harrison protested Respondent Westport's failure to offer her a job in May of 2010 to Coleman, she asked for a paper about her employment status. Coleman returned with a letter signed by Jeanette Quinteros, payroll/benefits coordinator, which stated that Harrison was employed by Westport Health Center starting in 12/13/89 as a housekeeper and that she "was terminated on 2/15/09." Neither Quinteros nor Coleman testified, so no evidence was adduced as to how or why or on what basis Quinteros wrote that Harrison was "terminated" by Respondent Westport on February 15, 2009. Further, no other witnesses from Respondents were presented, and no documentary or other evidence was adduced that Respondents terminated any of the employees of any of the centers in February of 2009 or indeed at any time.

To the contrary, as described above, the evidence disclosed above that the Union and the employees were not informed by either HSG or the Respondents that the employees were going to be terminated by the Respondents but only that they would be subcontracted to HSG, that the employees would be transferred to the payroll of HSG and that all conditions of employment under the union contract would be the same for all employees as it had been while employed by Respondents.

I also rely in part on some of the evidence presented by General Counsel concerning grievance processing during the "full service" period. Anthony Lecky, a union delegate and housekeeping employee, filed a grievance with Durkovic, administrator at Respondent Long Ridge, alleging that HSG failed to pay him for time spent on union business. Lecky complained to Durkovic about HSG's failure to pay him for this time. Durkovic told him this was "her building" and "if there are changes, she wants to know." She promised to look into the matter and to get back to them. After she did not, Atkinson met with Durkovic and handed the grievance to her, who accepted it and said that she was still looking into it.

Atkinson also approached Owusu and Crane about the issue, who indicated to Atkinson, that HSG would not pay Lecky for the time involved since it didn't involve HSG business but rather union business involving other than laundry and housekeeping employees.[31] This evidence is demonstrative that

---

[30] Except for the supervisory services that it had been performing for the centers, both before and after the "transition," which the employees were admittedly employees of Respondents.

[31] Lecky as a union delegate represents employees in all departments.

Durkovic, the Respondent Long Ridge administrator, did at least have some involvement in the grievance process concerning Lecky's grievance against HSG, showing at least co-determination of working conditions by Respondent Long Ridge with HSG of working conditions of the employees.

Similarly, the Parks-Hill grievance also demonstrates co-determination of working conditions of HSG. Parks-Hill, after being transferred to HSG's payroll in February of 2009, lost her regular hours at HSG as a result of a layoff at HSG in April of 2009 and was reduced to per diem status. She asked to be bumped into the nursing department and obtain her regular hours. The Union met with Administrator Durkovic about the issue. While initially Durkovic rejected the request, after being informed by the Union that the contract required Respondent Long Ridge to use her seniority to bump into nursing and allowed Parks-Hill to bump into nursing for a regularly scheduled position. This incident demonstrates that Respondent Long Ridge permitted Parks-Hill, an HSG employee, to use her seniority at HSG as well as at Respondent Long Ridge to bump into a CNA position at Respondent Long Ridge.

Also, Parkmond, HSG's account manager at Respondent Newington, when he had an opening for a housekeeper position in June of 2009 used a Respondent Newington form to post for this position and posted for the job at the facility to Respondent Long Ridge's employees, even though HSG was the putative employer at the time.

The Franz Petion grievance, I find, to be the most significant vis a vis this issue. There, Petion, who was a housekeeping employee on HSG's payroll, applied for a posted position in the dietary department at Respondent Westport. He was initially denied the position but after a grievance filed and processed in April of 2009, Petion was successful at the third step and received the position in dietary since Respondent Westport determined that he had more seniority than the person, who had been awarded the position. This incident demonstrates that Respondent Westport counted his seniority both while being employed by Respondent Westport and by HSG in awarding him the position in dietary. More importantly, after Petion won his grievance (having Coleman's decision reversed), he met with Coleman. Coleman, obviously somewhat miffed about being reversed on the grievance, told Petion that his pay would be cut to $12.80 per hour from $15.65 when he transferred to dietary. After Petion complained to Remillard, this decision was reversed, and Petition's pay was not reduced.

However, as Coleman did not testify, no explanation was offered as to why she sought to cut Petion's pay to $12.80 per hour. In the absence of any such explanation, I find it likely that Respondent Westport, even at that time, April of 2009, was contemplating or even had decided that it would be hiring back the laundry and housekeeping employees but as new employees, thereby, reducing their pay to $12.80 per hour. It appears to me that Coleman reasoned that since Petion was a housekeeping employee at the time of the transfer to dietary and would have been reduced to $12.80 per hour had he remained a housekeeping employee, he should be reduced to that level when he transferred to dietary. While Remillard overruled this decision of Coleman, it, nonetheless, demonstrates to me, as I have observed above, that Respondents were contemplating the

rehire of the subcontracted employees as new employees as far back as April of 2009 and further that the decision to subcontract these employees in the first place was temporary in nature.

This latter conclusion is further supported by other record evidence, which was not contradicted by any evidence from any officials of Respondents. I have found that in April of 2010 when Coleman was discussing accrual issues with Ricci of HSG, Ricci informed her that he didn't think that it was going to be a problem because the employees were going to be transferred back to the Westport payroll, and, therefore, the time would go back on the books when they got transferred back over to Westport.

Further, when Simone discussed the direct deposit issue with Parkmond, the HSG account manager at Respondent Newington, Parkmond told Simone several times starting in March or April of 2009 that the employees would eventually be going back to Respondent Newington's payroll, so they would be getting direct deposit then.

Finally, HSG's District Manager Crane in charge of Respondent Long Ridge's facility told Lecky in early 2010 that maybe the employees would be going back to becoming employees at Long Ridge.

I find the above evidence sufficient to conclude, particularly in the absence of any contradictory evidence from Respondents' representatives, that Respondents considered the subcontracting to be temporary and had contemplated, if not decided, to return the employees to the employ of the centers.[32]

This conclusion also reinforces my previous finding that the transfer of Respondents' laundry and housekeeping employees in 2009 was essentially a payroll transfer without much other significance as to employees' terms and conditions of employment. I also note in this connection the failure of Respondents to present any witness to explain the reasons for their decisions to subcontract the work to HSG in the first place, to cancel the subcontract in 2010 and/or to rehire the employees as new employees in May of 2010. I once again find it appropriate to draw an adverse inference against Respondents and conclude that if they had testified, their testimony would not be supportive of Respondents' version of the events. *International Automated*, supra.

Accordingly, based on the forgoing analysis, I conclude that Respondents and HSG co-determined the terms and conditions of employment of the laundry and housekeeping employees at the three centers during the "full service" or "transition" period. *Heileman Brewing*, supra; *Executive Cleaning*, supra. Therefore, as of May of 2010, these employees were still employees in the bargaining unit, subject to all the terms of the contract and eligible for all contract benefits.

Respondents, therefore, were not free to rehire them as new employees, cut their salaries, reduce their benefits and eliminate their seniority. They must be treated as continuously being employees of the centers, and Respondents' failure to do so is a blatant violation of Section 8(a)(1) and (5) of the Act. I so find.

---

[32] In this regard, I believe it is appropriate to draw an adverse inference from the refusal of any of Respondents' representatives to testify about this issue. *International Automated Machines*, 285 NLRB 1122, 1123 (1987).

70                                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

Respondents' argument that nothing in the contract requires them to rehire the employees with their old salaries and benefits intact misses the point. The employees, although technically "employed" by HSG for 14 months, were still also employed by Respondents. The alleged "hiring" of the employees in these circumstances is in reality a termination and rehire on the condition that the employees are rehired as new employees with a new probationary period and loss of salary benefits and seniority. Such conduct was effectuated without notification to or bargaining with the Union. Respondent has, therefore, violated Section 8(a)(1) and (5) of the Act.

The violations of the Act with respect to Respondents' conduct are based on two separate but related violations of its bargaining obligations to the Union. Respondent has by virtue of reducing benefits of bargaining unit employees modified the contract without the Union's consent. An employer may not modify the contract and, thereby, reduce employee benefits during the contract term other than by mutual agreement or with consent of the Union. *San Juan Bautista Inc.*, 356 NLRB 736, 738 (2011); *Bonnel/Tredegar Industries*, 313 NLRB 789, 792 (1994), enfd. 46 F.3d 339 (4th Cir. 1995); *Carrier Corp.*, 319 NLRB 184, 192, 199 (1995); *St. Vincent Hospital*, 320 NLRB 42, 45 (1995).

Additionally, an employer is obligated to notify and bargain with the union before it makes any changes in terms and conditions of employment with the union. Respondents have violated its statutory obligations to the Union in both respects, here, since they both modified the contract without obtaining the consent of the Union and made changes in terms and conditions of employment without notifying and bargaining with the Union.

I would also find, alternatively, that Respondents violated Section 8(a)(1) and (5) of the Act, even absent a joint employer finding between Respondents and HSG. In those circumstances, I conclude that Respondents, nonetheless, have an obligation to bargain with the Union about the terms of their "re-employment" with or "rehire" by the Respondents of these employees. Regardless of the joint employer issue, these employees were not "new" employees in the sense that they were formerly employees of the Respondents, who had not been terminated but merely subcontracted to HSG for a 14-month period. In such circumstances, I find it more akin to a layoff than a rehire and conclude that Respondents should have notified and bargained with the Union over the terms of their employment with Respondents. The fact that the contract does not specifically require Respondents to rehire employees at contract rates, who had been subcontracted out, is not dispositive. Neither the contract nor any other evidence established that the Union waived its rights to bargain about the terms and conditions of its employees, whom it "rehired" after they returned from their employment with the subcontractor. *Provena St. Joseph*, 350 NLRB 808, 815 (2007).

### B. The Failure to Rehire Harrison and Daye

It is undisputed that although Respondents offered positions to 46 of 48 laundry and housekeeping employees, who had been employed at the centers, Respondent Westport failed to offer a job to Harrison or Daye. It provided no witnesses and adduced no evidence as to why it failed to offer them employment.

Based on my findings above, this conduct is unlawful under several alternative but related theories. Since the Respondents were joint employers with HSG, Daye and Harrison were still in the employ of Respondents, subject to the terms of the agreement. In such circumstances, the failure to rehire them is akin to a layoff, and in such circumstances, Respondents were obligated to notify and to bargain with the Union before laying these employees off. *Kieft Bros. Inc.*, 355 NLRB 116 (2010); *Pan American Grain Co.*, 343 NLRB 318 (2004).

Also, since Respondent Westport was a joint employer with HSG, as I have found above, the collective-bargaining agreement between the Union and Respondent Westport was still in effect. Therefore, the contractual just cause provision in the agreement was applicable to Respondents' actions in refusing to hire them, which was tantamount to a layoff or termination since they were employees of Respondents. Since Respondents adduced no evidence that they complied with the just cause provision of the contract, the refusal to hire Harrison and Daye can be found to be violative of Section 8(a)(1) and (5) on that basis as well, I so find.

### C. The March 2010 Layoff by Respondent Long Ridge and Related Information Requests

It is undisputed that in March of 2010, Respondent Long Ridge instituted a layoff of CNAs by removing them from the schedule for certain days or shifts. Respondent Long Ridge engaged in this conduct despite the fact that the collective-bargaining agreement between it and the Union required 45-days notice before laying off employees and despite the fact that the Union had expressly declined the request made by Respondent Long Ridge and Respondent HealthBridge that the Union waive this contractual right in a meeting in late February of 2010.

Accordingly, there can be no doubt that Respondent Long Ridge and Respondent HealthBridge have violated Section 8(a)(1) and (5) and 8(d) of the Act by failing to adhere to the express terms of their contract with the Union. *Carrier Corp.*, supra; *Oak Cliff-Golman Co.*, 207 NLRB 1063 (1973).

Respondents argue, however, that no violation should be found inasmuch as Respondents rescinded the layoff after the Union filed a grievance protesting the Respondent's contract violation. Respondents further agreed to make the employees whole for their violations of the contract and were still engaged in discussion with the Union concerning the amounts due to the affected employees. Finally, they assert that Klimas, Respondent's administrator, is no longer employed by Respondent Long Ridge and that the Union never brought the alleged pay disparities or the need for further documentation to Remillard's attention, even though Remillard had handled the resolution of the grievance at Step 3.Therefore, Respondents contend that since "the Union never made the person who committed to make the employees whole and could remedy any outstanding pay issues aware of those issues…General Counsel had failed to prove that Respondent Long Ridge violated the Act regarding the alleged layoff."

Respondents' arguments, as outlined above, are totally without merit. They have no bearing on the ultimate issue of whether Respondents violated the Act by failing to adhere to the explicit terms of the contract, which it undisputedly failed to comply with. Respondents seem to be arguing that since they rescinded the layoff and agreed to make the employees whole, no violation should be found, in effect contending that they have cured the violation, warranting no finding that they have violated the Act. This argument is clearly contrary to established Board law as Respondents have fallen far short of its burden to sufficiently repudiate unlawful conduct as to justify a dismissal of the complaint allegation. *Claremont Resort & Spa*, 344 NLRB 832 (2005); *Passavant Memorial Area Hospital*, 237 NLRB 138 (1978). Here, Respondents did not admit that it had engaged in unlawful conduct,[33] did not give assurances that in the future that employees would not be interfered with and, indeed, did not even make a timely or unambiguous notification to their employees of their repudiation of the unlawful conduct.

The record also establishes that the Union made several information requests to Respondents in writing in March 2010 and orally by Clark in June and early July of 2010. The Union was requesting information clearly relevant to the processing of its grievance concerning the improper layoff of employees and the proper amount of backpay due to remedy Respondent's contract violations.

Respondents ignored the Union's information requests until June 25, 2010 when Klimas provided some responsive information, which was clearly not sufficient to meet the Union's requests as Clark explained to Klimas in early July of 2010. It was not until July 22, 2010 that Respondents supplied fully the information requested by the Union.

It is well-settled that an employer is obligated to supply relevant information to the union in a timely manner. Absent evidence justifying an employer's delay in furnishing such information, such a delay is violative of the Act since the union is entitled to the information at the time it made its initial request, and it is the employer's duty to furnish it as promptly as possible. *Woodland Clinic*, 331 NLRB 735, 737 (2000); *Monmouth Care Center*, 354 NLRB 11, 51 (2009), incorporated by reference in 356 NLRB 152 (2010).

Here, Respondents have provided no explanation for their delay in providing the requested information, Respondents do make the argument that Klimas is no longer employed by Respondent Long Ridge and Clark admits that she did not bring the alleged pay dispute or the need for further documentation to Remillard's attention even though he handled the resolution of the Step 3 grievance. Therefore, Respondents argue that the "Union never made the person who committed to make the employees whole and could remedy any outstanding pay issue aware of these issues." I find this purported explanation for the delay to be totally devoid of any substance. The fact is that

Klimas was still employed at Respondent's at least though July of 2010 as Clark continued to deal with Klimas concerning these issues until the Union finally received the information requested on July 22, 2010. It was not incumbent upon Clark or the Union to contact Remillard about the issues since it was sufficient to make the request to Klimas. Moreover, in fact, Clark did mention the issue to Remillard when she met with him on the Step 3 grievance on May 6, 2010, wherein she reminded him that the Union was still waiting for the information requested, some 2 months earlier. Thus, even by that time, Respondents had unreasonably delayed submitting the requested information. *Woodland Clinic*, supra at 737 (unexplained 7 weeks' delay unreasonable and unlawful); *Monmouth*, supra at 52 (6-week delay unreasonable); *Beverly California Corp.*, 326 NLRB 153, 157 (1998) (2-month delay unlawful); *International Credit Service*, 240 NLRB 715, 718 (1979) (unexplained delay of six weeks unreasonable).

Accordingly, based on the foregoing, I conclude that Respondents have violated Section 8(a)(1) and (5) of the Act by failing to respond promptly to the Union's information requests.

### D. Respondents' Discontinuance of Paying Time and a Half for Holidays

Prior to 2009 or early 2010, employees at all of Respondent Centers received time and a half pay when working on holidays, no matter how many hours a week they had worked or whether the employee was considered full-time, part-time or per diem.

Sometime in late 2009, Respondents began ceasing the payment of such holiday pay to at least some part-time employees and for per diem workers. There is no dispute that Respondents did not notify or bargain with the Union over this clear change in the terms and conditions of employment of the bargaining unit employees.

General Counsel alleges that Respondents have violated its bargaining obligation to the Union by failing to so notify and bargain with the Union about this change in their working conditions. I agree.

Respondent have adduced no evidence of any reasons or justification for instituting these changes. It produced no witness on this issue. While Remillard did respond to the Union's grievance by citing contractual provisions, allegedly supporting Respondents' actions, that position is undermined by record evidence contradicting this alleged defense. Thus, Remillard in his responses appears to be relying on the contractual provision authorizing holiday pay for part-time employees, who work 20 or more hours per week. However, evidence from Dewkett establishes that she did receive her holiday pay for Labor Day in September of 2010 as in the past. Dewkett worked over 20 hours per week but had only 15 regularly scheduled or control hours. It appears that Respondents seem to be applying the 20-hour requirement in the contract to hours scheduled (as opposed to hours worked), but again, in the absence of any testimony from Respondents' witnesses, their position and justification for the change is uncertain.

What is clear, however, is that there has been a change from prior practice, the Union was not notified about it nor given the

---

[33] Indeed, when Remillard in Respondents' May 26, 2010 letter to the Union confirmed their willingness to rescind the layoffs and make the employees whole, he advised that "the Center's willingness to this non-precedent setting action does not constitute an admission that its previous decision to remove members from the schedule constituted a violation of the collective-bargaining agreement."

opportunity to bargain about it and that the Union has not waived its rights to bargain about this subject. Respondents have, thereby, violated Section 8(a)(1) and (5) of the Act. *Provena St. Joseph*, 350 NLRB 808, 810–816 (2007).

### E. The Changes in Meal Time–Overtime Calculation

It is undisputed that at various times in 2010, all of Respondent Centers stopped including half-hour paid periods for meal breaks in calculating daily overtime. This is admittedly a change from prior practice and was also effectuated without notifying or bargaining with the Union about this change in employees' terms and conditions of employment.

As was the case with the Respondents' change in holiday pay, detailed above, Respondents have once more failed to produce any witnesses to explain their actions or why they departed from past practice. It appears from the timing of the decision and other evidence that the decision may have had relation to their institution of the new policy to require employees to state whether or not they had an "uninterrupted break" when they punch out for the day. Nonetheless, in the absence of any testimony from Respondents, it is difficult to determine why it decided to change its prior practices.

Respondents argue in their brief that they were privileged to implement this admitted change in past practice based on the explicit terms of the contract. They argue that based on the contract's terms overtime is to be paid at time and a half for "work in excess of eight (8) hours actually worked in excess of eight (8) hours per day." Relying on definitions of work in Webster's Dictionary and Black's Law Dictionary, Respondents argue that meal or break time cannot be construed as "work actually performed" for the half-hour meal period. However, this interpretation of the contract is clearly contrary to past practice, where Respondents have always paid employees for this time, whether or not they took their breaks. Thus, the contract terms are ambiguous and susceptible to varying reasonable interpretations. Where, as here, Respondents have chosen to ignore past practice and to implement this change without bargaining with the Union, they have violated the Act, unless they have met the stringent standard of establishing that the Union has clearly and unmistakably waived its rights to bargain over this subject. *Provena St. Joseph*, supra. I find that they have failed to demonstrate such a clear and unmistakable waiver, and Respondent have, thereby, violated Section 8(a)(1) and (5) of the Act by unilaterally instituting this change.

### F. The Changes in Eligibility for Certain Benefits at Respondents

At Respondents Wethersfield and Danbury, it is undisputed that in mid-2010 these two centers changed the way that they determined eligibility for part-time employees to receive various prorated benefits, such as holidays pay, personal days, vacation days, sick days and uniform allowance. There, Respondents implemented a new policy once again without notifying or bargaining with the Union that these benefits would henceforth be available only to employees, who were scheduled for over 20 hours per week, regardless of the actual hours worked. In the past, employees were eligible for and received

these benefits based upon their hours actually worked, regardless of their scheduled hours.[34]

Once more, Respondents have failed to offer any explanation for its deviation from prior practice or its clear modification of the expressed terms of the contract. As noted above, Respondents produced no witnesses or evidence with respect to these issues. Here, the record does not even include substantive responses to the Union's grievances with respect to these issues since Respondents made only procedural objections, contending that the Union had not properly filed its grievances separately against each center.

The only record evidence of any explanation by Respondents for its actions comes from comments made by the administrators to employees, who complained about the changes. In this regard, Pescatello, Respondent Danbury's administrator, informed employee Coladarci that Respondent Danbury was going to interpret the "control" hours differently. When Coladarci protested that she had been there 20–21 years and that Respondent Danbury can't do this, Pescatello replied, "It's not up to us, it's all corporate. And we're going to interpret the contract differently." Similarly, when Coladarci complained to DNS Aikens about these changes, Aikens responded to her, "It's not up to me, its' corporate."

When Dunchie complained to Respondent Wethersfield's administrator, Larry Condon, Condon informed her that he knew about it and the Union had filed grievances already. When Blair complained to Condon about not receiving her proper holiday pay as a result of the change, Condon replied that she should "take it up with the Union."

Notably, in this instance, Respondents has not even advanced any arguments in their brief as to why they made this change or on what basis their conduct can be found to be justified or lawful.

I, therefore, find that Respondents HealthBridge, Wethersfield and Danbury have violated Section 8(a)(1) and (5) on two grounds with respect to this conduct. They have unlawfully modified the contract[35] without the Union's consent in violation of Section 8(a)(5) and 8(d) of the Act. *Carrier Corp.*, supra; *Oak Cliff-Golman*, supra. I also conclude that Respondents have unilaterally changed terms and conditions of employment of their employees at these two centers without notifying and bargaining with the Union also in violation of Section 8(a)(1) and (5) of the Act. *Provena St. Joseph*, supra; *Champion Parts Rebuilders*, 260 NLRB 731, 733–734 (1982).

### G. The Threat to Call Police

As noted above, I have found that Respondents Westport and HealthBridge unlawfully refused to rehire Harrison and Daye on May 17, 2010. On that date, as also related above, Respondents notified employees that since they had been terminated by

---

[34] At Respondent Wethersfield, the employees' scheduled hours were known as "on the books" hours while at Respondent Danbury, it was referred to as "control hours." At both facilities, however, employees would work more than their "control" or "on the books" hours and would receive prorated benefits based on the amount of hours actually worked.

[35] The contracts in effect clearly provide that these benefits shall be received by employees, who work 20 hours or more per week.

HSG, they needed to reapply for jobs with Respondent Westport, fill out new job applications and they would be hired as new hires with pay at $12.80 per hour. The employees were understandably upset at having to reapply for their jobs as new employees with consequent substantial pay cuts and losses of benefits and seniority. They were discussing whether or not to comply with Respondent's demands that they fill out new applications and accept the new (unlawful) conditions for their acceptance of a job, including that they should consult with the Union before deciding whether to comply. In these circumstances, Coleman's response to these discussions that the employees must fill out the applications or leave the premises, and if not, she could call the police was a clear response to their protected conduct. Coleman repeated that threat to Harrison after she had been permitted by Coleman to return to the facility to drop off an Avon package to a fellow employee.

General Counsel argues, and I agree, that Coleman's comments were in response to employees' protected conduct of discussion how to react to Respondents' requirement (unlawful as it turns out) to file new job applications for hire as new employees and were coercive and violative of Section 8(a)(1) of the Act. *Winkle Bus Co.*, 347 NLRB 1203, 1219 (2006).

## CONCLUSIONS OF LAW

1. The Respondents are employers within the meaning of Section 2(2), (6), and (7) of the Act.

2. The Union is a labor organization within the meaning of Section 2(5) of the Act.

3. Respondents HealthBridge, Westport, Long Ridge and Newington operated as joint employers with HSG during the period of February 15, 2009, through May 17, 2010.

4. Respondents HealthBridge and Westport have violated Section 8(a)(1) of the Act by threatening to call the police in response to employees' protected concerted or union activities.

5. Respondents HealthBridge and Long Ridge have violated Section 8(a)(1) and (5) of the Act by failing and refusing to supply timely and complete information requested by the Union on March 2, 2010, April 12, 2010, May 6, 2010, and July 8, 2010.

6. Respondents HealthBridge and Long Ridge have violated Section 8(a)(1) and (5) of the Act by failing to adhere to the provisions of their collective-bargaining agreement with the Union by laying off their employees without providing the Union with a 45-day notice of the layoffs without the Union's consent.

7. Respondents HealthBridge, Wethersfield and Danbury violated Section 8(a)(1) and (5) of the Act by failing to adhere to provisions of their collective-bargaining agreement with the Union by implementing a new eligibility standard for employees regarding holiday pay, personal days, vacation days, sick days, and uniform allowance.

8. Respondents HealthBridge, Long Ridge, Wethersfield, Danbury, Newington, West River, and Westport have violated Section 8(a)(1) and (5) of the Act by unilaterally changing terms and conditions of employment of their employees by discontinuing their practice of including all time encompassed by lunch and breaks in tallying their employees' daily "hours worked" for purposes of calculating overtime payments and implementing a new policy and practice excluding time taken on these breaks and by implementing a new eligibility standard for payment at the premium rate for hours worked on holidays by their employees.

9. Respondents HealthBridge, Newington, Westport, and Long Ridge have violated Section 8(a)(1) and (5) of the Act by modifying the contracts' terms of their laundry and housekeeping employees without the Union's consent in that they conditioned employees' rehire on their condition that they become new employees with loss of salary, benefits and seniority and by changing terms and conditions of employment of their employees without notifying or bargaining with the Union over such changes and by failing to bargain with the Union concerning the terms of their re-employment with Respondents after being subcontracted to HSG.

10. Respondents HealthBridge and Westport have violated Section 8(a)(1) and (5) of the Act by laying off and/or refusing to hire their employees, Myrna Harrison and Newton Daye, without notifying or bargaining with the Union concerning their decision to lay off these employees or not to hire them and because their layoffs or termination were in violation of the collective-bargaining agreement with the Union.

## REMEDY

Having found that Respondents have engaged in certain unfair labor practices, I shall order them to cease and desist therefrom and to take certain affirmative action designed to effectuate the policies of the Act.

Having found that Respondents made a number of unlawful modifications of their contracts with the Union and unlawful, unilateral changes in terms and conditions of employment of their employees, I shall order that Respondents rescind these changes and restore the conditions of employment of their employees to what they had been prior to the changes.

I shall also order Respondents to make whole the employees for losses of pay and other benefits caused by the unlawful contract modifications and unilateral changes of Respondents.

Additionally, I shall order Respondents HealthBridge and Westport to offer reinstatement to employees, Myrna Harrison and Newton Daye, to their former positions of employment with Respondents HealthBridge and Westport without loss of seniority or pay and to make them whole for any loss of earnings and benefits. Backpay shall be for Harrison and Daye as well as for the other employees, who lost wages and benefits based upon Respondents' unlawful conduct. Backpay shall be computed in accordance with *F. W. Woolworth Co.*, 90 NLRB 289 (1950), with interest at the rate prescribed in *New Horizons*, 283 NLRB 1173 (1987), compounded daily as prescribed in *Kentucky River Medical Center*, 356 NLRB 6 (2010), enf. denied on other grounds sub.nom., *Jackson Hospital Corp. v. NLRB*, 647 F.3d 1137 (D.C. Cir. 2011).

On these findings of fact and conclusions of law and on the entire record, I issue the following recommended[36]

---

[36] If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and Regulations, the findings, conclusions, and recommended Order shall, as provided in Sec. 102.48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

ORDER

A. The Respondent, HealthBridge Management, LLC, Fort Lee, New Jersey, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Refusing to bargain collectively and in good faith with the Union concerning employees employed in appropriate units in Danbury, Connecticut (Danbury), Stamford, Connecticut (Long Ridge), Newington, Connecticut (Newington), Milford, Connecticut (West River), Westport, Connecticut (Westport), and Wethersfield, Connecticut (Wethersfield).

(b) Threatening to call the police in response to employees' protected concerted or union activities.

(c) Failing and refusing to supply timely and complete information requested by the Union.

(d) Failing to adhere to the provisions of its collective-bargaining agreement with the Union by laying off its employees at Long Ridge without providing the Union with a 45-day notice of the layoffs without the Union's consent.

(e) Failing to adhere to provisions of its collective-bargaining agreement with the Union by implementing a new eligibility standard for employees at Danbury and Wethersfield regarding holiday pay, personal days, vacation days, sick days and uniform allowance.

(f) Unilaterally changing terms and conditions of employment of its employees at Danbury, Long Ridge, Newington, Westport, West River, and Wethersfield by discontinuing its practice of including all time encompassed by lunch and breaks in tallying its employees' daily "hours worked" for purposes of calculating overtime payments and implementing a new policy and practice excluding time taken on these breaks and by implementing a new eligibility standard for payment at the premium rate for hours worked on holidays by its employees.

(g) Modifying the contract's terms of its laundry and housekeeping employees at Long Ridge, Westport, and Newington without the Union's consent by conditioning its employees' rehire on the condition that they become new employees with loss of salary, benefits and seniority and by changing terms and conditions of employment of its employees without notifying or bargaining with the Union over such changes and by failing to bargain with the Union concerning the terms of the employees' re-employment with it after being subcontracted to a subcontractor.

(h) Laying off and/or refusing to hire its employees at Westport without notifying or bargaining with the Union concerning its decision to layoff these employees or not to hire them, laying off or terminating its employees in violation of its collective-bargaining agreement with the Union.

(i) In any like or related manner, interfering with, restraining, or coercing employees in the exercise of their rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Within 14 days from the date of the this Order, offer Myrna Harrison and Newton Daye full reinstatement to their former jobs or, if that job no longer exists, to a substantially equivalent position, without prejudice to their seniority or any other rights or privileges previously enjoyed.

(b) Make Myrna Harrison and Newton Daye whole for any loss of earnings and other benefits suffered as a result of the discrimination against them in the manner set forth in the remedy section of the decision.

(c) Within 14 days from the date of this Order, remove from its files any reference to the layoff or refusal to hire of Harrison and Daye, and within 3 days thereafter notify the employees in writing that this has been done and that the layoffs will not be used against them in any way.

(d) Make whole the employees for their loss of wages and benefits that resulted from the unlawful layoff of employees employed by Respondent Long Ridge and that resulted from the unlawful changes in eligibility standards for employees employed by Respondents Wethersfield and Danbury regarding holiday pay, personal days, vacation days, sick days, and uniform allowances and from the unlawful change of the practices calculating overtime and breaks of employees employed by Respondents Long Ridge, Wethersfield, Danbury, Newington, West River, and Westport in the manner set forth in the remedy section of this decision, plus interest.

(e) Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

(f) Rescind the modification in its contracts covering employees employed by Respondents Newington, Long Ridge, and Westport, including changes in salary, seniority and benefits and restore the employees' terms and conditions of these employees to what they were prior to its unlawful modification of the contracts.

(g) Discontinue its practice of excluding all time encompassed by lunch and breaks in tallying employees' daily "hours worked" for purposes of calculating overtime payments and rescind its new eligibility standard for payment at premium rate for hours worked on holidays by its employees employed by Respondents Newington, Westport, Long Ridge, Wethersfield, West River and Danbury.

(h) Rescind its new eligibility standard for employees employed by Respondents Wethersfield and Danbury regarding holiday pay, personal days, vacation days, sick days and uniform allowance and restore the standards for eligibility that were in place prior to the changes.

(i) On request, bargain in good faith with the Union concerning the terms and conditions of employment of the employees employed in the appropriate units by it and by Danbury, Long Ridge, Newington, Westport, West River and Wethersfield.

(j) Within 14 days after service by the Region, post at its Fort Lee, New Jersey facility and at its facilities in Danbury, Stamford, Newington, Milford, Westport and Wethersfield, Connecticut copies of the attached notice marked "Appendix A."[37]

---

[37] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judg-

Copies of the notice, on forms provided by the Regional Director for Region 34, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. If the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since March 1, 2010.

(k) Within 21 days after service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

B. The Respondent, 710 Long Ridge Road Operating Company II, LLC (Long Ridge), Stamford, Connecticut, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Refusing to bargain collectively and in good faith with the Union concerning employees employed in the following appropriate unit:

All full-time, part-time, and per diem/casual service and maintenance Employees, including certified nurses assistants (CNAs), therapy technicians, housekeeping aides, dietary Employees, laundry aides, central supply clerks, relief cooks, unit secretaries, receptionists, medical records clerks, maintenance Employees, Registered Nurses and Licensed Practical Nurses employed by Long Ridge, including any new or expanded locations of Long Ridge, but excluding all other Employees, cooks, guards, other professional employees and supervisors as defined in the Act, as amended to date.

(b) Failing and refusing to supply timely and complete information requested by the Union.

(c) Failing to adhere to the provisions of its collective-bargaining agreement with the Union by laying off its employees at Long Ridge without providing the Union with a 45-day notice of the layoffs without the Union's consent.

(d) Unilaterally changing terms and conditions of employment of its employees by discontinuing its practice of including all time encompassed by lunch and breaks in tallying its employees' daily "hours worked" for purposes of calculating overtime payments and implementing a new policy and practice excluding time taken on these breaks and by implementing a new eligibility standard for payment at the premium rate for hours worked on holidays by its employees.

(e) Modifying the contract's terms of its laundry and housekeeping employees without the Union's consent by conditioning its employees' rehire on the condition that they become new employees with loss of salary, benefits and seniority and by changing terms and conditions of employment of its employees without notifying or bargaining with the Union over such changes and by failing to bargain with the Union concerning the terms of the employees' re-employment with it after being subcontracted to a subcontractor.

(f) In any like or related manner, interfering with, restraining, or coercing employees in the exercise of their rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Make whole its employees for their loss of wages and benefits that resulted from the modification of the contract terms of its laundry and housekeeping employees and from the unlawful change of the practices calculating overtime and breaks of its employees, plus interest.

(b) Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

(c) Rescind the modification in its contract, including changes in salary, seniority and benefits and restore the employees' terms and conditions of these employees to what they were prior to its unlawful modification of the contract.

(d) Discontinue its practice of excluding all time encompassed by lunch and breaks in tallying employees' daily "hours worked" for purposes of calculating overtime payments and rescind its new eligibility standard for payment at premium rate for hours worked on holidays by its employees.

(e) On request, bargain in good faith with the Union concerning the terms and conditions of employment of the employees employed in the appropriate unit described above.

(f) Within 14 days after service by the Region, post at its Stamford, Connecticut facility copies of the attached notice marked "Appendix B."[38] Copies of the notice, on forms provided by the Regional Director for Region 34, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. If the Respondent has gone out of business or closed the facility in-

ment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

---

[38] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

volved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since March 1, 2010.

(g) Within 21 days after service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

C. The Respondent, 1 Burr Road Operating Company II, LLC (Westport), Westport, Connecticut, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Refusing to bargain collectively and in good faith with the Union concerning employees employed in the following appropriate unit:

> All full-time, regular part-time service, and per diem/casual service and maintenance Employees, including certified nurses assistants (CNAs), dietary aides, cooks, head cooks, housekeeping, laundry and maintenance Employees, central supply clerks, scheduler, rehabilitations aides, recreation assistants and receptionists employed by Respondent at its Westport facility, but excluding all other Employees, registered nurses (RNs), social workers, licensed practical nurses (LPNs), and other technical Employees, therapeutic recreation directors, medical records clerks, payroll clerk and guards, professional Employees and supervisors as defined in the Act.

(b) Threatening to call the police in response to employees' protected concerted or union activities.

(c) Unilaterally changing terms and conditions of employment of its employees by discontinuing its practice of including all time encompassed by lunch and breaks in tallying its employees' daily "hours worked" for purposes of calculating overtime payments and implementing a new policy and practice excluding time taken on these breaks and by implementing a new eligibility standard for payment at the premium rate for hours worked on holidays by its employees.

(d) Modifying the contract's terms of its laundry and housekeeping employees without the Union's consent by conditioning its employees' rehire on the condition that they become new employees with loss of salary, benefits, and seniority and by changing terms and conditions of employment of its employees without notifying or bargaining with the Union over such changes and by failing to bargain with the Union concerning the terms of the employees' re-employment with it after being subcontracted to a subcontractor.

(e) Laying off and/or refusing to hire its employees without notifying or bargaining with the Union covering its decision to layoff their employees or not to hire them, laying off or terminating its employees in violation of its collective-bargaining agreement with the Union.

(f) In any like or related manner, interfering with, restraining, or coercing employees in the exercise of their rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Within 14 days from the date of the this Order, offer Myrna Harrison and Newton Daye full reinstatement to their former jobs or, if that job no longer exists, to a substantially equivalent position, without prejudice to their seniority or any other rights or privileges previously enjoyed.

(b) Make Myrna Harrison and Newton Daye whole for any loss of earnings and other benefits suffered as a result of the discrimination against them in the manner set forth in the remedy section of the decision.

(c) Within 14 days from the date of this Order, remove from its files any reference to the layoff or refusal to hire of Harrison and Daye, and within 3 days thereafter notify the employees in writing that this has been done and that the layoffs will not be used against them in any way.

(d) Make whole its employees for their loss of wages and benefits that resulted from the modification of the contract terms of its laundry and housekeeping employees and from the unlawful change of the practices calculating overtime and breaks of its employees, plus interest.

(e) Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

(f) Rescind the modification in its contract, including changes in salary, seniority and benefits and restore the employees' terms and conditions of these employees to what they were prior to its unlawful modification of the contract.

(g) Discontinue its practice of excluding all time encompassed by lunch and breaks in tallying employees' daily "hours worked" for purposes of calculating overtime payments and rescind its new eligibility standard for payment at premium rate for hours worked on holidays by its employees.

(h) On request, bargain in good faith with the Union concerning the terms and conditions of employment of the employees employed in the appropriate unit described above.

(i) Within 14 days after service by the Region, post at its Westport, Connecticut facility copies of the attached notice marked "Appendix C."[39] Copies of the notice, on forms provided by the Regional Director for Region 34, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. If the Respondent has gone out of business or closed the facility in-

---

[39] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

volved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since March 1, 2010.

(j) Within 21 days after service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

D. The Respondent, 240 Church Street Operating Company II, LLC (Newington), Newington, Connecticut, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Refusing to bargain collectively and in good faith with the Union concerning employees employed in the following appropriate unit:

> All full-time, part-time, and per diem/casual service and maintenance Employees, including current categories and future new and changed jobs in the service and maintenance bargaining unit including certified nursing assistants, physical therapy aides, housekeeping Employees, central supply clerks, nursing office secretary, secretary-receptionist, receptionists, medical records clerk- receptionist, maintenance Employees, social service designee, therapeutic recreational directors, recreation aides, Registered Nurses and Licensed Practical Nurses employed by Respondent including any new or expanded locations of Respondent but excluding all other Employees, guards, professional Employees and supervisors as defined in the Act.

(b) Unilaterally changing terms and conditions of employment of its employees by discontinuing its practice of including all time encompassed by lunch and breaks in tallying its employees' daily "hours worked" for purposes of calculating overtime payments and implementing a new policy and practice excluding time taken on these breaks and by implementing a new eligibility standard for payment at the premium rate for hours worked on holidays by its employees.

(c) Modifying the contract's terms of its laundry and housekeeping employees without the Union's consent by conditioning its employees' rehire on the condition that they become new employees with loss of salary, benefits and seniority and by changing terms and conditions of employment of its employees without notifying or bargaining with the Union over such changes and by failing to bargain with the Union concerning the terms of the employees' re-employment with it after being subcontracted to a subcontractor.

(d) In any like or related manner, interfering with, restraining, or coercing employees in the exercise of their rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Make whole its employees for their loss of wages and benefits that resulted from the modification of the contract terms of its laundry and housekeeping employees and from the unlawful change of the practices calculating overtime and breaks of its employees, plus interest.

(b) Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

(c) Rescind the modification in its contract, including changes in salary, seniority and benefits and restore the employees' terms and conditions of these employees to what they were prior to its unlawful modification of the contract.

(d) Discontinue its practice of excluding all time encompassed by lunch and breaks in tallying employees' daily "hours worked" for purposes of calculating overtime payments and rescind its new eligibility standard for payment at premium rate for hours worked on holidays by its employees.

(e) On request, bargain in good faith with the Union concerning the terms and conditions of employment of the employees employed in the appropriate unit described above.

(f) Within 14 days after service by the Region, post at its Newington, Connecticut facility copies of the attached notice marked "Appendix D."[40] Copies of the notice, on forms provided by the Regional Director for Region 34, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. If the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since March 1, 2010.

(g) Within 21 days after service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

E. The Respondent, 107 Osborne Street Operating Company II, LLC (Danbury), Danbury, Connecticut, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Refusing to bargain collectively and in good faith with the Union concerning employees employed in the following appropriate unit:

> All full-time, part-time, and per diem/casual RNs, LPNs, and service and maintenance Employees, including certified nurses assistants, therapy aides, housekeeping employees, dietary employees, cooks, laundry employees, payroll clerks, reha-

---

[40] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

78            DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

bilitation aides, therapeutic recreation directors, receptionists, and maintenance employees employed by Respondent at its 107 Osborne Ave., Danbury, Connecticut location, but excluding the Director of Nurses, the Assistant Director of Nurses, the infection control nurse, the resident care coordinator, the staff development nurses, the employee health nurses, shift supervisors, unit coordinators, but excluding all other Employees, guards, professional Employees and supervisors as defined in the Act.

(b) Failing to adhere to provisions of its collective-bargaining agreement with the Union by implementing a new eligibility standard for employees regarding holiday pay, personal days, vacation days, sick days and uniform allowance.

(c) Unilaterally changing terms and conditions of employment of its employees by discontinuing its practice of including all time encompassed by lunch and breaks in tallying its employees' daily "hours worked" for purposes of calculating overtime payments and implementing a new policy and practice excluding time taken on these breaks and by implementing a new eligibility standard for payment at the premium rate for hours worked on holidays by its employees.

(d) In any like or related manner, interfering with, restraining, or coercing employees in the exercise of their rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Make whole its employees for their loss of wages and benefits that resulted from the unlawful changes in eligibility standards, regarding holiday pay, personal days, vacation days, sick days, and uniform allowances and from the unlawful change of the practices calculating overtime and breaks of its employees, plus interest.

(b) Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

(c) Rescind its new eligibility standard for employees regarding holiday pay, personal days, vacation days, sick days and uniform allowance and restore the standards for eligibility that were in place prior to the changes.

(d) Discontinue its practice of excluding all time encompassed by lunch and breaks in tallying employees' daily "hours worked" for purposes of calculating overtime payments and rescind its new eligibility standard for payment at premium rate for hours worked on holidays by its employees.

(e) On request, bargain in good faith with the Union concerning the terms and conditions of employment of the employees employed in the appropriate unit described above.

(f) Within 14 days after service by the Region, post at its Danbury, Connecticut facility copies of the attached notice marked "Appendix E."[41] Copies of the notice, on forms provid-

ed by the Regional Director for Region 34, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. If the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since March 1, 2010.

(g) Within 21 days after service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

F. The Respondent, 341 Jordan Lane Operating Company II, LLC (Wethersfield), Wethersfield, Connecticut, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Refusing to bargain collectively and in good faith with the Union concerning employees employed in the following appropriate unit:

> All full-time, part-time, and per diem service and maintenance Employees, including certified nurses assistants, porters, activity assistants, housekeepers, dietary aides, cooks, cooks helpers, laundry aides, and maintenance Employees, but excluding all other professional Employees, all technical Employees, all business office clerical Employees and all guards, professional Employees and supervisors as defined in the National Labor Relations Act, employed at the Center, 341 Jordan Lane, Wethersfield, CT 06109.

(b) Failing to adhere to provisions of its collective-bargaining agreement with the Union by implementing a new eligibility standard for employees regarding holiday pay, personal days, vacation days, sick days and uniform allowance.

(c) Unilaterally changing terms and conditions of employment of its employees by discontinuing its practice of including all time encompassed by lunch and breaks in tallying its employees' daily "hours worked" for purposes of calculating overtime payments and implementing a new policy and practice excluding time taken on these breaks and by implementing a new eligibility standard for payment at the premium rate for hours worked on holidays by its employees.

(d) In any like or related manner, interfering with, restraining or coercing employees in the exercise of their rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

---

[41] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the Na-

tional Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

(a) Make whole its employees for their loss of wages and benefits that resulted from the unlawful changes in eligibility standards, regarding holiday pay, personal days, vacation days, sick days and uniform allowances and from the unlawful change of the practices calculating overtime and breaks of its employees, plus interest.

(b) Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

(c) Rescind the its new eligibility standard for employees regarding holiday pay, personal days, vacation days, sick days and uniform allowance and restore the standards for eligibility that were in place prior to the changes.

(d) Discontinue its practice of excluding all time encompassed by lunch and breaks in tallying employees' daily "hours worked" for purposes of calculating overtime payments and rescind its new eligibility standard for payment at premium rate for hours worked on holidays by its employees.

(e) On request, bargain in good faith with the Union concerning the terms and conditions of employment of the employees employed in the appropriate unit described above.

(f) Within 14 days after service by the Region, post at its Danbury, Connecticut facility copies of the attached notice marked "Appendix F."[42] Copies of the notice, on forms provided by the Regional Director for Region 34, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. If the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since March 1, 2010.

(g) Within 21 days after service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

G. The Respondent, 245 Orange Avenue Operating Company, LLC (West River), Milford, Connecticut, its officers, agents, successors, and assigns, shall

---

[42] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

1. Cease and desist from

(a) Refusing to bargain collectively and in good faith with the Union concerning employees employed in the following appropriate unit:

> All full-time, part-time, and per diem/casual service and maintenance and clerical Employees, including certified nurses assistants, occupational therapy aides, ward clerks, dietary aides, cooks, head cooks, housekeeping aides, laundry aides, assistant maintenance supervisor, recreation aides, physical therapy aides, central supply clerk, billing, collections and accounts receivable clerks and medical records clerks employed by Respondent at its 245 Orange Avenue, Milford, Connecticut facility, but excluding, receptionists, payroll/accounts payable clerks, computer operators, data entry clerks, admissions clerks, licensed practical nurses, registered dietetic technicians, rehabilitation therapy technicians, physical therapy assistants, dieticians, registered respiratory therapists, certified respiratory therapy technicians, speech pathologists, social workers, administrative assistants, marketing director, manager of case management, head receptionist/secretary, executive chef, managerial Employees, confidential Employees, technical Employees and all guards, professional Employees and supervisors as defined in the Act.

(b) Unilaterally changing terms and conditions of employment of its employees by discontinuing its practice of including all time encompassed by lunch and breaks in tallying its employees' daily "hours worked" for purposes of calculating overtime payments and implementing a new policy and practice excluding time taken on these breaks and by implementing a new eligibility standard for payment at the premium rate for hours worked on holidays by its employees.

(c) In any like or related manner, interfering with, restraining, or coercing employees in the exercise of their rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Make whole its employees for their loss of wages and benefits that resulted from the unlawful change of the practices calculating overtime and breaks of its employees, plus interest.

(b) Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

(c) Discontinue its practice of excluding all time encompassed by lunch and breaks in tallying employees' daily "hours worked" for purposes of calculating overtime payments and rescind its new eligibility standard for payment at premium rate for hours worked on holidays by its employees.

(d) On request, bargain in good faith with the Union concerning the terms and conditions of employment of the employees employed in the appropriate unit described above.

(e) Within 14 days after service by the Region, post at its Milford, Connecticut facility copies of the attached notice

marked "Appendix G."[43] Copies of the notice, on forms provided by the Regional Director for Region 34, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. If the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by Respondent at any time since March 1, 2010.

(f) Within 21 days after service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

Dated, Washington, D.C., August 1, 2012.

APPENDIX A

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

WE WILL NOT fail or refuse to bargain collectively and in good faith with the Union concerning employees employed in appropriate units in Danbury, Connecticut (Danbury), Stamford, Connecticut (Long Ridge), Newington, Connecticut (Newington), Milford, Connecticut (West River), Westport, Connecticut (Westport), and Wethersfield, Connecticut (Wethersfield).

WE WILL NOT threaten to call the police in response to employees' protected concerted or union activities.

WE WILL NOT fail and refuse to supply timely and complete information requested by the Union.

WE WILL NOT fail to adhere to the provisions of our collec-

tive-bargaining agreement with the Union by laying off our employees at Long Ridge without providing the Union with a 45-day notice of the layoffs without the Union's consent.

WE WILL NOT fail to adhere to provisions of our collective-bargaining agreement with the Union by implementing a new eligibility standard for employees at Danbury and Wethersfield regarding holiday pay, personal days, vacation days, sick days and uniform allowance.

WE WILL NOT unilaterally change terms and conditions of employment of our employees at Danbury, Long Ridge, Newington, West River, Westport, and Wethersfield by discontinuing our practice of including all time encompassed by lunch and breaks in tallying our employees' daily "hours worked" for purposes of calculating overtime payments and implementing a new policy and practice excluding time taken on these breaks and by implementing a new eligibility standard for payment at the premium rate for hours worked on holidays by our employees.

WE WILL NOT modify the contracts' terms of our laundry and housekeeping employees at Long Ridge, Westport, and Newington without the Union's consent by conditioning our employees' rehire on the condition that they become new employees with loss of salary, benefits and seniority and by changing terms and conditions of employment of our employees without notifying or bargaining with the Union over such changes or by failing to bargain with the Union concerning the terms of the employees' re-employment with us after being subcontracted to a subcontractor.

WE WILL NOT lay off and/or refuse to hire our employees at Westport without notifying or bargaining with the Union concerning our decision to layoff these employees or not to hire them, lay off or terminate our employees in violation of our collective-bargaining agreement with the Union.

WE WILL NOT in any like or related manner, interfere with, restrain, or coerce employees in the exercise of their rights guaranteed them by Section 7 of the Act.

WE WILL within 14 days from the date of the this Order, offer Myrna Harrison and Newton Daye full reinstatement to their former jobs at Westport or, if that job no longer exists, to a substantially equivalent position, without prejudice to their seniority or any other rights or privileges previously enjoyed.

WE WILL make Myrna Harrison and Newton Daye whole for any loss of earnings and other benefits suffered as a result of the discrimination against them, plus interest.

WE WILL within 14 days from the date of this Order, remove from our files any reference to the layoff or refusal to hire of Harrison and Daye, and within 3 days thereafter notify the employees in writing that this has been done and that the layoffs will not be used against them in any way.

WE WILL make whole the employees for their loss of wages and benefits that resulted from the unlawful layoff of employees employed by Long Ridge and that resulted from the unlawful changes in eligibility standards for employees employed by Wethersfield and Danbury regarding holiday pay, personal days, vacation days, sick days and uniform allowances and from the unlawful change of the practices calculating overtime and breaks of employees employed by Long Ridge, Weth-

---

[43] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

ersfield, Danbury, Newington, West River and Westport, plus interest.

WE WILL rescind the modification in our contracts covering employees employed by Newington, Long Ridge, and Westport, including changes in salary, seniority and benefits and restore the employees' terms and conditions of these employees to what they were prior to our unlawful modification of the contracts.

WE WILL discontinue our practice of excluding all time encompassed by lunch and breaks in tallying employees' daily "hours worked" for purposes of calculating overtime payments and rescind our new eligibility standard for payment at premium rate for hours worked on holidays by our employees employed by Respondents Newington, Westport, Long Ridge, Wethersfield, West River, and Danbury.

WE WILL rescind our new eligibility standard for employees employed by Wethersfield and Danbury regarding holiday pay, personal days, vacation days, sick days and uniform allowance and restore the standards for eligibility that were in place prior to the changes.

WE WILL on request, bargain in good faith with the Union concerning the terms and conditions of employment of the employees employed in the appropriate units by us and by Danbury, Long Ridge, Newington, Westport, West River, and Wethersfield.

HEALTHBRIDGE MANAGEMENT

### APPENDIX B

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

### FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union

Choose representatives to bargain with us on your behalf

Act together with other employees for your benefit and protection

Choose not to engage in any of these protected activities.

WE WILL NOT fail or refuse to bargain collectively and in good faith with the Union concerning employees employed in the following appropriate unit:

All full-time, part-time, and per diem/casual service and maintenance Employees, including certified nurses assistants (CNAs), therapy technicians, housekeeping aides, dietary Employees, laundry aides, central supply clerks, relief cooks, unit secretaries, receptionists, medical records clerks, maintenance Employees, Registered Nurses and Licensed Practical Nurses employed by Long Ridge, including any new or expanded locations of Long Ridge, but excluding all other Employees, cooks, guards, other professional employees and supervisors as defined in the Act, as amended to date.

WE WILL NOT fail and refuse to supply timely and complete information requested by the Union.

WE WILL NOT fail to adhere to the provisions of our collective-bargaining agreement with the Union by laying off our employees without providing the Union with a 45-day notice of the layoffs without the Union's consent.

WE WILL NOT unilaterally change terms and conditions of employment of our employees by discontinuing our practice of including all time encompassed by lunch and breaks in tallying our employees' daily "hours worked" for purposes of calculating overtime payments and implementing a new policy and practice excluding time taken on these breaks and by implementing a new eligibility standard for payment at the premium rate for hours worked on holidays by our employees.

WE WILL NOT modify the contract's terms of our laundry and housekeeping employees without the Union's consent by conditioning our employees' rehire on the condition that they become new employees with loss of salary, benefits and seniority and by changing terms and conditions of employment of our employees without notifying or bargaining with the Union over such changes or by failing to bargain with the Union concerning the terms of the employees' re-employment with us after being subcontracted to a subcontractor.

WE WILL NOT in any like or related manner, interfere with, restrain, or coerce employees in the exercise of their rights guaranteed them by Section 7 of the Act.

WE WILL make whole our employees for their loss of wages and benefits that resulted from the modification of the contract terms of our laundry and housekeeping employees and that resulted from the unlawful change of the practices calculating overtime and breaks of our employees, plus interest.

WE WILL rescind the modification in our contract, including changes in salary, seniority, and benefits and restore the employees' terms and conditions of these employees to what they were prior to our unlawful modification of the contract.

WE WILL discontinue our practice of excluding all time encompassed by lunch and breaks in tallying employees' daily "hours worked" for purposes of calculating overtime payments and rescind our new eligibility standard for payment at premium rate for hours worked on holidays by our employees.

WE WILL on request, bargain in good faith with the Union concerning the terms and conditions of employment of the employees employed in the appropriate unit described above.

710 LONG RIDGE ROAD OPERATING COMPANY II, LLC
(LONG RIDGE)

### APPENDIX C

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

### FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union

Choose representatives to bargain with us on your behalf

Act together with other employees for your benefit and protection

Choose not to engage in any of these protected activities.

WE WILL NOT fail or refuse to bargain collectively and in good faith with the Union concerning employees employed in the following appropriate unit:

All full-time, regular part-time service, and per diem/casual service and maintenance Employees, including certified nurses assistants (CNAs), dietary aides, cooks, head cooks, housekeeping, laundry and maintenance Employees, central supply clerks, scheduler, rehabilitations aides, recreation assistants and receptionists employed by Respondent at its Westport facility, but excluding all other Employees, registered nurses (RNs), social workers, licensed practical nurses (LPNs), and other technical Employees, therapeutic recreation directors, medical records clerks, payroll clerk and guards, professional Employees and supervisors as defined in the Act.

WE WILL NOT threaten to call the police in response to employees' protected concerted or union activities.

WE WILL NOT unilaterally change terms and conditions of employment of our employees by discontinuing our practice of including all time encompassed by lunch and breaks in tallying our employees' daily "hours worked" for purposes of calculating overtime payments and implementing a new policy and practice excluding time taken on these breaks and by implementing a new eligibility standard for payment at the premium rate for hours worked on holidays by our employees.

WE WILL NOT modify the contract's terms of our laundry and housekeeping employees without the Union's consent by conditioning our employees' rehire on the condition that they become new employees with loss of salary, benefits and seniority and by changing terms and conditions of employment of our employees without notifying or bargaining with the Union over such changes or by failing to bargain with the Union concerning the terms of the employees' re-employment with us after being subcontracted to a subcontractor.

WE WILL NOT lay off and/or refuse to hire our employees without notifying or bargaining with the Union covering our decision to layoff our employees or not to hire them, laying off or terminating our employees in violation of our collective-bargaining agreement with the Union.

WE WILL NOT in any like or related manner, interfere with, restrain, or coerce employees in the exercise of their rights guaranteed them by Section 7 of the Act.

WE WILL within 14 days from the date of the this Order, offer Myrna Harrison and Newton Daye full reinstatement to their former jobs or, if that job no longer exists, to a substantially equivalent position, without prejudice to their seniority or any other rights or privileges previously enjoyed.

WE WILL make Myrna Harrison and Newton Daye whole for any loss of earnings and other benefits suffered as a result of the discrimination against them, plus interest.

WE WILL within 14 days from the date of this Order, remove from our files any reference to the layoff or refusal to hire of Harrison and Daye, and within 3 days thereafter notify the employees in writing that this has been done and that the layoffs will not be used against them in any way.

WE WILL make whole our employees for their loss of wages and benefits that resulted from the modification of the contract terms of our laundry and housekeeping employees and from the unlawful change of the practices calculating overtime and breaks of our employees, plus interest.

WE WILL rescind the modification in our contract, including changes in salary, seniority and benefits and restore the employees' terms and conditions of these employees to what they were prior to its unlawful modification of the contract.

WE WILL discontinue our practice of excluding all time encompassed by lunch and breaks in tallying employees' daily "hours worked" for purposes of calculating overtime payments and rescind our new eligibility standard for payment at premium rate for hours worked on holidays by our employees.

WE WILL on request, bargain in good faith with the Union concerning the terms and conditions of employment of the employees employed in the appropriate unit described above.

1 BURR ROAD OPERATING COMPANY II, LLC (WESTPORT)

## APPENDIX D

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

### FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union

Choose representatives to bargain with us on your behalf

Act together with other employees for your benefit and protection

Choose not to engage in any of these protected activities.

WE WILL NOT fail or refuse to bargain collectively and in good faith with the Union concerning employees employed in the following appropriate unit:

All full-time, part-time, and per diem/casual service and maintenance Employees, including current categories and future new and changed jobs in the service and maintenance bargaining unit including certified nursing assistants, physical therapy aides, housekeeping Employees, central supply clerks, nursing office secretary, secretary-receptionist, receptionists, medical records clerk- receptionist, maintenance Employees, social service designee, therapeutic recreational di-

rectors, recreation aides, Registered Nurses and Licensed Practical Nurses employed by Respondent including any new or expanded locations of Respondent but excluding all other Employees, guards, professional Employees and supervisors as defined in the Act.

WE WILL NOT unilaterally change terms and conditions of employment of our employees by discontinuing our practice of including all time encompassed by lunch and breaks in tallying our employees' daily "hours worked" for purposes of calculating overtime payments and implementing a new policy and practice excluding time taken on these breaks and by implementing a new eligibility standard for payment at the premium rate for hours worked on holidays by our employees.

WE WILL NOT modify the contract's terms of our laundry and housekeeping employees without the Union's consent by conditioning our employees' rehire on the condition that they become new employees with loss of salary, benefits and seniority and by changing terms and conditions of employment of our employees without notifying or bargaining with the Union over such changes or by failing to bargain with the Union concerning the terms of the employees' re-employment with us after being subcontracted to a subcontractor.

WE WILL in any like or related manner, interfere with, restrain, or coerce employees in the exercise of their rights guaranteed them by Section 7 of the Act.

WE WILL make whole our employees for their loss of wages and benefits that resulted from the modification of the contract terms of our laundry and housekeeping employees and from the unlawful change of the practices calculating overtime and breaks of our employees.

WE WILL rescind the modification in our contract, including changes in salary, seniority and benefits and restore the employees' terms and conditions of these employees to what they were prior to our unlawful modification of the contract.

WE WILL discontinue our practice of excluding all time encompassed by lunch and breaks in tallying employees' daily "hours worked" for purposes of calculating overtime payments and rescind our new eligibility standard for payment at premium rate for hours worked on holidays by our employees, plus interest.

WE WILL on request, bargain in good faith with the Union concerning the terms and conditions of employment of the employees employed in the appropriate unit described above.

240 CHURCH STREET OPERATING COMPANY II, LLC (NEWINGTON)

APPENDIX E

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

WE WILL NOT fail or refuse to bargain collectively and in good faith with the Union concerning employees employed in the following appropriate unit:

All full-time, part-time, and per diem/casual RNs, LPNs, and service and maintenance Employees, including certified nurses assistants, therapy aides, housekeeping employees, dietary employees, cooks, laundry employees, payroll clerks, rehabilitation aides, therapeutic recreation directors, receptionists, and maintenance employees employed by Respondent at its 107 Osborne Ave., Danbury, Connecticut location, but excluding the Director of Nurses, the Assistant Director of Nurses, the infection control nurse, the resident care coordinator, the staff development nurses, the employee health nurses, shift supervisors, unit coordinators, but excluding all other Employees, guards, professional Employees and supervisors as defined in the Act.

WE WILL NOT fail to adhere to provisions of our collective-bargaining agreement with the Union by implementing a new eligibility standard for employees regarding holiday pay, personal days, vacation days, sick days and uniform allowance.

WE WILL NOT unilaterally change terms and conditions of employment of our employees by discontinuing our practice of including all time encompassed by lunch and breaks in tallying our employees' daily "hours worked" for purposes of calculating overtime payments and implementing a new policy and practice excluding time taken on these breaks and by implementing a new eligibility standard for payment at the premium rate for hours worked on holidays by our employees.

WE WILL NOT in any like or related manner, interfere with, restrain, or coerce employees in the exercise of their rights guaranteed them by Section 7 of the Act.

WE WILL make whole our employees for their loss of wages and benefits that resulted from the unlawful changes in eligibility standards, regarding holiday pay, personal days, vacation days, sick days, and uniform allowances and from the unlawful change of the practices calculating overtime and breaks of our employees, plus interest.

WE WILL rescind the our new eligibility standard for employees regarding holiday pay, personal days, vacation days, sick days and uniform allowance and restore the standards for eligibility that were in place prior to the changes.

WE WILL discontinue our practice of excluding all time encompassed by lunch and breaks in tallying employees' daily "hours worked" for purposes of calculating overtime payments and rescind our new eligibility standard for payment at premium rate for hours worked on holidays by our employees.

WE WILL on request, bargain in good faith with the Union concerning the terms and conditions of employment of the employees employed in the appropriate unit described above.

107 OSBORNE STREET OPERATING COMPANY II, LLC (DANBURY)

## APPENDIX F

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

### FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

WE WILL NOT fail or refuse to bargain collectively and in good faith with the Union concerning employees employed in the following appropriate unit:

All full-time, part-time, and per diem service and maintenance Employees, including certified nurses assistants, porters, activity assistants, housekeepers, dietary aides, cooks, cooks helpers, laundry aides, and maintenance Employees, but excluding all other professional Employees, all technical Employees, all business office clerical Employees and all guards, professional Employees and supervisors as defined in the National Labor Relations Act, employed at the Center, 341 Jordan Lane, Wethersfield, CT 06109.

WE WILL NOT fail to adhere to provisions of our collective-bargaining agreement with the Union by implementing a new eligibility standard for employees regarding holiday pay, personal days, vacation days, sick days, and uniform allowance.

WE WILL NOT unilaterally change terms and conditions of employment of our employees by discontinuing our practice of including all time encompassed by lunch and breaks in tallying our employees' daily "hours worked" for purposes of calculating overtime payments and implementing a new policy and practice excluding time taken on these breaks and by implementing a new eligibility standard for payment at the premium rate for hours worked on holidays by our employees.

WE WILL NOT in any like or related manner, interfere with, restrain, or coerce employees in the exercise of their rights guaranteed them by Section 7 of the Act.

WE WILL make whole our employees for their loss of wages and benefits that resulted from the unlawful changes in eligibility standards, regarding holiday pay, personal days, vacation days, sick days, and uniform allowances and from the unlawful

change of the practices calculating overtime and breaks of our employees, plus interest.

WE WILL rescind the our new eligibility standard for employees regarding holiday pay, personal days, vacation days, sick days, and uniform allowance and restore the standards for eligibility that were in place prior to the changes.

WE WILL discontinue our practice of excluding all time encompassed by lunch and breaks in tallying employees' daily "hours worked" for purposes of calculating overtime payments and rescind our new eligibility standard for payment at premium rate for hours worked on holidays by our employees.

WE WILL on request, bargain in good faith with the Union concerning the terms and conditions of employment of the employees employed in the appropriate unit described above.

341 JORDAN LANE OPERATING COMPANY II, LLC (WETHERSFIELD)

## APPENDIX G

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

### FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

WE WILL NOT fail or refuse to bargain collectively and in good faith with the Union concerning employees employed in the following appropriate unit:

All full-time, part-time, and per diem/casual service and maintenance and clerical Employees, including certified nurses assistants, occupational therapy aides, ward clerks, dietary aides, cooks, head cooks, housekeeping aides, laundry aides, assistant maintenance supervisor, recreation aides, physical therapy aides, central supply clerk, billing, collections and accounts receivable clerks and medical records clerks employed by Respondent at its 245 Orange Avenue, Milford, Connecticut facility, but excluding, receptionists, payroll/accounts payable clerks, computer operators, data entry clerks, admissions clerks, licensed practical nurses, registered dietetic technicians, rehabilitation therapy technicians, physical therapy assistants, dieticians, registered respiratory therapists, certified respiratory therapy technicians, speech pathologists, social workers, administrative assistants, marketing director, manager of case management, head receptionist/secretary, executive chef, managerial Employees, confidential Employees, technical Employees and all guards, professional Employees and supervisors as defined in the Act.

WE WILL NOT unilaterally change terms and conditions of employment of our employees by discontinuing our practice of including all time encompassed by lunch and breaks in tallying our employees' daily "hours worked" for purposes of calculating overtime payments and implementing a new policy and practice excluding time taken on these breaks and by implementing a new eligibility standard for payment at the premium rate for hours worked on holidays by our employees.

WE WILL NOT in any like or related manner, interfere with, restrain, or coerce employees in the exercise of their rights guaranteed them by Section 7 of the Act.

WE WILL make whole our employees for their loss of wages and benefits that resulted from the unlawful change of the practices calculating overtime and breaks of our employees, plus interest.

WE WILL discontinue our practice of excluding all time encompassed by lunch and breaks in tallying employees' daily "hours worked" for purposes of calculating overtime payments and rescind our new eligibility standard for payment at premium rate for hours worked on holidays by our employees.

WE WILL on request, bargain in good faith with the Union concerning the terms and conditions of employment of the employees employed in the appropriate unit described above.

245 ORANGE AVENUE OPERATING COMPANY II, LLC (WEST RIVER)